FILED
BD
2014 Nov. 10 PM 2: 38

CLERK [?] COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE FLORIDA

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

UNITED STATES OF AMERICA
*ex rel.* 84Partners LLC,

    Plaintiff and Relator,

        v.

NUFLO, INC., SYNERGY FLOW
SYSTEMS, LLC, GENERAL DYNAMICS,
MARINE SYSTEMS DIVISION, ELECTRIC
BOAT CORP., and HUNTINGTON
INGALLS INDUSTRIES, NEWPORT
NEWS SHIPBUILDING DIVISION,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 3:14 cv 1256-J-32 PDB

Judge: _____

**FILED *IN CAMERA* AND
UNDER SEAL PURSUANT TO
31 U.S.C. § 3730(b)(2)**

**DO NOT SERVE**

## COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

**I.      INTRODUCTION.**

1.      Qui Tam Relator 84Partners LLC (hereinafter "Relator") brings this action
on behalf of the United States of America and itself to recover damages and penalties
under the False Claims Act, 31 U.S.C. § 3729 *et seq.,* against Defendants Nuflo, Inc.
(Nuflo), Synergy Flow Systems, LLC (SFS), General Dynamics, Marine Systems
Division, Electric Boat Corporation (Electric Boat), and Newport News Shipbuilding, a
division of Huntington Ingalls Industries, (NNS) (collectively, "Defendants").  Defendants
have submitted or caused the submission of false claims for payment to the United
States, and made false records or statements material to false claims under
government contracts for ships and boats, including submarines, containing
nonconforming parts, to include critically-important parts designated Level 1, Level N
and SUBSAFE.

S-3

2.      This complaint details conduct by Defendants that caused nonconforming parts to be sold and delivered to the Unites States under government contracts in violation of the False Claims Act, 31 U.S.C. 3729 *et seq*.  The parts, which are manufactured and/or assembled by defendant Nuflo, are not properly manufactured and assembled, and Nuflo has failed and continues to fail in myriad ways to utilize and enforce the quality systems which are required by all of the contracts pursuant to which the United States purchases these parts.

3.      The parts at issue are delivered to the United States both directly by Nuflo, and by prime contracts with Electric Boat and NNS as part of finished equipment or as spares.  Nuflo also utilizes a sham corporation, SFS to sell some of these parts to the prime contractors.  Electric Boat and NNS subcontract with Nuflo, Inc. and/or SFS to purchase the parts, which are required to be manufactured and assembled to conform to government contracts.

4.      Electric Boat and NNS certify to the United States that the parts in question conform to drawings, specifications and quality procedures when the parts do not, in fact, conform to those requirements.

II.      **JURISDICTION AND VENUE.**

5.      This action arises under the United States Civil False Claims Act, 31 U.S.C. § 3729 *et seq*.

6.      This Court has jurisdiction of the subject matter of this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331 and has personal jurisdiction over Defendants, all of whom do business in this District.

7.     Venue is proper in this District under 28 U.S.C. § 1391 and 31 U.S.C. §3732(a) because Defendants operate and transact business within this District.

8.     The facts and circumstances alleged in this complaint have not been publicly disclosed in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or from the news media.

9.     Relator is the "original source" of the information upon which this complaint is based, as that term is used in the False Claims Act and other laws at issue herein.

10.     Prior to filing this action, Relator voluntarily disclosed to the United States the information on which their allegations are based.  Additionally, should there have been a public disclosure of any aspect of these allegations prior to the filing of this action, Relator has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions.

