**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* | ) | |
| 84 Partners LLC, | ) | Case No. 3:14-cv-01256-TJC-PDB |
| Plaintiff, | ) | |
| | ) | Hon. Timothy J. Corrigan |
| v. | ) | |
| | ) | |
| GENERAL DYNAMICS ELECTRIC BOAT | ) | |
| CORP.; HUNTINGTON INGALLS | ) | |
| INDUSTRIES, NEWPORT NEWS | ) | |
| SHIPBUILDING DIVISION, | ) | |
| Defendants. | ) | |

**MOTION TO DISMISS OF**
**DEFENDANT GENERAL DYNAMICS ELECTRIC BOAT CORP.**

General Dynamics Electric Boat Corp. ("EB") moves for an order dismissing the Amended Complaint ("AC") for failing to state a claim and failing to plead fraud with particularity. *See* Fed. R. Civ. P. 8(a), 9(b), 12(b)(6); Local Rule 3.01(a).

## INTRODUCTION

This False Claims Act ("FCA") case concerns alleged fraud at one of the "thousands of subcontractors" providing parts for the nuclear submarines that EB builds for the U.S. Navy.  AC ¶ 33.  Mickey Skobic, a named member of the corporate relator, claims he participated in a years-long effort to defraud EB by conspiring with his coworkers to "[p]erform[] improper welds" on parts sold to EB, to "machine [the parts] to disguise" the welds, and to "regularly and intentionally falsify records." *Id.* ¶¶ 89, 92, 101, 124, 129.  After the original complaint was filed, Nuflo settled, and the United States declined to intervene against EB.  ECF Nos. 37, 51.  Relator has amended its complaint to focus on the claim that EB, and Huntington Ingalls Industries, Newport News Shipbuilding Division ("NNS"), violated the FCA by not uncovering the fraud earlier.

Relator fails to transform the alleged fraud of Skobic and Nuflo *against* EB into a fraud *by* EB against the government.  The FCA does not make contractors liable for frauds by their

subcontractors; instead, the FCA reserves its "essentially punitive" civil penalties and treble damages for contractors who *themselves* knowingly defraud. *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016); *see U.S. ex rel. Ervin & Assoc., Inc. v. Hamilton Secs. Grp.*, 298 F. Supp. 2d 91, 102 (D.D.C. 2004).  Nor does the FCA inflict these penalties on contractors who *might have* sought payment while falling short in performing; rather, the FCA limits its penalties to those who *actually* sought payment *based on* knowing falsehoods. *Jallali v. Nova Se. Univ., Inc.*, 486 F. App'x 765, 767 (11th Cir. 2012).  Under these standards, Relator's Amended Complaint against EB must be dismissed.[1]

First, Relator fails to plead the prerequisites for "false claims" liability under Rule 9(b). Relator does not identify any "claim" that EB submitted for payment.  The Eleventh Circuit has repeatedly held that the "submission of a claim" is the FCA's "*sine qua non*," and so must be pled with particularity, supported by "indicia of reliability."  *U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002).  Under Rule 9(b), courts "decline[] to assume that the defendant actually billed for any noncompliant work."  *Jallali*, 486 F. App'x at 767.

Relator also does not plead the threshold requirement for a claim to be "false."  Relator does not say that EB billed for goods it did not provide.  It says that, due to the fraud of Skobic and Nuflo, EB's submarine program violated EB's contracts—supposedly rendering EB's claims "false."  But in the Eleventh Circuit, it is not enough to assert a breach and then declare that the defendant has defrauded the government.  Relators must identify where the defendant, in seeking payment, "certifie[d]" compliance.  *U.S. v. Space Coast Med. Assocs., LLP*, 94 F. Supp. 3d 1250, 1259 (M.D. Fla. 2015).  That rule guards the line between contract breaches and the FCA, consistent with the Supreme Court's warning that the FCA must not be used to turn every alleged

---

[1] EB joins in the legal arguments advanced by NNS in its motion to dismiss to the extent applicable to EB.

breach into a "false claim." *Escobar*, 136 S. Ct. at 2003.   Here, Relator identifies no such certification.

Second, in its attempt to use the FCA to hold EB responsible for Nuflo's fraud, Relator does not plead any "objective and knowing falsehood" by EB under Rule 9(b)'s standards.  *U.S. v. AseraCare, Inc.*, 938 F.3d 1278, 1301 (11th Cir. 2019).   Relator asserts that *Nuflo* performed bad welds and made false representations.  But Relator identifies not one part where *EB* knew of (or was reckless as to) any nonconformance but installed and billed for the part anyway.  Relator's conclusory, hindsight-laden assertions that EB *should have* discovered these issues utterly fail to plead an "objective and knowing falsehood" by EB—and they are especially deficient given Nuflo's elaborate efforts to hide its misconduct by disguising its welds and falsifying records.

Relator fares no better with its attempt to charge EB with Nuflo's fraud by relying on the general requirement that EB implement a "Quality Program."   Relator avers that EB's contracts required EB to create a "Quality Program" with the "goal" of "assur[ing] conformance" to contract requirements, AC ¶¶ 54, 55, 57 n.3, 63, and it faults EB for not more effectively implementing those open-ended requirements.  But that does not state an FCA claim.  EB's supposed certification that it generally maintained a "Quality Program" aiming to "assure" conformance, *id.* ¶¶ 54-55, does not become an "objective and knowing falsehood" simply because Relator pronounces that EB should have carried out its program differently—with greater "diligen[ce]," or fewer "desk audits."  Indeed, to the extent Relator descends from generalities to recount anything *specific* about EB, it shows that EB was *detecting* nonconforming parts and *avoiding* their installation.  Policing whether EB could have or should have done more is not the FCA's domain.  Under the FCA, "a lie is actionable but not an error."  *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).

At the end of the day, there is a good reason why Relator cannot plead any violation of any duty that EB's contracts actually impose, much less that EB acted "knowingly" and fraudulently: The contracts' bargained-for quality program aims to provide quality control over EB's many production processes, not to guarantee that no issues will ever arise.   Indeed, it "would be remarkable if, on a project of this magnitude and scale, there were not some issues." *U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 729 (4th Cir. 2010). Certainly, Relator cites nothing suggesting that the contracts required a program designed to ferret out intentional fraud—which would, nonsensically, impose near-infinite expense on the Navy and hamstring the Nation's ability to *actually produce* the submarines on which its defense depends.

## BACKGROUND

EB is a "market-leading designer and builder of nuclear-powered submarines."   AC ¶ 15. It holds contracts "for construction, final assembly, test and delivery of 38 Virginia-class" submarines.   *Id.* ¶ 14.   To build the vessels' "extensive and complex systems," EB relies on "thousands of subcontractors."   *Id.* ¶¶ 33-34.   EB is the prime contractor for all Virginia-class submarines and typically alternates final assembly, testing, and delivery with NNS.   *Id.* ¶ 19.

One of EB's subcontractors was Nuflo.   *Id.* ¶ 35.   Nuflo supplied "piping components including elbows, tees, couplings, bushings, flanges, pipe flanges," and the like, and has contributed "more than 225,000 pipe fittings for use by the Navy."   *Id.*   Nuflo was also a subcontractor to NNS, and it sold parts directly to the federal government.   *Id.* ¶ 195.   Synergy Flow Systems, LLC ("SFS") was a distributor for Nuflo.   *Id.* ¶ 80.