III.     **PARTIES.**

11.     The real party in interest to the claims set forth herein is the United States of America.

12.     Relator 84Partners LLC is a Delaware corporation, whose members are personally aware of the fraud alleged.

13.     Defendant Nuflo is a Florida corporation located at 3440 Evergreen Avenue, Suite 1, Jacksonville, Florida.  Nuflo manufactures, supplies and distributes elbows, tees, couplings, bushings, flanges, pipe flanges, tailpieces, threadpieces, nuts, adapters, deck drains, metallic tubes, stuffing tubes, vent & drains, sleeves,

3

sightglasses, hose assemblies, hydraulic cylinders, and seamless tubing through direct sales to the United States and sales to prime contractors to the United States. For the period January 6, 2003 to June 4, 2014, Nuflo had at least 591 direct contracts with the U.S. government, to include 441 contracts related to the Department of the Navy (Navy); 146 with the U.S. Defense Logistics Agency (DLA) and four with the U.S. Defense Contract Management Agency (DCMA). The total obligated funds for those contract actions was $5,965,864.91. In addition to these direct sales, Nuflo has subcontracts for the provision of products to the United States, including with Defendants Electric Boat Corporation and Newport News Shipbuilding. Nuflo has approximately 40 employees, and an annual revenue of $15,000,000.

14.     Defendant SFS is a Virginia limited liability corporation located in Newport News, Virginia. SFS is used by Nuflo to supply Nuflo products to prime contractors. For the period December 7, 2009 to September 6, 2012, SFS also had five direct contracts with the United States, to include four with the Navy and one with DLA. The total obligated funds for those direct contract actions during the period was $64,191. As of September 3, 2014, SFS reported that it had approximately five employees, and an annual revenue in 2012 of $5,000,000.

15.     Defendant Electric Boat Corporation is a Delaware corporation with its principal place of business in Groton, Connecticut. Electric Boat is a wholly-owned subsidiary of General Dynamics Corporation. General Dynamics is a Delaware corporation with its principal place of business in Falls Church, Virginia. In the General Dynamic's 2013 annual report, the company reported operating through four business groups, including the Marine Systems Group, which includes Electric Boat. On or about

4

August 14, 2003, Electric Boat was awarded multiyear contract number N00024-03-C-2101 in the amount of $8,687,903,765 for the construction, final assembly, test and delivery of six Virginia Class Submarines for the United States Navy.  On or about December 22, 2008, Electric Boat was awarded multiyear contract number N00024-09-C-2104 in the amount of $14,011,153,663 for the construction, final assembly, test and delivery of eight Virginia Class Submarines for the United States Navy.  On or about April 2014, the Navy awarded Electric Boat a fixed-price incentive multiyear contract valued at $17.645 billion for the construction of 10 additional Virginia-class submarines. NNS, or its predecessor Northrup Grumman Shipbuilding, is a major subcontractor for each of these contract awards.

16.     Defendant NNS is a Delaware corporation with its principal place of business in Newport News, Virginia.  NNS is a division of Huntington Ingalls Industries (HII) which was founded on March 30, 2011, when Northrop Grumman Corporation spun off its shipbuilding capabilities.  HII is a Delaware Corporation with its principal place of business in Newport News, Virginia.  In HII's annual report and Form 10-K filing in 2011, it stated that revenues from the U.S. Government accounted for "substantially all" of its total revenues.  In 2011, approximately 97% of revenues were from the U.S. Navy and approximately 3% were generated from the U.S. Coast Guard.  In 2011, HII total sales and service revenues were $6.575 billion ($3.766 at Newport News and $2.885 at Ingalls Shipbuilding).  In a fact sheet dated July 22, 2014 (available at http://www.huntingtoningalls.com/about/docs/HII_Fact_Sheet.pdf), NNS reported it "is the nation's sole designer, builder and refueler of nuclear-powered aircraft carriers and one of only two shipyards capable of designing and building nuclear- powered sub-

marines." Northrop-Grumman Ship Building (NGSB), the predecessor of NNS, was the first tier subcontractor to Electric Boat for the 2003 and 2008 prime contract awards identified above. NNS is a major subcontractor for the 2014 prime contract awarded Electric Boat for the construction of 10 additional Virginia-class submarines. Defendants Electric Boat and NNS manufacture and deliver Virginia Class submarines to the United States under a joint production arrangement.