Many of the Amended Complaint's additions are expanded allegations about Nuflo.   *Id.* ¶¶ 86-131, 206-42.   Relator asserts that Nuflo, with Skobic and his wife, executed a fraud with three parts.   First, "Nuflo routinely covered up defects … with unauthorized and undocumented weld repair," "disguis[ing]" the repairs to hide defects.   *Id.* ¶¶ 92, 101.   Principally, Skobic carried

out this aspect of the fraud.  *Id.* ¶ 115 (describing Skobic conducting a weld on a part "for Eboat" he knew "was illegal[]"); *see also id.* ¶¶ 206-42.  Second, Nuflo "fail[ed] to perform required" testing, "[f]alsified [h]eat [t]reat [n]umbers," and "gave unqualified … employees the answers to … certification tests."  *Id.* ¶¶ 119, 124, 125.  Third, Nuflo "routinely falsified … documents."  *Id.* ¶ 129.  Relator focuses on the problems this created for "SUBSAFE" and "Level 1" parts, which are particularly important for safety.  *Id.* ¶ 34.  Those parts must conform to physical specifications, and must have "traceability," *i.e.*, "documented evidence that [the part] … was manufactured … in full compliance with … specifications"—which Nuflo "destroy[ed]."  *Id.* ¶¶ 72, 106.

Relator seeks to hold EB and NNS liable for Nuflo's fraud.  But although Relator proceeds under the FCA, its complaint does not identify any actual claim for payment EB submitted.  Instead, "[u]pon information and belief," Relator avers that EB "submits progress payment requests" that "certify such payments are only for conforming performance."  *Id.* ¶¶ 247, 249.

Relator focuses on two sets of alleged contract breaches.  First, it alleges that the contracts required goods with particular characteristics; that Nuflo's illegal and "disguise[d]" welds rendered parts nonconforming; and that EB's supposed certification of "conforming performance" was thus false.  *Id.* ¶¶ 101, 249, 258(a), 261(a), (f), (g).  Second, Relator attacks EB's quality program.  It says the contracts required EB to "have a quality system in accordance with MIL-Q-9858A, Amendment 2, or International Quality Standard ['ISO'] 9001."  *Id.* ¶ 52.  Relator asserts that these systems have the "goal" of "[d]eliver[ing] conforming products which … meet all contractual, drawing, and inspection requirements."  *Id.* ¶ 57 n.3.  Per Relator, EB pursued this goal with insufficient "diligen[ce]" and "effective[ness]."  *Id.* ¶¶ 137, 139, 141, 145, 150, 153.

## ARGUMENT

## I.   The Standards For Pleading An FCA Violation Are Stringent.

The FCA reserves its "quasi-criminal" liability for exceptional misconduct.  *U.S. ex rel.*

*Atkins v. McInteer*, 470 F.3d 1350, 1360 (11th Cir. 2006). It does not concern itself with "garden-variety breaches of contract." *Escobar*, 136 S. Ct. at 2003. Nor does it police whether a contractor made sound judgments. "Proof of … mistake is not evidence that one is a cheat," and "the common failings of engineers and other scientists are not culpable under the Act." *Wang ex rel. U.S. v. FMC Corp.*, 975 F.2d 1412, 1420-21 (9th Cir. 1992). Even proof of fraudulent conduct does not suffice. The FCA only penalizes demands that the government "pay money it does not owe," *Clausen*, 290 F.3d at 1311, where the defendant has "knowingly present[ed] … a false or fraudulent claim." 31 U.S.C. § 3729(a)(1). A relator must show that the defendant: "(1) made a false statement, (2) with scienter, (3) that was material, (4) causing the Government to" pay. *AseraCare*, 938 F.3d at 1284.[2]

FCA claims also must satisfy Rule 9(b)'s particularity requirement by pleading the "'who,' 'what,' 'where,' 'when,' and 'how'" of fraud. *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005). The "Eleventh Circuit has recognized that while these requirements … may, in practice, make it difficult for a *qui tam* plaintiff to bring an action, they are necessary to prevent '[s]peculative suits against innocent actors for fraud' and charges of guilt by association." *U.S. ex rel. Keeler v. Eisai, Inc.*, 568 F. App'x 783, 793 (11th Cir. 2014). Rule 9(b) also "ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of" and "protects defendants from harm to … reputation." *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1277 (11th Cir. 2006). Relators thus must "do more than the usual investigation before filing," rather than hope to make their case in discovery. *U.S. ex rel. Hanna*

---

[2] While the FCA includes separate provisions for "false claims," 31 U.S.C. § 3729(a)(1)(A), and "false … statements," *id.* § 3729(a)(1)(B), both provisions require the submission of an actual false claim. *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017). The differences between the provisions—which principally arise when one person's false statement causes *another person* to submit a false claim—are not implicated as to EB. *U.S. ex rel. Sharpe v. Americare Ambulance*, 2017 WL 2840574, at *6-7 (M.D. Fla. July 3, 2017).

*v. City of Chicago*, 834 F.3d 775, 779 (7th Cir. 2016); *see Casey v. Fla. Coastal Sch. of Law, Inc.*, 2015 WL 10096084, at *9 (M.D. Fla. Aug. 11, 2015).

To establish FCA liability based on contract noncompliance, a relator must do all of the following: It must plead a specific "claim." *Clausen*, 290 F.3d at 1311. That claim must have certified compliance. *Id.* The certification must have been "an objective and knowing falsehood" (and a *single* identifiable employee must have known the facts making it so). *AseraCare*, 938 F.3d at 1301; *see U.S. v. Sci. Apps. Int'l Corp.*, 626 F.3d 1257, 1274-76 (D.C. Cir. 2010). Finally, that lie must have been "material," such that the government otherwise "would not have paid." *Escobar*, 136 S. Ct. at 1996, 2004; *see U.S. v. Salus Rehab., LLC*, 304 F. Supp. 3d 1258, 1264 (M.D. Fla. 2018). The relator must also "adequately allege the entire chain—from start to finish" by pleading with particularity a specific nonconformance, covered by a specific claim for payment and certification, that a specific employee knew was materially false. *U.S. ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 914 (6th Cir. 2017). At each step, Relator fails.

## II.   Relator Does Not Plead Any "Claim For Payment" That Could Be "False."

Relator fails to plead the FCA's threshold requirements: presentment of a "claim" that could be "false." A relator must plead, with particularity, (a) a "claim for payment" the defendant submitted, and (b) a certification of compliance with the standards allegedly violated. *AseraCare*, 938 F.3d at 1284; *Space Coast*, 94 F. Supp. 3d at 1259. Without those elements, even the most "detailed portrayals of [a] fraudulent scheme[]" do not yield FCA liability. *U.S. v. Southerncare, Inc.*, 2015 WL 5278413, at *2 (S.D. Ga. Sept. 9, 2015).