## IV.    FED. R. CIV. P 9(b) ALLEGATIONS.

17.    Some of the factual information necessary to prove the allegations in this Complaint is exclusively in the possession of either the Defendants or the United States.

18.    With respect to each allegation made on information and belief identifies a situation in which Relator has, based on their knowledge and experience, a reasoned factual basis to make but lack complete details.

19.    Relator is personally aware of the improper policies and practices of Defendant Nuflo, as well as its relationship with SFS, Electric Boat and NNS, and these Defendants' failure to properly ensure that Nuflo conformed to material quality requirements.

20.    However, Relator does not have access to all of the information regarding the claims for payment caused to be submitted by Defendants. This information is in the exclusive possession and control of the Defendants or the United States.

21.    Defendants have submitted or caused to be submitted, and continue to submit or cause the submission of, false claims to the United States for the delivery of nonconforming parts.

22.    Defendants' scheme has been in place since at least 2005 and is ongoing.

6

23.    The allegations in this Complaint are personally known to Relator unless specifically identified as being made on information or belief.

## IV.    FACTUAL ALLEGATIONS.

24.    Defendants' actions led to the delivery of nonconforming products to the United States.  These actions include systemic manufacturing and quality failures, including at least:

- Performance of improper welds;

- Performance of welding by unqualified welders;

- Failure to record rework on welding repairs;

- Failure to maintain traceability;

- Falsification of inspection reports;

- Requiring unqualified personnel to perform quality inspections;

- Use of uncalibrated or improperly-calibrated testing and measuring equipment;

- Failure to perform quality inspections;

- Failure to perform proper source inspections; and

- Inadequate receiving inspection and resulting loss of materials traceability.

### A.    LACK OF QUALITY CONTROL SYSTEM AT NUFLO.

25.    The prime contractors are required by their contracts with the United States to ensure that all parts delivered to the United States be manufactured, assembled, tested and inspected in an environment which is controlled by what is called a "quality control system."  These requirements are material to payment and are flowed down to Nuflo though purchase orders between the prime contractors and Nuflo.  The

purchase orders to Nuflo incorporate many requirements flowed down by the prime contractors, including drawing references, material specifications (to include heat-treat requirements), testing requirements, and quality requirements.

26.    A critically-important aspect of the intensive quality-assurance systems required by the Department of Defense (DOD) for military end items is "traceability."

27.    Traceability exists when there is objective evidence of conformance to all requirements, to include without limitation quantitative and qualitative data documenting all mechanical, chemical and performance tests required by applicable specifications, drawings and/or the procurement document, all of which combines to prove that the material supplied conforms to the specified requirements.  Traceability also establishes an evidence trail for every part, which permits the manufacturer, the prime contractor and the United States to verify with confidence that materials conform to requirements, that outsourced vendors are properly qualified and do proper work, that required processes were performed in proper sequence, that all operations were performed by qualified and properly-certified personnel and that required testing and inspections were performed in proper sequence.

28.    Traceability is defined by the Naval Sea Systems Command ("NAVSEA") as:

Physically marking or tagging (only when formally authorized by contract, specification or drawing) items with serial codes that directly relate to certified records (tests and inspection reports) displaying the same unique serial codes. The process of establishing traceability exists from the time the operation is performed until final shipboard installation, at which time the traceable nomenclature is documented on an installation record.  Traceability establishes documented evidence that the item supplied was manufactured and/or maintained in full compliance with the specifications, drawings, storage, packaging and handling requirements, and other associated requirements as required.  When required, the additional documentation is necessary to allow the

government to trace items back through the manufacturing process in the event of item failure.  When specified by contract, the traceable manufacturing process records are to be retained and/or provided, include date and place of actual manufacturing, and verification of all aspects of material, manufacture, special processing, personnel qualifications, assembly and test, non-destructive testing, inspection, installation, and repair.