### A.   Relator Does Not Plead With Particularity Any "Claim For Payment."

As the Eleventh Circuit held in *Clausen*, Rule 9(b) requires that relators plead with particularity the "*actual false claim* for payment being made," where the defendant asked the government to pay based on fraudulent pretenses. 290 F.3d at 1311. That is because, in an FCA

case, the *thing* that is fraudulent—the "true essence of the fraud," and its "*sine qua non*"—is the submission of a claim that fraudulently asks the government to "pay money it does not owe." *Id.* at 1311-12 & n.21. A relator thus "must identify the particular document and statement alleged to be false, who made or used it, when the statement was made, how the statement was false, and what the defendants obtained." *U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 703 (11th Cir. 2014). Absent such particularity, any number of things may intervene between supposed misconduct and a false claim for payment: Alleged breaches at one point in performance may be fixed elsewhere—and under Rule 9(b), courts "decline[] to assume that the defendant actually billed for any noncompliant work." *Jallali*, 486 F. App'x at 767; *Klusmeier v. Bell Constructors, Inc.*, 469 F. App'x 718, 721 (11th Cir. 2012). Hence, when relators plead only that claims "must have been submitted," courts dismiss. *Clausen*, 290 F.3d at 1311.

This strict rule applies even if relators otherwise satisfy Rule 9(b). Absent specific allegations of a "claim for payment," accompanied by "indicia of reliability," courts dismiss even complaints containing "detailed portrayals" of fraudulent schemes, *Southerncare*, 2015 WL 5278413, at *2—that identify what the "contract required," how "the defendant failed to" comply, and how "the regulations required the defendant to certify compliance." *Jallali*, 486 F. App'x at 766-67; *see Klusmeier*, 469 Fed. App'x at 721-22; *accord U.S. v. Liberty Ambulance Serv., Inc.*, 2016 WL 81355, at *3-4 (M.D. Fla. Jan. 7, 2016) ("indicia of reliability" lacking where complaint "detail[ed] a scheme whose purpose may well have been to secure payment … based on false claims … [b]ut … stop[ped] short of describing" actual claims).[3]

That clear precedent compels dismissal. Relator does not plead a single claim EB

---

[3] *See also Corsello*, 428 F.3d at 1013; *Atkins*, 470 F.3d at 1359; *Britton ex rel. U.S. v. Lincare Inc.*, 634 F. App'x 238, 240-41 (11th Cir. 2015); *Hopper v. Solvay Pharm., Inc.*, 590 F. Supp. 2d 1352, 1361 (M.D. Fla. 2008), *aff'd*, 588 F.3d 1318 (9th Cir. 2009); *U.S. v. Healogics, Inc.*, 2016 WL 2744949, at *5-6 (M.D. Fla. May 11, 2016); *U.S. v. Aggarwal*, 2004 WL 5509107, at *4-5 (M.D. Fla. 2004).

submitted; instead, EB is left to guess what claim for payment Relator contends was false, and how. Relator can only muster the assertion, made "[u]pon information and belief," that EB must have submitted false claims. AC ¶ 249. But this is exactly what *Clausen* rejected. 290 F.3d at 1310; *see Dixon v. Lincare Corp.*, 2006 WL 8439910, at \*2 (M.D. Fla. Sept. 19, 2006). The Eleventh Circuit has authorized only a single alternative to pleading billing data or attaching actual claims—and it does not help Relator: A "relator with direct, first-hand knowledge of the defendants' submission of false claims gained through her employment with the defendants may have a sufficient basis for asserting that the defendants actually submitted false claims," *Mastej*, 591 F. App'x at 704, if the "basis of this direct knowledge [is] pled with particularity," *U.S. v. HPC Healthcare, Inc.*, 723 F. App'x 783, 789 (11th Cir. 2018). Here, Relator says only that its "members ... included a former [EB] engineer." AC ¶ 143.[4] Relator does not suggest that this person had first-hand knowledge of EB's billing practices.

Relator tries to remedy this deficiency with yet another tactic *Clausen* rejected. There, the relator "attached a blank Form 1500" and described how he believed "examples of improper testing would have been identified." 290 F.3d at 1306, 1313. But the Eleventh Circuit explained that, if "Rule 9(b) is to carry any water," relators cannot rely on such speculation in lieu of properly pleading "the submission of any actual claims." *Id.* at 1313. Likewise, here, Relator describes "several ways" it believes "claims were submitted," based on the Federal Acquisition Regulation ("FAR"). AC ¶¶ 246-49. *Clausen*, however, does not permit that evasion of Rule 9(b). Indeed, this case underscores why actual claims, or first-hand knowledge, are so essential: Relator's characterizations of the FAR are incorrect.

---

[4] *E.g.*, *HPC*, 723 F. App'x at 789; *U.S. v. Lee Mem'l Health Sys.*, 2019 WL 1061113, at \*7 (M.D. Fla. Mar. 6, 2019); *U.S. ex rel. Headen v. Adams & Assocs.*, Inc., 2017 WL 6017775, at \*7 (N.D. Ala. Dec. 5, 2017); *U.S. ex rel. Stepe v. RS Compounding LLC*, 2017 WL 5178183, at \*6 (M.D. Fla. Nov. 8, 2017) (all dismissing where such allegations were absent).

**B.      Relator Does Not Plead Any Certification That Could Be "False."**

Where, as here, a relator asserts that a claim is false because the contractor violated its contract or applicable regulations, it must plead where the defendant, in seeking payment, "certifie[d] that it has complied." *Space Coast*, 94 F. Supp. 3d at 1259.  Otherwise, there may be a breach of contract, but there is no fraud.  *Id.*  Here, Relator identifies no such certification—and its efforts to do so confirm that the "indicia of reliability" required by *Clausen* are absent.  290 F.3d at 1311.  Relator cites FAR 52.232–5, which directs that "[a]s prescribed in 32.111(a)(5)," contracting officers are to "insert the following clause" entitled "Payments under Fixed-Price Construction Contracts."  FAR 52.232–5(c).  That clause in turn requires contractors to certify, with each progress payment request, that "to the best of my knowledge" the "amounts requested are only for performance in accordance with the" contract.  *Id.*  Hence, Relator says, EB must have certified full contract compliance with every progress payment.  AC ¶ 247.

But this clause does not apply to the contracts here.  FAR 32.111(a)(5) "prescribe[s]" when this clause should be used, FAR 52.232–5, and restricts this clause to "contracts for construction." In turn, the FAR defines "construction" as covering only "buildings, structures, or other real property" and "not includ[ing] the manufacture, production, furnishing, construction, alteration, repair, processing, or assembling of vessels."  FAR 2.101.  This error highlights why the FCA and Rule 9(b) require pleading actual invoices or that the relator had specific billing knowledge.[5]

The Supreme Court has also recognized an "implied certification" theory, but it cannot

---

[5] Relator also refers to "receiving report[s]" that contractors supposedly "prepare and furnish … at the time of each delivery," referencing "a system called Wide Area WorkFlow" and "DD Form 250."  AC ¶ 248. But Relator does not assert that these reports require any certifications of conforming performance.  *Id.*  In any event, unless Form 250 is used *as an invoice*, courts have rejected attempts to ground FCA claims on *anything* in it.  *U.S. ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321, 330 (9th Cir. 1995); *see U.S. ex rel. Angeles v. Raytheon Co.*, 2018 WL 7568579, at *3 (C.D. Cal. Nov. 20, 2018).  That is fatal here because Relator concedes that "the Government … does not require … the contractor to use [these forms] as an invoice" to obtain payment and does not allege that EB used these forms as invoices.  AC ¶ 248 n.7.

help Relator.  This "implied certification" theory requires a showing that a defendant's claims for payment made "specific representations about … goods or services" that are rendered "misleading half-truths" in light of undisclosed noncompliance with "material statutory, regulatory, or contractual requirements."  *Escobar*, 136 S. Ct. at 2000-01.  Here, Relator has not pled the most basic prerequisite for an implied certification theory: It fails to identify any "specific representations" EB's claims for payment made *at all*, much less ones that could be "misleading half-truths."  *Id.* at 2001.