NAVSEA Instruction 9078.1, May 1, 2007.

29.    Traceability is a critical prerequisite for the supply of parts to United States as part of military procurement contracts, and it is an important part of what they Navy pays for when it buys submarines.

30.    Nuflo has systematically ignored, and defeated, this critical requirement by abjectly failing to promulgate and comply with a proper quality system.  Rather, with the full knowledge and participation of its senior managers, Nuflo regularly and intentionally uses its purported quality apparatus to: (1) falsify the appearance of traceability which does not exist; and (2) falsify records purporting to show that parts were properly manufactured, assembled, inspected and tested when they were not.  Nuflo routinely fabricates material certifications, manufacturing certifications, vendor certifications, welding certifications and inspection certifications to create the false appearance of compliance with a quality system.  Nuflo uses its purported quality system as an artifice to cover up defects in materials, vendor compliance, manufacture, assembly, inspection, testing, and certification.

31.    As a result of the fraudulent application of Nuflo's sham quality system, all parts shipped by Nuflo are nonconforming to contract requirements and are of suspect integrity.  This condition dates to at least 2005 and is ongoing.

32.    The massive breakdown of Nuflo's quality system is exemplified by the following examples.

### 1.      Improper Weld Repairs to Falsify Conformances.

33.      Nuflo routinely performs welding operations with the purpose and effect of hiding defects on parts it manufactures and/or assembles.

34.      Welding is not an appropriate corrective action for many defects.  By welding over defects, Nuflo both fails to correct the pre-existing defects, and masks them from later detection through nondestructive testing.  Such welding renders the part nonconforming to contract requirements.

35.      Even when welding might be an appropriate corrective action for a properly-documented nonconformance in a part, the quality requirements of Defendants' contracts, and the overarching mandate of complete traceability, require that nonconformances be properly documented in a rejection record; that the planned weld repair be documented by work order; and inspected pursuant to the dictates of the quality system.  However, neither the defect nor the weld repair is recorded by Nuflo. Nor is the repaired component subject to nondestructive testing and inspection, which is not just required but which must be performed by qualified individuals and documented as part of the traceability package which must accompany all parts Nuflo delivers for use in military end items, including submarines.

36.      Nuflo routinely makes welding repairs without generating welding sketches or repair travelers, meaning that such repair welds are not traceable.  Further, Nuflo routinely fails to notify the prime contractors and receive approval prior to conducting the repairs.

37.     Weld repairs directed by Nuflo management are not only undocumented but the majority of such repairs were also inappropriate corrective actions for the defects presented.

38.     The majority of these welds were egregiously out of conformance with the rigorous quality requirements expected for military end item components.  For example, Nuflo management required its welders to:

- Weld over cracks, without documentation or proper non-destructive examination to ensure the part was conforming to specification;

- Weld in locations where the drawing did not permit welding, such as on the end preps of parts;

- Use weld wire to build wall thickness; and

- Use weld wire to fabricate parts such as flanges and sockets, without disclosing to the United States that the parts were made from material that had no traceability to a heat-treat lot, while falsifying or omitting certification of the source material.

39.     Nuflo management ordered its welders to engage in each of these practices since at least 2005.

40.     Relator estimates that 50% of parts delivered by Nuflo to the United States have been improperly welded.  The lack of proper documentation and the resulting failure to meet traceability requirements make it impossible to determine which components were and which were not improperly welded.  All such parts shipped by Nuflo are nonconforming to contract requirements and of suspect integrity.  This condition has existed since at least 2005 and is ongoing.

41.     Nuflo's failure to generate documentation for the vast majority of welding in its facility renders those weld repairs untraceable, in violation of the contractual specifications for products supplied to the United States.  More alarmingly, Nuflo's

11

conduct calls into question the physical integrity of Nuflo products installed in Virginia class submarines and other DOD applications.