## III. Relator Does Not Plead Any "Objective And Knowing Falsehood" That Would Render EB Liable For The Fraud Of Skobic And Nuflo.

Relator also fails to plead that EB uttered any "objective and knowing falsehood" that would render EB liable for the "illegal[]" and "disguise[d]" welds Skobic supposedly performed.  AC ¶¶ 101, 106-07, 115.  First, Relator says that Nuflo's fraud caused Nuflo's parts to violate contract requirements.  But Relator pleads no facts showing that EB knew of (or was reckless to) any nonconformance yet installed and billed for a bad part anyway.  Second, Nuflo tries to hold EB liable for failing to catch Nuflo's fraud.  The FCA, however, does not impose its penalties for failing to *prevent* a subcontractor's fraud.  *Ervin*, 298 F. Supp. 2d at 102; *see U.S. ex. rel. Folliard v. Govplace*, 930 F. Supp. 2d 123, 134 (D.D.C. 2013), *aff'd*, 764 F.3d 19 (D.C. Cir. 2014).  Neither of Relator's attempts to evade this principle—based on the contract requirement to have a "Quality Program," and an unprecedented "agency" theory—succeed in showing that EB defrauded the government with a knowing and objective falsehood.  Even if "more extensive quality controls could have been in place (as is always the case)," failure "to create a system better attuned to the possibility of error … d[oes] not constitute" an FCA violation.  *Ervin*, 298 F. Supp. 2d at 101-02.

That is especially true because Relator must (but cannot) plead EB's supposedly fraudulent conduct with particularity, by identifying the "'who,' 'what,' 'where,' 'when,' and 'how'" of what

EB did and failed to do.  *Corsello*, 428 F.3d at 1014; *see* AC ¶¶ 91-131.  Instead, Relator tries to

swap length for specificity.  While the Amended Complaint is far longer than the original, the new

verbiage either adds to the story of misconduct by Nuflo and Skobic (as with Skobic's journals,

AC ¶¶ 115, 206-42), or uses distractions—such as the stories of the *USS Thresher* in 1963, or an

FCA lawsuit decades ago, *id.* ¶¶ 39-42, 76-85—to filibuster around Relator's inability to plead

with particularity any actual fraudulent conduct by EB.  Meanwhile, Relator's allegations

repeatedly "lump[] together" "Defendants," which Rule 9(b) forbids.  *Lawrie v. Ginn Cos., LLC*,

2010 WL 3746725, at *3-4 (M.D. Fla. Sept. 21, 2010).[6]

### A. Relator Does Not Plead That EB Knew That Nuflo Parts Were Nonconforming But Installed And Billed For Them Anyway.

Before Relator could begin to state an FCA claim against EB with its first theory—that the

fraud of Skobic and Nuflo yielded nonconformances that violated supposedly "non-delegable"

requirements of EB's contracts, AC ¶¶ 38, 258(a), 261(a), (f), (g)—Relator would have to identify

a specific part that (1) Skobic's welds rendered nonconforming, (2) Nuflo sold EB, (3) EB knew

was nonconforming (or was reckless to the problem); but (4) EB installed anyway (rather than

detecting); even as (5) EB billed the Navy for that part; while (6) certifying compliance with the

requirements Relator claims were violated.  Relator does not even attempt to carry that burden.

Primarily, Relator describes Nuflo's improper welding *in general* and (equally generally)

avers that EB should have sleuthed out the welds.  *Id.* ¶¶ 89-131.  To the extent Relator identifies

particular "purchase orders" or "part numbers," *e.g.*, *id.* ¶ 167, it does not try to plead that EB was

reckless as to any particular nonconformance but installed and billed for the part anyway.  And it

does not account for the possibility that EB identified nonconforming parts and repaired them or

---

[6] AC ¶¶ 2-5, 37, 44, 48-49, 51-52, 59, 61, 63, 64, 70, 80, 85, 89, 91-93, 96-98, 107, 109-10, 112-13, 117-18, 122, 124, 128, 131-35, 138, 139, 141, 144-45, 148-49, 150, 152-53, 156-58, 166, 169, 179, 180-85, 188-89, 191-93, 195, 197.

avoided their installation, even though its own allegations repeatedly show EB doing just that. *Infra* at 20; *see U.S. ex rel. Grant v. United Airlines, Inc.*, 912 F.3d 190, 198 (4th Cir. 2018) (complaint that "leaves open the possibility that any fraudulent repairs were remedied prior to government payment" does not state an FCA claim).[7]  This fails to carry Relator's burden to "adequately allege the entire chain" connecting Nuflo's alleged misconduct to an "objective and knowing falsehood" by EB.  *Ibanez*, 874 F.3d at 914; *AseraCare*, 938 F.3d at 1301.

Even Relator's generalized assertions about EB fail to plead that EB acted "knowingly" as to any (unpled) certification of compliance.  In fact, Relator's allegations demonstrate the opposite. Even as Relator asserts that Nuflo's failure to "record[]" "defect[s] []or weld repair … should have drawn Defendants['] attention," AC ¶ 110, Relator details Nuflo's efforts to "disguise" physical welding markers to "cover[] up defects in materials and unauthorized and undocumented weld repair," *id.* ¶¶ 92, 101.  Even as Relator faults EB for not getting confirmation from "records validating that the required tests had been performed," *id.* ¶ 124, Relator avers that "for at least a decade, Nuflo regularly and intentionally falsified records," *id.* ¶ 92.  And even as Relator says that "Nuflo's use of improperly certified inspectors" should have "been readily apparent," *id.* ¶¶ 125, 128, it recounts how Nuflo gave employees "answers to … certification tests"—without explaining how this was "readily apparent," *id.* ¶ 128.  If anything, this shows that Nuflo understood EB was monitoring conformance and thus concealed its actions to avoid detection.

Relator thus fails to plead that EB "knowingly" installed and billed for faulty parts.  While Rule 9(b) allows pleading knowledge "generally," this "merely excuses a party from pleading … intent under an *elevated* pleading standard."  *Ashcroft v. Iqbal*, 556 U.S. 662, 686-87 (2009)

---

[7] Relator avers that nonconforming parts were installed on three submarines, AC ¶ 200, but it pleads no specifics at all about these parts.  It does not identify how they were welded, who purchased the parts (EB, NNS, or the Navy), which specifications the parts violated, how they were billed to the government, or what red flags should have alerted whoever installed these parts to the existence of nonconformances.