42.     Nuflo's conduct violates, or causes the violation of, material conditions of payment, and the resulting claims for payment are false claims.

## 2.     Falsified Heat Treat Numbers.

43.     Nuflo routinely fails to maintain documentation sufficient to establish traceability of materials used to make parts, because it intentionally changes heat lot numbers, which are codes assigned by steel mills, casting houses, or forgers to permit cradle-to-grave control over the parts.

44.     Every piece of raw material and every forging or casting used to make or assemble a Navy component must be traceable by means of a heat-lot number. Material validation is required to ensure that parts are manufactured from the specified materials. Just as important, the heat-lot number means that if a problem is identified with the material used in a part, the Navy, or other DoD agency, can capably determine what other parts were made from the same material in order to assess their safety and conformance. Notwithstanding the criticality of these requirements, Nuflo management instructs its quality inspectors to change heat lot numbers on parts to reflect conformity to requirements, when in fact other materials have been falsely substituted, without traceability.

45.     Nuflo marks new heat lot numbers on parts without verifying the conformance of the material to requirements by testing its chemical properties, and without any documentation of the false change.

46.    Nuflo's failure to maintain the traceability of materials violates the contractual specifications for products supplied to the United States, and destroys the integrity of the products installed in equipment used by the United States, including Virginia class submarines.

47.    Nuflo's conduct violates, or causes the violation of, material conditions of payment, and the resulting claims for payment are false claims.

### 3.    Failure to Perform Required Testing.

48.    Various forms of nondestructive testing ("NDT") are the way government contractors validate the conformance of components to contract specifications and drawing requirements, and are a critical and integral part of quality systems which are required to be in full force and effect at Nuflo.  Such methods of validation and verification are specified in the quality requirements flowed down to Nuflo. Notwithstanding these requirements, Nuflo routinely fails to conduct required NDT.

49.    One NDT method which is required to be utilized by Nuflo is liquid penetrant testing ("LPT") is used to ensure that parts are not cracked.  LPT is conducted by flowing a fluorescing medium across the surface of the part and examining it under ultraviolet light in order to inspect for variations in the surface of metal parts.  These tests are often omitted and are often performed by personnel who are not qualified to do so—which is the equivalent of not doing the test at all.

50.    Another NDT method which is required to be utilized by Nuflo is visual inspection, which can be performed with or without magnification and with or without close-tolerance measuring devices depending on requirements.  Visual inspection is required to ensure that parts conform to drawing requirements at various stages during

13

manufacture.  At Nuflo, however, visual inspections are often performed only after manufacture is complete, which means that required inspection of the internal surfaces of parts are skipped.

51.     Another method of inspection that Nuflo is required to perform is hydrostatic testing.  As the name implies, this is a pressure-test methodology which requires the flow path of the valve to be secured and water pressure applied to the valve to test for leaks.  Nuflo rarely, or never, performs this required testing.

52.     Another method of inspection is ultrasound testing.  Upon information and belief, Nuflo rarely, or never, performs this testing when required.

53.     Nuflo's failure to perform required NDT means that it has not assured, and cannot demonstrate, that the products it supplied to the United States conform to contract specifications and drawing requirements.  This failure calls into question the integrity of the products installed in equipment used by the United States, including Virginia class submarines.

54.     Nuflo's conduct violates, or causes the violation of, material conditions of payment, and the resulting claims for payment are false claims.

### 4.     Unqualified Personnel and Improper Inspections.

55.     Nuflo routinely allows improperly certified, or wholly-uncertified, personnel to perform procedures, tests, and inspections required to complete the manufacture and assembly of parts in conformity with contract and quality requirements.  All forms of NDT require training and familiarity with the equipment, means, and methods of the test, and NDT operators are required to be certified.  Typical certification programs allow

certification as Level I, Level II, and Level III test operators, and uncertified personnel are not permitted to perform any NDT operations.