(emphasis added).  This rule does not give "license to evade the less rigid—though still operative—strictures of Rule 8."  *Id.*  The "*Twombly/Iqbal* pleading standard" thus "requires the plaintiff to plead *facts* … from which the court can plausibly infer that the … defendants [acted] knowingly."[8]  Under the FCA, scienter means "actual knowledge" or at minimum "reckless disregard."  29 U.S.C. § 3729(b)(1)(A)(iii).  The Eleventh Circuit has characterized recklessness as an "aggravated form of gross negligence"—and explained that "recklessness" means the contractor must have known (or should have known) facts making its certifications "likely" false.  *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1057 (11th Cir. 2015).  This strict standard, the Court stressed, is necessary to respect Congress's judgment that the FCA not become a tool for "punishing honest mistakes or … negligence."  *Id.* at 1058.  Relator nowhere pleads facts plausibly showing that EB knew a part was "likely" nonconforming but installed and billed for it anyway.[9]

Certainly, Relator does not satisfy this standard with its conclusory assertions that EB should have done better.  *E.g.*, AC ¶ 118 (EB did not "engage in proper fact-finding and corrective action analysis").  Relator also contends that EB should have taken specific additional steps that would have detected of the fraud of Skobic and Nuflo—such as conducting "tests comparing the chemical properties recorded by Nuflo with the actual chemical properties of the delivered parts," or "asking for Traveler Records mid-process."  *Id.* ¶¶ 121, 131; *see id.* ¶¶ 124, 128 (similar).  But

---

[8] *Shuler v. Infinity Prop. & Cas.*, 2013 WL 1346615, at *4 (N.D. Ala. Mar. 29, 2013); *see Herengracht Grp. LLC v. WM. Wrigley Jr. Co.*, 2011 WL 13174744, at *4 (S.D. Fla. Aug. 15, 2011) (quoting *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 (Fed. Cir. 2009)) (similar).

[9] The jumble of allegations from Skobic's journal entries do not do so.  AC ¶¶ 206-42.  Relator does not connect a *single* allegation in these entries to a claim for payment for nonconforming work, or even to installation on a submarine—flouting its obligation to plead "the entire chain," *Ibanez*, 874 F.3d at 914, and "leav[ing] open the possibility that any fraudulent repairs were remedied prior to … payment," *Grant*, 912 F.3d at 198.  Indeed, Relator's journal allegations often fail to plead that nonconforming parts were actually *shipped* to EB, AC ¶¶ 226-28, 231-32, 233-34, 237-38, 239, and many even omit an EB purchase number, *id.* ¶¶ 226-28, 231, 232, 239.  Nor does Relator explain how Skobic's journals could show that EB was reckless to intentional fraud: By design, Nuflo did not make a habit of sending documentation memorializing improper welds, *e.g.*, *id.* ¶¶ 234, 238, or leaving physical traces of those welds, *id.* ¶¶ 226, 231-33—and Relator's loose allegations that certain documents contained "discrepancies," or were not "initialed by Nuflo welders," *id.* ¶¶ 109, 218, hardly render fraud "likely."

Relator does not identify any requirement or standard *mandating* those steps.  Of course, now that Relator has described how the Skobics were defrauding EB, it is all too easy to identify ways the fraud could have been detected.  But hindsight is not how the FCA measures scienter.  And none of Relator's allegations plead a "knowing" FCA violation by EB or yield a plausible inference that, at the time, EB knew or should have known that any specific part was "likely" nonconforming.  *Urquilla-Diaz*, 780 F.3d at 1057-58.  As EB details below, Relator cannot plead "reckless disregard" without identifying any requirement or objective standard that EB supposedly violated.  *U.S. v. Krizek*, 111 F.3d 934, 941 (D.C. Cir. 1997) (recklessness is an "extension of gross negligence," *i.e.*, "a palpable failure to meet the … standard of care").

**B.**      **EB Cannot Be Held Liable For Fraud Committed By Skobic And Nuflo.**

Relator offers two theories that try to penalize EB for the fraud of Skobic and Nuflo.  First, Relator says EB's quality system was deficient because it did not catch Nuflo's alleged fraud earlier; second, Relator claims EB can be charged with any knowledge of the fraud possessed by certain Nuflo inspectors (as well as NNS).  Neither states an FCA claim.

**1.**      ***Relator Does Not Plead Any Objective And Knowing Falsehood Concerning The Contracts' "Quality Program" Requirements.***

Relator first points to the contracts' quality requirements.  AC ¶ 57 n.3; *see id.* ¶¶ 132-79.  Relator says that EB did not "diligent[ly]" or "effective[ly]" implement its quality program— generally, *id.* ¶¶ 137-39, or as to its Supplier Delegated Inspection Program specifically, *id.* ¶¶ 141, 145, 150, 153.  Relator also avers that EB should have responded differently to a handful of problems it found at Nuflo, *id.* ¶¶ 160-79.  These claims, however, cannot turn Nuflo's alleged fraud *against* EB into an objective and knowing falsehood *by* EB, particularly given Rule 9(b).  Relator makes only four sets of allegations about EB's alleged shortcomings with any specificity: It names the inspector who supposedly "did not perform diligent on-site inspections," *id.* ¶ 137;

criticizes EB's approval of Nuflo's president under the "Supplier Delegated Inspection Program," *id.* ¶¶ 142, 146; avers that EB "recognize[d]" SFS as often "late," *id.* ¶ 155; and identifies a few cases where EB addressed nonconformances but says EB should have responded differently, *id.* ¶¶ 161-65, 167, 171-72.  These patchwork allegations do not yield an FCA violation.

 ***Quality Generally.***   Relator avers that EB's contracts required a "Quality Program" consistent with either MIL-Q-9858A or ISO 9001.  *Id.* ¶¶ 52, 54.  Without saying which applies, Relator asserts that both have, "at [their] core," the "goal" of assuring "[d]elivery of conforming products."  *Id.* ¶¶ 53, 57 n.3.  Relator also cites a handful of general provisions:  The Military Specifications instruct the contractor to implement a "Quality Program" requiring that "[a]ll supplies and services … be controlled at all points necessary to assure conformance," *id.* ¶¶ 54-55 (MIL-Q-9858A); to "maintain an inspection system which will assure that all supplies and services … conform to [the] contract," *id.* ¶ 62 (MIL-I-45208); and to "maintain an effective and positive system for controlling nonconforming material" via procedures that are "documented [and] acceptable to the Government," *id.* ¶ 63 (MIL-I-45208).   ISO 9001 recites its purpose as "demonstrat[ing] ability to consistently provide products … that meet … requirements"; provides that the contractor "shall ensure control over [outsourced] processes," with the "type and extent of control … defined within the quality management system"; and it specifies that the system must account for "the need for product conformity."  *Id.* ¶¶ 57, 59, 61.

 Relator cannot use these broad standards to wrench an "objective and knowing falsehood" out of EB's supposed certification of compliance.  *AseraCare*, 938 F.3d at 1301.  The leading case is *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370 (4th Cir. 2008), which dismissed an FCA claim based on "general and relatively vague maintenance provisions, such as keeping vehicles 'in a safe operating condition and good appearance.'"  *Id.* at 377.  This provision

could not support a claim because it did not "set forth anything resembling a specific maintenance program," and the defendant did not make representations "concerning specific acts of maintenance that [it] knew it lacked the capacity to perform." *Id.*; *see U.S. v. Southland Mgmt. Corp.*, 326 F.3d 669, 675 (5th Cir. 2003) (because "'[d]ecent, safe, and sanitary' … is not precise or measurable," it is "unacceptable" as basis for "[FCA] liability"). The Eleventh Circuit and its district courts have followed *Wilson*.[10]