56.     In order to create the fraudulent appearance that it employed properly-trained and –certified NDT operators, Nuflo gave unqualified, untrained employees the answers to NDT certification tests. These fraudulently-certified inspectors perform the overwhelming majority of visual inspections of parts.

57.     By way of example, Evan Licausi performed the following inspections the week of August 1, 2011, even before his sham inspection certification:

| Date | Job # | Customer | Fitting |
|------|-------|----------|---------|
| 8/1/11 | 64731-01 | SFS | 90 deg. ELL |
| 8/1/11 | 62578-01 | EB | Flange |
| 8/2/11 | 64806-01 | SFS | Flange |
| 8/2/11 | 64805-01 | SFS | Flange |
| 8/3/11 | 64804-01 | SFS | Flange |
| 8/3/11 | 64802-01 | SFS | Flange |
| 8/4/11 | 64801-01 | SFS | Tee |
| 8/4/11 | 64772-01 | SFS | Flange |

58.     Nuflo also causes a welder who is not certified as an inspector, Enrique Cintra, perform liquid penetrant testing (LPT).

59.     Also, for several months in 2012 and 2013, Nuflo management directed an improperly-supervised trainee, Dale Huggins, to perform many LPTs.

60.     Nuflo also regularly uses uncalibrated gages in its inspection of parts.

61.     Nuflo's use of improperly certified inspectors and uncalibrated equipment violates the contractual specifications for products supplied to the United States for use in submarines and other DOD applications.

62.     The above failures violate material conditions of payment of the United States.  In violating these material conditions of payment, Nuflo knowingly caused, and continues to cause, false claims to be submitted to the United States.

### 5.     **Falsification of Records.**

63.     Each part supplied to the United States, either directly or through its contractors, is accompanied by a documentation package which assures that the part has been manufactured, tested, inspected, and approved under the required contractual specifications.  These documents also allow the end user to verify the traceability of a particular part, from raw material to delivery.  This is often referred to as "cradle to grave" traceability.

64.     Nuflo routinely falsifies these documents.

65.     For example, Nuflo routinely marks the Traveler Record after the fact, just prior to delivering an end product.  The Traveler Record, however, is a document that follows the part and ensures that each part of the process is certified to be complete by both the technician performing the action (such as grinding, deburring, LP testing, pressure testing, or performing Quality Control) and the Quality Control Representative.

66.     Nuflo routinely completes the documents at the end of the process, falsifying that it was completed by the actual technicians or inspectors.  In addition, by doing so, Nuflo falsifies that it has assured that each part of the process actually occurred, which is a critical component of quality control.

16

67.     Nuflo's practice is to have personnel who did not perform the action falsely sign the Traveler Record, in order to represent that the action occurred when it did not, or that it had been performed by a qualified individual, when it did not.

68.     Nuflo also routinely substitutes stock parts when needed to fulfill an order to the United States, either directly or through a contractor.  These parts are often stored in stock without the required paperwork, such that the Traveler Record is blank or the accompanying documentation is missing.  Nuflo then falsifies the Traveler Record in order to supply the stock part to the United States.

69.     The above failures violate material conditions of payment of the United States.  In violating these material conditions of payment, Nuflo knowingly caused, and continues to cause, false claims to be submitted to the United States.

### B.     NUFLO'S FRAUDULENT USE OF SHAM CORPORATION SFS.

70.     Upon information and belief, Nuflo, through its officers, created a sham corporation, SFS, to supply products to the United States through direct sales and sales to prime contractors.

71.     SFS has no manufacturing capability.  Rather, it is a storage warehouse located in Virginia, near NNS's facility, with no machining capability and no quality system.

72.     SFS, which purportedly contracts with Nuflo, does nothing to monitor or audit the products which it receives from Nuflo.  SFS has no receiving inspection and has not conducted any audits of Nuflo quality procedures.  Instead, it is a shell company, created and operated for the purpose of accepting Nuflo parts and selling

them to prime contractors, with the false certification that such products conform to contractual specifications.