The Eleventh Circuit has also applied the same principle to hold that scienter was absent under similarly open-ended standards. It has explained that a relator cannot establish a knowing falsehood by relying on its own "personal … assessments of … performance … untethered from any binding or persuasive authority." *Urquilla-Diaz*, 780 F.3d at 1059. Likewise, when a contract or regulation is "ambiguous," a contractor does not act "knowingly" unless it has "actual knowledge of a different authoritative interpretation." *U.S. ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1155 (11th Cir. 2017). Hence, in *United States ex rel. Jamison v. McKesson Corp.*, 784 F. Supp. 2d 664 (N.D. Miss. 2011), the court explained that FCA plaintiffs may not "rest[] … an objective falsehood … on [their] subjective interpretation of [a contractor's] duties," *id.* at 676—citing as an example *United States ex rel. Sharp v. Eastern Oklahoma Orthopedic Center*, 2009 WL 499375 (N.D. Okla. Feb. 27, 2009), which dismissed an FCA suit claiming that the contractor did not use the "most appropriate" method for delivering medical equipment, when "neither the … regulations nor the secondary materials expanding upon the regulations explicitly require[d]" the relator's preferred method, *id.* at *21; *accord Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1210-11 (11th Cir. 2001) ("Although Plaintiffs generally allege a duty … to investigate

---

[10] *AseraCare*, 938 F.3d at 1298 n.11; *e.g.*, *U.S. ex rel. Phalp v. Lincare Holdings, Inc.*, 116 F. Supp. 3d 1326, 1343-44 (S.D. Fla. 2015), *aff'd*, 857 F.3d 1148 (11th Cir. 2017); *U.S. v. Aegis Therapies, Inc.*, 2015 WL 1541491, at *11-12 (S.D. Ga. Mar. 31, 2015); *U.S. ex rel. Jamison v. McKesson Corp.*, 784 F. Supp. 2d 664, 675 (N.D. Miss. 2011).

17

…, they point to no accounting principle which clearly sets out such a duty," and a "careful reading of [the] relevant section reveals that it sets forth no bright-line duties").[11]

These principles require dismissal.  Relator does not claim, for example, that EB's quality program failed an audit under the ISO 9001 standards but EB told the Navy the opposite.  Instead, Relator says that EB simply did not do *well enough* under the open-ended governing standards.  It opines that EB did not exert "adequate … oversight"; "perform … inspections" that were sufficiently "diligent"; or "ensure" its review was "substantive" enough.  AC ¶¶ 133-34, 137-38.  Alternatively, Relator again faults EB for taking or not taking *specific steps*, such as using too many "desk audits" and "checklists" and not enough "actual independent evaluation"—without identifying any specification requiring those steps.  *Id.* ¶ 138; *id.* ¶ 135 (audits should have included actual "repair welding occurring at Nuflo"); *id.* ¶ 136 (EB should have "met with or spoke with … welders").  This is nothing more than Relator's "personal … assessment" that (with hindsight benefit) EB should have taken different steps to discover Skobic and Nuflo's fraud.  *Urquilla-Diaz*, 780 F.3d at 1059.  The FCA, with its quasi-criminal penalties, is not the place to police whether EB's performance was sufficient measured against the broad governing standards.[12]

**SDIP.**  Relator attempts the same theory as to EB's Supplier Delegated Inspection Program("SDIP"), which allowed certain Nuflo personnel to "act on behalf of EB regarding

---

[11] Although *Ziemba* concerned a statute requiring "severe recklessness," courts have applied similar principles under the FCA.  *U.S. ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 26-27 (2d Cir. 2016) (dismissing FCA claims based on "conclusory statements" that defendant should have followed more rigorous "testing regime"); *U.S. ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1378 (D.C. Cir. 2000) ("[I]t is hard to see how [defendant] could … have satisfied even the loosest standard of knowledge" based on relator's mere "argumentation and possibility"); *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 284-85, 291 (D.C. Cir. 2015) (no scienter as to "undefined and ambiguous term" "[a]bsent evidence that" the defendant had been "warned … away" from its approach).

[12] *See Southland*, 326 F.3d at 684 (FCA's "punitive treble damages and penalties … are not interchangeable with remedies for ordinary breaches of contract").  The same principles compel dismissal to the extent the Amended Complaint alleges that EB failed to ensure that Nuflo and SFS had conforming quality systems.  AC ¶ 133 (asserting that EB violated requirement to "perform[] functions ensuring that quality control requirements flow down to subcontractors").  Relator does not assert that EB failed to mandate that Nuflo and SFS implement acceptable quality control systems—just that EB did not oversee their compliance in a manner Relator deems "adequate."  *Id.* ¶ 134.  For all the reasons explained above, this assertion does not plead a knowing and objective falsehood by EB.

inspection of hardware and review of deliverable documentation."  AC ¶ 142.  That program contains objective requirements, such as that "the supplier must maintain a quality rating of 95%." *Id.* ¶ 144.  Relator, however, does not assert that EB failed to enforce those requirements.  Instead, it again points to vague requirements that EB audit Nuflo in a manner sufficient to "assure compliance with contract and policy requirements" and "adequately maintain[]" the program.  *Id.* ¶ 144.  Again, Relator broadly asserts that EB's approach was "ineffective" and "not rigorous enough." *Id.* ¶ 145.  And again, Relator claims that EB should have made certain specific choices differently, without pointing to anything requiring Relator's approach.  Thus, Relator says that Nuflo's personnel were "not qualified" (without identifying any qualification, imposed by the SDIP program, they lacked); that Nuflo personnel should not have been approved as inspectors because of an "inherent conflict" (without citing any requirement prohibiting their participation); and that EB's audits were too "perfunctory" and reliant on "checklist[s]" and should have focused more on "actual … observation of Nuflo processes such as welding" (without identifying any requirement violated or even exactly *how* EB was deficient).  *Id.* ¶¶ 146-47, 149.  As before, none of this pleads that EB uttered an "objective and knowing falsehood."  *AseraCare*, 938 F.3d at 1301.

Nor does Relator carry its burden with claims that EB should not have allowed Nuflo into the SDIP after a 2001 suit (the *Hunt Valve* case) alleged fraud at another valve company, or after NNS suspended Nuflo from its SDIP program in 2007.  AC ¶¶ 80, 143, 162, 190.  Relator does not claim that the "quality issues" triggering NNS's action, *id.* ¶ 162, rendered Nuflo ineligible for EB's program.  To the contrary, Relator concedes that Nuflo maintained the 95% quality rating required. *Id.* ¶ 144.  Indeed, the "dimensional issues" that prompted NNS's 2007 action, *id.* ¶¶ 143-44, differ from the welding issues alleged here.  As to *Hunt Valve*, the key point is that Relator does not and cannot allege that the government responded by requiring EB to take any action that

EB failed to carry out.  *Id.* ¶¶ 78-80.[13]  Absent such allegations, Relator cannot avoid dismissal by questioning EB's judgments: "Proof of … mistake[] is not evidence that one is a cheat," and "the common failings of engineers and other scientists are not culpable under the Act."  *Wang*, 975 F.2d at 1420-21.