73.     SFS's and Nuflo's conduct violates material conditions of payment for products supplied to the United States.  In violating these material conditions of payment, SFS and Nuflo knowingly caused, and continues to cause, false claims to be submitted to the United States.

### C.     THE PRIME CONTRACTORS KNOWINGLY SUBMITTED CLAIMS TO THE UNITED STATES NOTWITHSTANDING THESE SERIOUS FAILURES.

74.     Electric Boat and NNS accept and sell Nuflo parts to the United States. Each of these defendants know, are deliberately ignorant, or are recklessly indifferent to the fact that Nuflo parts sold or delivered to the United States were not properly manufactured and that Nuflo failed in myriad ways to utilize and enforce the quality-system requirements which are mandated by all contracts pursuant to which these valves are made.

75.     Defendants certify to the United States that product manufactured by Nuflo conform to the contract requirements and quality procedures when they do not. As prime contractors, Defendants are required to ensure that all parts delivered to the United States be manufactured, tested, and inspected in a quality-controlled environment.  As part of their certifications, Defendants attest that they have performed functions ensuring quality control requirements flow down to subcontractors.

76.     On information and belief, Defendants failed to perform reasonable receiving inspections of Nuflo parts.  The welding defects are often of such blatant

nature that receiving inspection, had it been performed, would have uncovered the nonconformances.

77.     Defendants also failed to conduct adequate source inspections of Nuflo.

78.     By way of example, Electric Boat had a Quality Insurance Inspector physically visit Nuflo's plant periodically each year to ensure that Nuflo delivered conforming product. However, its inspector rarely, if ever, visited the floor to perform the inspections. Instead, Electric Boat continued (and continues) to accept product from Nuflo and did not effectively audit and require correction of Nuflo's quality and welding operations, choosing instead to allow Nuflo to remain out of control and continue delivering nonconforming products year after year.

79.     Instead of requiring that Nuflo implement a proper quality system, Electric Boat selected Nuflo as a supplier under its "Qualified Supplier Delegated Inspection Program (also called "SDIP", referred to herein as "Electric Boat Program")," which permits Nuflo to act on behalf of Electric Boat regarding inspection of hardware and review of deliverable documentation. Under that program, specific Nuflo personnel are identified as Supplier Delegated Inspectors and Supplier Delegated Analysts to act in lieu of Electric Boat Source Inspection and provide "necessary assurance that complete and fully satisfactory material is supplied to Electric Boat." These designations include Nuflo personnel Chris Moore, Steven Cefalu, Ryan Licausi, John Licausi and Burt Colbert.

80.     To qualify a supplier under its Program, Electric Boat promises that it will conduct initial and periodic on-site Quality Assurance System Survey/Evaluation to "assure compliance with contract and policy requirements." In addition, Electric Boat

represents that it will perform on-site evaluations to ensure the program is being adequately maintained, and that a compliance audit will be performed.  Electric Boat's Program further requires that the supplier must maintain a quality rating of 95% or greater to be and remain eligible for the program.  The Program also provides that the on-site evaluation and compliance audit may be performed by NNS and "will verify compliance by review of objective quality evidence contained in documentation, observation of actual practices, inspection of material, software, etc."

81.     On information and belief, the evaluation and audit required by Electric Boat's Program have not been performed.  Nuflo's practices and procedures do not provide any objective quality evidence of compliance with government contract requirements.  Indeed, during Electric Boat's Quality Inspector's periodic visits to the plant, he routinely does not performs an audit or evaluation of actual practices.

82.     Neither Electric Boat nor NNS personnel have performed on-site audits or evaluations which have routinely included observation of actual practices or inspections of material.  Defendants' audit and evaluation processes have deliberately ignored and/or recklessly disregarded the true state of the failed quality system at Nuflo.