**Supposedly Deficient Responses.**  Relator offers a variation on the same approach with its sole claims of misconduct remotely particularized to EB.  Relator describes a few cases where EB's quality program was *successful*: EB detected nonconformances and avoided their installation on ships, AC ¶¶ 161, 164-65, rejected parts with marking issues, *id.* ¶ 163, raised concerns with Nuflo's president, *id.* ¶ 165, issued Supplier Corrective Action Reports and Engineering Reports, *id.* ¶¶ 167, 177, re-inspected parts, *id.* ¶ 171, and created a "log which would document … issues" and facilitate corrective action, *id.* ¶ 172.  Still, Relator says that EB should have done more or acted differently.  For example, when EB discovered an "underwall" condition in February 2009, Relator says EB should have gone beyond taking the matter up with "the Nuflo President" and continuing its "SDIP audit[s]."  *Id.* ¶ 165.  Likewise, when "Quonset[] Point shipyard employees" discovered a "mismark[ing]" issue with eight parts, Relator says EB should have gone beyond "issu[ing] an Engineering Report which rejected the parts" and instead "create[d] a [quality rejection notice]."  *Id.* ¶ 177.[14]  But again, the FCA is not a vehicle for policing whether EB

---

[13] Nor does the fact that one valve manufacturer once engaged in misconduct render it "likely" that Nuflo and Skobic were undertaking the disguised fraud Relator now alleges.  *See U.S. ex rel. Polukoff v. St. Mark's Hosp.* 2016 WL 1449219, at *4 (M.D. Tenn. Apr. 13, 2016) ("Relator seems to rest his claims against HCA on the hope that the Court will intuit that because of HCA's past compliance issues and current compliance policies, HCA should have known of [the] alleged scheme.… [T]his unsubstantiated speculation simply cannot survive a motion to dismiss ….").

[14] The other examples are similar.  *See* AC ¶ 161 (after EB detected issues with "two Nuflo elbows" and avoided their "installation on a submarine" in March 2007, EB should have gone farther and "issu[ed] a Supplier Corrective Action Report"); *id.* ¶ 163 (EB should have gone beyond "reject[ing] 24 pieces … delivered" with "marking problem" in February 2008); *id.* ¶ 164 (EB should have gone beyond "repair[ing] the defects" found on a single elbow being installed on submarine in February 2009); *id.* ¶ 167 (in May 2009, EB should have gone beyond issuing a "Supplier Corrective Action Report" for two parts that "violate[d] … minimum wall thickness"); *id.* ¶ 171 (when EB discovered that flange had been "sent directly to EB" without "source inspection" in August 2012, EB should have gone beyond "hunt[ing] down the part" and "perform[ing] a receipt inspection"); *id.* ¶ 172 (in response to miscellaneous "issues …

correctly calibrated its responses.   None of Relator's incidents, alone or together, renders objectively and knowingly false EB's alleged certification that EB had a quality program with the "goal" of "deliver[ing] conforming products." *Id.* ¶ 57 n.3.   Nor can Relator manufacture such a falsehood out of the statement that EB maintained "an effective and positive system for controlling nonconform[ances]," *id.* ¶¶ 54, 55, 63, by saying EB was not effective and positive *enough*.

Indeed, Relator's examples add up to little.   Over eight years, during which "Nuflo has supplied more than 225,000" parts, *id.* ¶ 35, Relator takes issue with seven incidents concerning EB, *id.* ¶¶ 161, 163-65, 167, 171, 177.   To do so, it must stretch beyond "Level 1" parts (and cites none about SUBSAFE parts), even though Level 1 and SUBSAFE parts—with their heightened quality requirements—are at the heart of Relator's theory. *Id.* ¶¶ 161, 164, 167; *see id.* ¶¶ 34, 39-75.   Few of the incidents even concern welding. *Id.* ¶¶ 163, 165, 167, 171, 177.   Even if (arguendo) Relator had identified a handful of genuine issues, spread across a decade, that would not render objectively and knowingly false any certification of compliance with the quality requirements. These provisions do not promise perfection, much less turn any mistake into an FCA case. *Owens*, 612 F.3d at 729 (given project's "magnitude and scale," it "would be remarkable if … there were not some issues…. That is after all what a quality control department exists to" address).[15]

*Collective Knowledge.*   Relator's allegations of knowledge fail for yet another reason:

at SFS," EB should have done more than meet "with [the] Nuflo president" in September 2013 and initiate "a log [to] document all future … issues").

[15] More strained is Relator's assertion that "delays" at Nuflo and SFS show that EB was reckless to fraud. AC ¶¶ 155-56. Delays are endemic to contracting—and the Air Force Manual cited by Relator shows just how far off Relator is from pleading any facts that put EB on notice that fraud was "likely." *Urquilla-Diaz*, 780 F.3d at 1058; *see* AC ¶ 155 n.6 (citing *Air Force Material Command Procurement Fraud Indicators Handbook*, Air Force Material Command Law Office (July 2008)).  That 65-page document explains that the "indicators" it catalogs may well "reflect … legitimate business practice[s]," and its litany of indicators include submitting a contract price that is too high, or too low, or "very close to the government estimate." Manual at 2, 14, 19, 20. So, too, a contractor's winning too frequently can be associated with fraud—as can a contractor's not wining enough, or even an "odd company name." *Id.* at 10, 12, 17. Like these other indicators, delay may occasionally be associated with fraud—but that does not mean that EB ignored a red flag that fraud was "likely." *Urquilla-Diaz*, 780 F.3d at 1058; *see Daniel Hamm Drayage Co. v. Waldinger Corp.*, 508 F. Supp. 390, 395 (E.D. Mo.) ("Delivery delays … standing alone, do not provide a sufficient basis for inferring fraud."), *aff'd in part*, 666 F.2d 1213 (8th Cir. 1981).

Relator seeks to hold EB liable by "piec[ing] together scraps of … knowledge held by various corporate officials." *Sci. Apps.*, 626 F.3d at 1274-76.   Courts have rejected this "collective knowledge" theory, explaining that the FCA requires plaintiffs to show that a "particular … employee knew that the company's claims were false or … acted in deliberate ignorance or reckless disregard." *Id.* at 1273-74; *see U.S. v. Life Care Ctr. of Am., Inc.*, 114 F. Supp. 3d 549, 567-68 (E.D. Tenn. 2014) (collecting cases).   Here, Relator's allegations either do nothing to identify the EB employees at issue, or affirmatively show that *different* employees were involved.[16] For this reason, too, dismissal is required.   *U.S. ex rel. Durkin v. Cty. of San Diego*, 2018 WL 3361148, at *6 (C.D. Cal. July 10, 2018) (applying same rule on motion to dismiss).

### 2.    EB Cannot Be Liable Based On Imputed Knowledge Of NNS Or Nuflo.

Relator also tries to hold EB liable for Nuflo's fraud based on an unprecedented theory of imputed knowledge.   It claims that EB should be charged with knowledge of everything known by Nuflo's SDIP inspectors (as EB's "agents"), and even NNS (based on its "Teaming Arrangement" with EB).   AC ¶¶ 150, 266.   That is, even if EB fulfilled every duty, and could not have known of any nonconformance, Relator would impose penalties and treble damages on EB based solely on the imputed knowledge of its subcontractors, including those who were *defrauding* EB.