83.     By way of example, after quality issues at Nuflo were initially flagged by NNS, it subsequently accepted Nuflo product distributed through sham company SFS. SFS, a storage warehouse located near NNS's facility, has no machining capability nor any quality system.  It is a warehouse where Nuflo products are received for shipping to NNS.  On information and belief, NNS has not inspected SFS, nor ensured in any way that SFS is conforming to the quality requirements of its contracts with the United

States.   Defendant NNS has deliberately ignored and/or recklessly disregarded the sham nature of SFS and its complete lack of a manufacturing or quality system.

84.     Defendants Electric Boat and NNS accept and sell Nuflo parts to the United States certified for conformance to material government contract requirements despite actual knowledge, deliberate ignorance, and/or reckless disregard of the false practices described above.

85.     Defendants' conduct results in false claims to the United States, both for parts directly sold to the United States by Nuflo, and for material installed in United States' vessels by prime contractors Electric Boat and NNS.   This conduct is ongoing, and has been occurring since at least 2005.

**COUNT I:  FALSE CLAIMS ACT VIOLATIONS**
**31 U.S.C. §§ 3729 *et seq.***

86.     The allegations in the foregoing paragraphs are re-alleged as if fully set forth herein.

87.     The False Claims Act, 31 U.S.C. § 3729(a)(1)(A) (B), (C), and (G) imposes liability upon, *inter alia*, those who knowingly cause to be presented false claims for payment or approval, and those who make or use, or cause to be made or used, false records or statements material to a false claim or to an obligation to pay money to the government, or those who knowingly conceal, improperly avoid or decreases an obligation to pay to money to the government, as well as those who conspire to do so.

88.     Defendants' systemic manufacturing and quality failures violated material conditions of payment of the resulting claims to the United States.

21

89.     Defendants' knowing conduct resulted in false claims for payment to be submitted to the United States, in violation of 31 U.S.C. §3729(a)(1)(A).

90.     In the furtherance of these schemes, Defendants also caused to be made or used false records or statements material to a false claim in violation of 31 U.S.C. § 3729(a)(1)(B).

91.     Defendants acted knowingly, as that term is used in the False Claims Act.

92.     Defendants conspired among and between themselves, and each of them engaged in one or more overt acts in furtherance of the conspiracy.

93.     The United States has been harmed in an amount equal to the value paid by the United States.

### PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of the United States and on its own behalf, demands judgment against Defendants, as follows:

A.     That this Court enter judgment against defendants, jointly and severally, in an amount equal to three times the amount of damages the United States Government has sustained because of each Defendants' actions, plus a civil penalty of $11,000 for each claim made in violation of 31 U.S.C. § 3729 *et seq.*, together with the costs of this action, with interest, including the cost to the United States Government for its expenses related to this action.

B.     That in the event the United States Government intervenes in this action, Relator be awarded 25% of any proceeds of the claim, and that in the event the United States Government does not intervene in this action, Relator be awarded 30% of any proceeds.

C.      That Relator be awarded all costs and attorneys' fees incurred in the prosecution of this action.

D.      That the United States and Relator receive all relief, both in law and in equity, to which they are entitled.

Respectfully submitted,

Jennifer M. Verkamp
Frederick M. Morgan, Jr.
MORGAN VERKAMP, LLC
35 East Seventh Street, Ste. 600
Cincinnati, Ohio  45202-2015
Tel. (513) 651-4400
Fax (513) 651-4405
jennifer.verkamp@morganverkamp.com
rick.morgan@morganverkamp.com

Kenneth J. Nolan (Local Counsel)
Florida Bar Number 603406
Nolan, Auerbach, and White, LLC
435 N.  Andrews Ave., Suite 401
Ft.  Lauderdale, FL 33301
Tel. (954) 779-3943
Fax (954) 779-3937
ken@whistleblowerfirm.com

*Counsel for Relator*

# DO NOT SERVE

# DO NOT PUT ON PACER