This theory is both unsupported and wrong.   Under the FCA, the Eleventh Circuit has held that "the knowledge of *an employee* is imputed to the corporation when *the employee* acts for the benefit of the corporation and within the scope of *his employment*." *Grand Union Co. v. U.S.*, 696 F.2d 888, 891 (11th Cir. 1983) (emphasis added).   But neither the Eleventh Circuit nor any other court has adopted Relator's unbounded theory and attributed to a contractor the knowledge of its

---

[16] *Compare, e.g.*, AC ¶ 137 (identifying "Frank Chiaradio" as supposedly knowing that "on-site inspections" were insufficiently "diligent"), *and id.* ¶ 162 ("Nancy Beckwith" knew of Nuflo's suspension from NNS's SDIP), *with id.* ¶¶ 109-10, 117-18, 121, 124, 128, 131, 140 (referring generically to Defendants), *and id.* ¶ 161 ("EB discovered"), *id.* ¶ 164 (same), *id.* ¶ 167 ("EB's awareness"), *id.* ¶ 171 (similar), *id.* ¶ 177 ("Quonset[] Point shipyard employees").

subcontractors.  For good reason: "[U]se of agency" principles in this way would "eviscerate the statute's *scienter* requirement"—as one court has observed in rejecting a similar argument under the FCA.  *U.S. v. Nazon*, 1993 WL 459966, at *2 (N.D. Ill. Nov. 3, 1993).  If EB is chargeable with knowledge based on Relator's theory, *every* contractor is potentially liable for every action of every subcontractor

The FCA does not permit this sweeping form of constructive knowledge.  Courts have roundly rejected the similar "collective knowledge" theory—which also tries to leverage common-law agency rules to impute knowledge to a principal—"because it effectively imposes liability, complete with treble damages and … civil penalties, for a type of loose constructive knowledge that is inconsistent with the Act's language, structure, and purpose." *Sci. Apps.*, 626 F.3d at 1274. The same defects are fatal to Relator's agency theory, which is even broader: Congress "defined 'knowingly' to include some forms of constructive knowledge," and to cover "mistakenly false claims only when the defendant deliberately avoided learning the truth or engaged in aggravated gross negligence." *Id.* at 1274-75.  Yet Relator would hold contractors strictly liable based on an unmoored form of "constructive knowledge." *Id.*  Relator thereby would nullify Congress's choice and defy *Escobar*'s warning that the FCA's "scienter requirement[]" must be "strict[ly] enforce[d]," given "concerns about fair notice and open-ended liability."  136 S. Ct. at 2002. Indeed, where the law imposes penalties, as the FCA does, it often refuses to charge defendants with the knowledge of every "agent" (as do the many cases rejecting "collective knowledge").[17]

This would be an especially poor case to contemplate Relator's unprecedented expansion—

---

[17] *Restatement (Third) of Agency* § 5.03 cmt. b (2006) (because "[i]mputation … may carry severe consequences," "certain legal consequences may require a greater showing of culpability on the part of the principal, such as the knowledgeable involvement of higher-level agents"); *id.* cmt. d(7) (for "penal consequences," "personal knowledge may be required"); *Restatement (Second) of Agency* § 217C (1958) (narrowly restricting punitive damages based on agents' knowledge); *id.* § 217D & cmts. c-d (similar for "penalties"); *see U.S. v. Ridglea State Bank*, 357 F.2d 495, 500 (5th Cir. 1966) (treating the FCA's sanctions as criminal for purposes of imputing knowledge, given "mandatory" per-occurrence forfeiture and potential to yield "recovery wholly out of proportion to actual loss").

because even under the rules for *employees*, the knowledge of Nuflo's SDIP inspectors could not be imputed to EB.  Relator suggests that these inspectors "perform[ed] certain inspections on behalf of" EB; knew parts were nonconforming; and passed them anyway.  AC ¶¶ 150, 152, 266.  If true, those allegations show that Nuflo's SDIP inspectors were not acting "for the benefit of" EB—as is necessary for imputing even employees' knowledge.  *Grand Union*, 696 F.2d at 891.  They defrauded EB to benefit themselves and Nuflo.  *E.g.*, AC ¶ 115 (Skobic "illegally welded" parts he knew were destined "for Eboat").  In *United States v. Ridglea State Bank*, 357 F.2d 495 (5th Cir. 1966), the court declined to impose FCA liability on banks based on the knowledge of an official who approved "false" loan applications while "personally receiv[ing] … proceeds."  *Id.* at 496.  In an opinion binding here, the Fifth Circuit explained that a corporation "does not acquire the knowledge … of unfaithful servants whose conduct was undertaken to advance the interests of parties other than their … employer," and that the official's purpose "was to line his own pockets and" ensure his "wrongdoings … remain[ed] concealed."  *Id.* at 498.  So, too, here.[18]

Last, Relator does not plead the facts its theory demands.  It offers only conclusory labels that Nuflo inspectors were "agents."  AC ¶¶ 150, 266.  Agency, however, turns on whether its *elements* are met.  *Marchisio v. Carrington Mortg. Servs., LLC*, 919 F.3d 1288, 1311 (11th Cir. 2019) (Florida law); *accord S.B. v. Tenet Healthcare Corp.*, 732 F. App'x 721, 724 (11th Cir. 2018) (dismissing agency theory based on "conclusory" allegations).[19]  Relator also does not identify with particularity any part that a Nuflo SDIP inspector (1) inspected *as an SDIP inspector*; (2) knew was nonconforming; and (3) passed anyway.  While Relator asserts that the people designated as Nuflo's SDIP inspectors engaged in wrongdoing *in general*, AC ¶¶ 99, 115, 207-08,

---

[18] Courts in this Circuit have repeatedly reaffirmed this rule.  *E.g.*, *U.S. ex rel. Wuestenhoefer v. Jefferson*, 105 F. Supp. 3d 641, 667 (N.D. Miss. 2015); *U.S. v. Hill*, 676 F. Supp. 1158, 1179 (N.D. Fla. 1987).

[19] These elements are "(1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent."  *Marchisio*, 919 F.3d at 1311.

219, it does not identify any action they took "within the scope of [their] employment" as SDIP inspectors knowledge of which should be attributed to EB.  *Grand Union*, 696 F.2d at 891.

## IV.    The FCA's *Qui Tam* Provisions Are Unconstitutional.

The FCA's *qui tam* provisions are unconstitutional.  They violate the separation of powers because they divest the President of his Article II authority to control litigation on the United States' behalf and to remove individuals exercising executive power.  *E.g.*, *Morrison v. Olson*, 487 U.S. 654, 685 (1988).  These provisions also violate the Appointments Clause: Relators exercise the United States' authority but are not appointed as "Officers."  *E.g.*, *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018); *see Common Legislative Encroachments on Executive Branch Authority*, 13 Op. O.L.C. 207, 209-10 (1989) (same conclusions by William P. Barr).

## CONCLUSION

This case has been pending for six years.  Relator has already amended once—taking its best shot at pleading a legally sufficient complaint.  Dismissal therefore should be with prejudice.

Dated: March 16, 2020                              Respectfully submitted:

                                                   By:    /s/ Gregory W. Kehoe
                                                          Gregory W. Kehoe
Michael A. Doornweerd (*pro hac vice*)                    GreenbergTraurig
David M. Greenwald (*pro hac vice*)                       101 East Kennedy Boulevard
Zachary C. Schauf (*pro hac vice* pending)                Suite 1900
Jenner & Block LLP                                        Tampa, FL  33602
353 N. Clark Street                                       (813) 318-5732
Chicago, IL  60654                                        kehoeg@gtlaw.com
(312) 923-2776
mdoornweerd@jenner.com
dgreenwald@jenner.com
zschauf@jenner.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

                                      /s/ Gregory W. Kehoe
                                          Attorney