**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* 84Partners LLC, | 3:14-CV-1256-J-32-PDB |
| Plaintiff and Relator, | Hon. Timothy J. Corrigan |
| v. | |
| GENERAL DYNAMICS ELECTRIC BOAT and HUNTINGTON INGALLS INDUSTRIES, NEWPORT NEWS SHIPBUILDING DIVISION | |
| Defendants. | |

**DEFENDANT HUNTINGTON INGALLS INDUSTRIES, NEWPORT NEWS
SHIPBUILDING DIVISION'S MOTION TO DISMISS
AND INCORPORATED MEMORANDUM OF LAW**

Michael C. Marsh
Donnie M. King
AKERMAN LLP
Three Brickell City Centre
98 Southeast Seventh Street, Suite 1100
Miami, FL 33131
(305) 374-5600
michael.marsh@akerman.com

**OF COUNSEL:**

Michael L. Waldman (*pro hac vice* motion to be filed)
Lee Turner Friedman (*pro hac vice* motion to be filed)
John B. Goerlich (*pro hac vice* motion to be filed)
Carolyn M. Forstein (*pro hac vice* motion to be filed)
ROBBINS, RUSSELL, ENGLERT,
  ORSECK, UNTEREINER & SAUBER LLP
2000 K Street N.W., Fourth Floor
Washington, DC 20006
(202) 775-4500
mwaldman@robbinsrussell.com

*Counsel for Defendant Huntington Ingalls Industries,
Newport News Shipbuilding Division*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................. 1

BACKGROUND ............................................................................................. 4

    A. NNS ................................................................................................ 4

    B. Nuflo ............................................................................................. 5

    C. Procedural History ....................................................................... 5

ARGUMENT .................................................................................................. 6

    I. THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO PLEAD
        FRAUD WITH PARTICULARITY ....................................................... 6

        A. Relator Fails To Plead With Particularity The Presentment Of A False
           Claim By NNS. ....................................................................... 7

        B. Relator Fails To Plead With Particularity A Fraudulent Scheme That Led
           To The Submission Of A False Claim By NNS. ........................... 11

        C. Relator Fails To Plead With Particularity Any Wrongful Conduct By
           NNS ....................................................................................... 16

    II. THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO PLEAD
        FACTS TO SUPPORT A PLAUSIBLE INFERENCE OF A
        "KNOWING" VIOLATION ................................................................ 19

        A. Relator Does Not Even Attempt To Plead That NNS Had "Actual
           Knowledge." ........................................................................... 20

        B. Relator Does Not Plead Facts To Support A Plausible Inference That
           NNS Acted With "Deliberate Ignorance" Or "Reckless Disregard." ............ 20

        C. Relator Cannot Establish FCA Scienter By Imputing Knowledge From
           Other Entities To NNS. ............................................................ 23

CONCLUSION ............................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*U.S. ex rel Aakhus v. Dyncorp Inc.*,
   136 F.3d 676 (10th Cir. 1998) ....................................................................................20

*U.S. ex rel. Atkins v. McInteer*,
   470 F.3d 1350 (11th Cir. 2006) .................................................................6, 7, 9, 10

*Bingham v. HCA, Inc.*,
   783 F. App'x 868 (11th Cir. 2019) ..............................................................................11

*Britton ex rel. U.S. v. Lincare, Inc.*,
   634 F. App'x 238 (11th Cir. 2015) ................................................................................9

*U.S. ex rel. Bumbury v. Med-Care Diabetic & Med. Supplies, Inc.*,
   2014 WL 12284079 (S.D. Fla. June 23, 2014) ............................................................6

*U.S. ex rel. Burlbaw v. Orenduff*,
   548 F.3d 931 (10th Cir. 2008) ....................................................................................17

*U.S. ex rel. Butler v. Magellan Health Servs., Inc.*,
   101 F. Supp. 2d 1365 (M.D. Fla. 2000) .......................................................................9

*Carlisle v. Daewon Kangup Co.*,
   2018 WL 3199148 (M.D. Ala. Mar. 29, 2018) ............................................................9

*Carrel v. AIDS Healthcare Found.*,
   898 F.3d 1267 (11th Cir. 2018) ..............................................................................9, 10

*U.S. ex rel. Chase v. HPC Healthcare, Inc.*,
   723 F. App'x 783 (11th Cir. 2018) ...............................................................................9

*U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*,
   290 F.3d 1301 (11th Cir. 2002) ......................................................................... *passim*

*U.S. ex rel. Cooper v. Blue Cross & Blue Shield of Fla., Inc.*,
   19 F.3d 562 (11th Cir. 1994) ................................................................................7, 16

*Corsello v. Lincare, Inc.*,
   428 F.3d 1008 (11th Cir. 2005) ......................................................................... *passim*

*Durham v. Bus. Mgmt. Assocs.*,
   847 F.2d 1505 (11th Cir. 1988) ............................................................................7, 13

## <u>TABLE OF AUTHORITIES</u> –Cont'd

**Page(s)**

*U.S. ex rel. Ervin & Assocs., Inc. v. Hamilton Sec. Grp.*,
    298 F. Supp. 2d 91 (D.D.C. 2004) ...................................................................22, 23

*U.S. ex rel. Folliard v. Gov't Acquisitions, Inc.*,
    764 F.3d 19 (D.C. Cir. 2014) ..............................................................................22

*Grand Union Co. v. U.S.*,
    696 F.2d 888 (11th Cir. 1983) ............................................................................25

*U.S. ex rel. Grant v. United Airlines, Inc.*,
    912 F.3d 190 (4th Cir. 2018) ..............................................................................14

*U.S. ex rel. Harper v. Muskingum Watershed Conservancy Dist.*,
    842 F.3d 430 (6th Cir. 2016) ..............................................................................20

*U.S. ex rel. Hefner v. Hackensack Univ. Med. Ctr.*,
    495 F.3d 103 (3d Cir. 2007)................................................................................22

*Herengracht Grp. LLC v. WM. Wrigley Jr. Co.*,
    2011 WL 13174744 (S.D. Fla. Aug. 15, 2011).................................................20

*Hill v. Morehouse Med. Assocs.*,
    2003 WL 22019936 (11th Cir. Aug. 15, 2003)..................................................10

*U.S. ex rel. Isabell v. Kindred Healthcare*,
    2019 WL 4345782 (M.D. Fla. Sept. 12, 2019) ..................................................16

*U.S. ex rel. Keeler v. Eisai, Inc.*,
    568 F. App'x 783 (11th Cir. 2014) .....................................................................11

*U.S. ex rel. Kirk v. Schindler Elevator Corp.*,
    130 F. Supp. 3d 866 (S.D.N.Y. 2015).................................................................23

*Klusmeier v. Bell Constructors, Inc.*,
    469 F. App'x 718, 721 (11th Cir. 2012) .............................................................15

*Lary v. Trinity Physician Fin. & Ins. Servs.*,
    780 F.3d 1101 (11th Cir. 2015) ..........................................................................20

*U.S. ex rel. Mateski v. Raytheon Co.*,
    745 F. Appx. 49 (Mem.) 50 (9th Cir. 2018) ......................................................12

*MW Builders, Inc. v. U.S.*,
    134 Fed. Cl. 469 (2017) .....................................................................................23

*U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*,
    612 F.3d 724 (4th Cir. 2010) ..............................................................................14

## TABLE OF AUTHORITIES –Cont'd

**Page(s)**

*U.S. ex rel. Pelletier v. Liberty Ambulance Serv., Inc.*,
　2016 WL 81355 (M.D. Fla. Jan. 7, 2016)...........................................................7, 10

*U.S. ex rel. Polukoff v. St. Mark's Hosp.*
　2016 WL 1449219 (M.D. Tenn. Apr. 13, 2016).....................................23

*U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*,
　145 F. Supp. 3d 1220 (N.D. Ga. 2015), *rev'd on other grounds*, 841 F.3d 927
　(11th Cir. 2016)...............................................................................16, 23

*U.S. ex rel. Sanchez v. Lymphatx, Inc.*,
　596 F.3d 1300 (11th Cir. 2010) ...........................................................6, 9

*U.S. ex rel. Seal 1 v. Lockheed Martin Corp.*,
　429 F. App'x 818 (11th Cir. 2011) .......................................................10

*U.S. v. AseraCare, Inc.*,
　938 F.3d 1278 (11th Cir. 2019) ...........................................................17

*U.S. v. Choudhry*,
　2016 WL 7228760 (M.D. Fla. Oct. 11, 2016) ...................................16, 24

*U.S. v. Hill*,
　676 F. Supp. 1158 (N.D. Fla. 1987)......................................................25

*U.S. v. Krizek*,
　111 F.3d 934 (D.C. Cir. 1997)..........................................................17, 20

*U.S. v. Nazon*,
　1993 WL 459966 (N.D. Ill. Nov. 3, 1993) ............................................24

*U.S. v. Ridglea State Bank*,
　357 F.2d 495 (5th Cir. 1966) ...............................................................25

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
　136 S. Ct. 1989 (2016)..........................................................................19

*Urquilla-Diaz v. Kaplan Univ.*,
　780 F.3d 1039 (11th Cir. 2015) ................................................... *passim*

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*,
　529 U.S. 765 (2000)...............................................................................24

*U.S. ex rel. Williams v. Bell Helicopter Textron, Inc.*,
　417 F.3d 450 (5th Cir. 2005) ................................................................20

## <u>TABLE OF AUTHORITIES</u> –Cont'd

**Page(s)**

*U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
   525 F.3d 370 (4th Cir. 2008) ...................................................................17

**Statutes**

31 U.S.C. § 3729(a)(1)(A)-(B) .................................................................19

31 U.S.C. § 3729(b) .....................................................................................3

31 U.S.C. § 3729(b)(1)(A)(i–iii) ...............................................................19

**Other Authorities**

FAR 2.101 .....................................................................................................8

FAR 52.232–5 ...............................................................................................8

FRCP 8(a) ..................................................................................................1, 6

FRCP 9(b) ............................................................................................. *passim*

FRCP 12(b)(6) ...........................................................................................1, 6

J.  Boese & D. Baruch, *Civil False Claims & Qui Tam Actions* (12/2019 Update)...............11, 25

## PRELIMINARY STATEMENT

The Court should dismiss this case pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6) because the Amended Complaint ("Complaint" or "AC") fails to state a claim upon which relief may be granted.  Relator 84Partners LLC ("Relator") alleges that Huntington Ingalls Industries, Newport News Shipbuilding Division ("NNS") was "deliberately ignorant" or "recklessly indifferent" to the quality of the pipe fittings it purchased from supplier Nuflo, Inc. for use on submarines and aircraft carriers delivered to the U.S. Navy.  This accusation is both meritless and deeply offensive.  NNS employees are among the first individuals to sail on these ships, accompanying them on initial voyages where the ships are tested and stressed to their maximum capabilities.  NNS employees are always aware that their sons, daughters, brothers, sisters, cousins, coworkers, friends, and neighbors man these ships.  NNS is committed to providing the Navy with the finest and safest warships.  The charge that NNS would be "indifferent" or "reckless" about the parts installed on its ships is utterly baseless.

Although the Complaint emphasizes the importance of a quality assurance program, it notably says very little about how NNS's supplier oversight program operates, and for good reason.  NNS has an entire department dedicated to ensuring supplier quality, including former military veterans with decades of experience in quality assurance.  They spend much of their time on the road auditing and inspecting the several thousand suppliers that provide parts to NNS.  In addition, dozens of employees work full time inspecting parts (including pipe fittings) received from suppliers.  Several hundred more employees are devoted exclusively to quality inspections relating to the nuclear and SUBSAFE programs.  And that does not include the hundreds of NNS employees who support their work by providing complex engineering analysis, lab services, and non-destructive testing.

Given Relator's lack of knowledge about—or unwillingness to mention—NNS's extensive supplier oversight program, the fatal deficiencies in Relator's Complaint against NNS are not surprising.

*First*, while full of sweeping allegations of "unauthorized" conduct and "falsified" documents, the Complaint fails to meet its obligation under Rule 9(b) to plead with particularity NNS's submission of false claims or statements.  Relator devotes much attention to building a narrative about misconduct *at Nuflo*, but lacks the "who," "what," "when," "where," and "how" of any alleged false claim or false statement submitted *by NNS* to the Government. *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005).  The Complaint does not identify specific claims or certifications that NNS made to the Navy; instead, NNS can only speculate (and this Court is left to sort out) as to when it allegedly submitted such claims or certifications, who at NNS made them, where the claims or certifications were sent, and, critically, why they were false.  Relator cannot bootstrap its obligation to allege that NNS presented a false claim to the Navy by alleging that Nuflo committed fraudulent conduct unbeknownst to NNS.

The Complaint also fails to allege with particularity any fraudulent scheme. Which of the hundreds of thousands of parts Nuflo and Synergy Flow Systems ("SFS") delivered to NNS from 2005-2015 were allegedly nonconforming?  Which of the nearly 4,000 welds allegedly done by one of Relator's members actually resulted in nonconforming parts being sent to and accepted by NNS?  Relator not only fails to identify the nonconforming parts, but also fails to link a specific nonconforming Nuflo part to an actual false invoice sent *by NNS* to the Navy.  And while attempting to hold NNS responsible for an alleged fraud by one of its subcontractors, Relator is vague as to what was deficient in NNS's oversight of Nuflo.  Relator alleges NNS did not do "enough" audits, inspections, or investigations of Nuflo, but those general criticisms are not tied

to any contractual certifications or requirements, defy objective falsity, and, again, are not linked to any specific false claim or statement NNS made to the Navy.  Alleging various improper actions Nuflo committed does not satisfy Relator's pleading obligation as to NNS; the Complaint simply does not provide NNS with the fair notice of the accusations of fraud against it to which it is entitled under Rule 9(b).

*Second*, Relator fails to plausibly plead the "knowing" submission of a false claim, as required by 31 U.S.C. § 3729(b).  Relator does not even attempt to show that anyone at NNS had direct knowledge of Nuflo's allegedly wrongful conduct; despite being written after and with the benefit of a five-year investigation by the Government, the Complaint mentions *not a single NNS employee.*  Relator's efforts to meet the extraordinarily high standard for pleading "deliberate ignorance" or "reckless disregard" also fall woefully short.  As Relator notes, Nuflo *concealed* its behavior from NNS—taking great pains to "cover[] up defects in materials . . . and falsif[y] inspection, testing, and certification," AC ¶ 92—precisely because Nuflo knew NNS was serious about supplier quality.  Relator points to "red flags" that it says should have put NNS on notice of Nuflo's alleged fraud, but most of the supposed red flags do not involve parts sent to NNS and so could not have alerted the company to anything.  The allegations that *do* involve NNS consist mostly of examples of the company *identifying* problems and *rejecting* fittings Nuflo supplied to NNS, and highlight NNS sending follow-up requests to Nuflo for explanation and information about nonconforming parts or discrepancies.  *Id.*  ¶¶ 162, 166, 169, 170, 173, 174, 176. Relator may disagree with how NNS resolved these issues, but the allegations in the Complaint show the company actively engaging in supplier oversight, refuting the bald assertion that NNS acted with deliberate ignorance or reckless disregard.  *Id.* ¶¶ 206-42.

It is truly troubling if Relator's members really were aware of improper welding at Nuflo

3

in 2006 (*id.* ¶ 115) yet elected not to come forward and notify anyone until late 2014 when this Complaint was filed.  To conceal misconduct for nearly 10 years and then seek to profit by blaming the shipbuilders for not discovering the fraud earlier is simply unconscionable.  The allegations against NNS lack merit on their face, and Relator's Complaint should be dismissed.

## BACKGROUND

### A.  NNS

NNS is the sole builder of aircraft carriers for the U.S. Navy. AC ¶ 17.  It also builds *Virginia*-class submarines as a subcontractor to Defendant General Dynamics Electric Boat ("EB"), with the two companies separately building their respective portions of the submarines in their own shipyards and alternating final assembly and delivery. *Id.* ¶¶ 19, 31.  NNS has been building ships for 134 years and is the largest industrial employer in Virginia.

NNS purchases parts for use in construction of Navy vessels from a vast network of suppliers. *Id.* ¶ 33.  From 2005 to 2015, NNS procured approximately one *billion* parts.  These parts come from approximately 2,500 suppliers spread across 47 states, *id.* ¶ 33, and range from simple fasteners to sophisticated navigation and guidance electronics.

NNS maintains an ISO-9001 quality management system ("QMS") (*see id.* ¶ 52) that is audited and recertified every three years by the American Bureau of Shipping.[1]  NNS's supplier oversight staff conducts audits, performs part inspections, and addresses quality issues that arise during the course of shipbuilding.  This department intersects with NNS's engineering and supply chain management groups to ensure that suppliers are subjected to a rigorous system of checks and balances.  In addition, other departments are devoted to inspecting parts provided to NNS, as well

---

[1] Relator also fails to mention that the Navy conducts regular audits of all aspects of the shipyard's system, including its supplier oversight program.  In addition, the Undersea Warfare and the Nuclear Reactor units of NAVSEA perform their own separate audits of the company's quality management system on a yearly or bi-yearly basis.  And the Navy has several hundred employees stationed onsite at NNS conducting daily surveillance and audits of the company.

as providing lab services and non-destructive testing.

### B. Nuflo

Nuflo manufactures a variety of pipe fittings. *Id.* ¶ 35.  Located in Florida, Nuflo has about 40 employees and annual revenue of $15 million. ECF No. 3 ¶ 13.  During the 2005-2015 time period, NNS and EB purchased Nuflo fittings, as did the Navy and other Government agencies. According to Relator, Nuflo had 591 direct contracts with the Government (which means that the Navy purchased many parts directly from Nuflo and not through NNS), and Nuflo has "supplied more than 225,000 pipe fittings for use by the Navy." AC ¶ 35.  Nuflo also had many commercial customers, especially in the oil and gas sector.

### C. Procedural History

Relator 84Partners LLC filed its complaint under seal on November 10, 2014. ECF No. 3. Relator's members include Mickey and Joanne Skobic, former employees of Nuflo. AC ¶ 13. None of Relator's current or past principals ever worked at NNS.

Relator's original complaint named Nuflo, SFS, NNS, and EB as defendants.  The 23-page complaint focused almost entirely on the alleged fraud at Nuflo and the nonconforming parts it allegedly provided to the Navy. *See* ECF No. 3 § IV(A).  Relator included no discussion of "red flags" and alleged no specific facts about the shipyards.  Instead, NNS and EB were discussed at the end of the original complaint, in three pages containing only a handful of general allegations against them—largely based "[o]n information and belief."  *Id.* ¶¶ 76, 77, 82, 83.

The Government investigated Relator's allegations for more than five years.  Justice Department attorneys issued Civil Investigative Demands (CIDs) and conducted extensive formal and informal discovery.  NNS alone produced more than 135,000 pages of documents.  Justice Department and Navy officials met several times with NNS, asking questions of NNS's quality assurance officials and engineers as well as visiting the NNS shipyard.  Ultimately, the

Government intervened against Nuflo and recovered $2,250,000, plus certain additional moneys upon Nuflo's sale, in a settlement.  ECF No. 51.  On August 1, 2019, the Government elected not to intervene against NNS and EB, and this case was unsealed.  ECF Nos. 37, 38.

On January 31, 2020, having had access to the hundreds of thousands of pages the Government collected during its five-year investigation, Relator filed an Amended Complaint.  ECF No. 52.  This Complaint was three times longer than its original complaint and targeted the two shipyards.  Even with the added length, the Amended Complaint still contains no allegations which plead with particularity any False Claims Act violation by NNS and, accordingly, NNS now moves to dismiss the Complaint.

## ARGUMENT

## I.   THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO PLEAD FRAUD WITH PARTICULARITY

Federal Rule of Civil Procedure 9(b) requires that a plaintiff "state with particularity the circumstances constituting fraud."  The Eleventh Circuit has held repeatedly that Rule 9(b) applies to False Claims Act ("FCA") cases. *U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1309 (11th Cir. 2002); *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006).  As such, a plaintiff alleging a violation of the FCA must plead specific "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them."  *Clausen*, 290 F.3d at 1310.[2] Absent "specific details" of the submission of the allegedly fraudulent claims, Rule 9(b) requires dismissal.  *U.S. ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1302-03 (11th Cir. 2010).

The Eleventh Circuit "rigidly enforces Rule 9(b)'s particularity requirement."  *U.S. ex rel. Bumbury v. Med-Care Diabetic & Med. Supplies, Inc.*, 2014 WL 12284079, at *2 (S.D. Fla. June

---

[2] All internal quotation marks, footnotes, and citations are omitted, and all emphasis is added, unless otherwise noted.

23, 2014).  Steadfastly applying that strict standard may "make[] it hard for many persons to bring a *qui tam* suit," but that is by design to prevent "[s]peculative suits."  *U.S. ex rel. Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 566-67 (11th Cir. 1994).  The Eleventh Circuit has stressed that Rule 9(b) serves an "important purpose . . . by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior."  *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988).[3]  Rigid enforcement is "especially important" in the FCA context given the "quasi-criminal nature of FCA violations" and the risk that a "relator's strong financial incentive . . . [will] precipitate the filing of frivolous suits." *Atkins*, 470 F.3d at 1360.

## A.  Relator Fails To Plead With Particularity The Presentment Of A False Claim By NNS.

"The submission of a claim is . . . the *sine qua non* of a[n] [FCA] violation."  *Clausen*, 290 F.3d at 1311.  And because "a central question in False Claims Act cases is whether the defendant ever presented a false or fraudulent claim to the government, . . . the *presentment* of such a claim" is a key element that must be pleaded with particularity, *id*. (emphasis in original)—"meaning particular facts about 'the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government.'"  *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1052 (11th Cir. 2015) (quoting *Corsello*, 428 F.3d at 1014).[4]

Relator fails to meet this standard.  From 2005 to 2015, NNS continually sent invoices to the Navy for submarines and aircraft carriers totaling more than $30 billion.  But Relator never

---

[3]  Rule 9(b)'s role in "protecting defendants against spurious charges of immoral and fraudulent behavior," *Clausen*, 290 F.3d at 1310, and preventing "guilt by association," *id.* at 1308, seems especially critical here where NNS is accused of knowingly putting the lives of its employees, other contractors, and servicemembers at risk without Relator alleging any particular facts of how NNS committed a supposed fraud.

[4]  "To satisfy Rule 9(b), a False Claims Act plaintiff may not describe an improper scheme in detail and assume that a claim for payment must have been or likely was submitted based on the scheme."  *U.S. ex rel. Pelletier v. Liberty Ambulance Serv., Inc.*, 2016 WL 81355, at *3 (M.D. Fla. Jan. 7, 2016).

identifies "what" was allegedly false.  Relator fails to cite a single invoice from these numerous submissions to the Navy which was supposedly false.  Instead, Relator spends the vast majority of the Complaint discussing a fraudulent scheme at Nuflo and describing in the most general terms Relator's (usually flawed) understanding of the construction of Navy vessels, without ever connecting any of Nuflo's fraudulent behavior to the submission of an actual false claim by NNS.

This glaring defect is most evident from a review of the paragraphs purporting to set out NNS's alleged "false claims" (AC ¶ 275) and alleged "false statements" (*id.* ¶ 278).  Rather than identifying specific false claims, Relator provides only general categories, *e.g.*, "Claims for parts that NNS purchased from Nuflo and/or SFS that NNS had direct knowledge had been mismarked" or "Claims for parts that NNS purchased from Nuflo and/or SFS for which NNS acted with deliberate indifference as to Nuflo's manufacturing practices."  *Id.* ¶ 275.  Likewise, for "false statements," it mentions only general categories of certifications, *e.g.*, "Certifying to the United States that NNS would and did exercise appropriate discretion in selecting the suppliers to whom it delegated inspection authority under the SDIP" or "Certifying to the United States that, when required, every part installed on the submarine had the documentation to ensure cradle-to-grave traceability."  *Id.* ¶ 278.  These broad descriptions of *types* of false claims or statements are no substitute for providing defendant NNS with the required notice of the *specific* claims or statements it is alleged to have submitted to the United States.[5]

Because Relator's Complaint is utterly devoid of the "who," "what," "where," "when," and "how" of any fraudulent submissions by NNS to the Government, *Urquilla-Diaz*, 780 F.3d at 1052,

---

[5] The Complaint also alleges "[u]pon information and belief" that NNS submitted false progress payment requests to the Navy.  AC ¶¶ 247-49.  According to Relator, this allegation of false progress payment requests is based on its reading of FAR 52.232–5.  *Id.* ¶ 247.  However, this FAR provision is applicable only to construction of "buildings, structures, or other real property" projects and explicitly does *not* apply to the "manufacture [or] assembling of vessels."  FAR 2.101 & 32.111(a)(5).

NNS is left with these questions, any one of which is enough to mandate dismissal:

- *When* did NNS supposedly make these false claims or false statements to the Navy?  The Complaint includes not a single date of an alleged false submission.  NNS cannot defend itself against an allegation that it submitted a false claim when the Complaint does not allege when that claim was submitted.  The lack of specificity regarding the *when* is critical here, where Relator purports to describe conduct that spanned *a decade* (AC ¶ 284).[6]

- *Who* at NNS submitted a false claim or statement to the United States?  The AC does not identify the NNS employee who allegedly made the false claim or statement, and fails to allege even what department at NNS was responsible for billing the Navy for Nuflo parts.  NNS has more than 23,000 employees, but Relator apparently expects NNS to guess as to the employee(s) who allegedly submitted the purportedly false claim.[7]

- *What* were the false invoices or certifications that NNS allegedly submitted?  The Complaint does not identify a single invoice for a specific amount submitted on a particular day.  Nor does it identify a single certification with specific false representations.  As a result, it provides no guidance as to which of the billions of dollars of invoices and numerous other submissions to the Navy made over the 2005-2015 time period were allegedly false.[8]

- *How* was the alleged claim or statement false?  The Complaint does not point to a single invoice or certification and describe why it is false.  Relator freely alleges a variety of reasons why the Nuflo parts were nonconforming, *see* AC ¶¶ 96-131, but it does not explain how a single NNS invoice or certification was rendered false.  Relator makes no attempt to tie alleged misconduct by Nuflo to a specific NNS submission to the Government.[9]

What NNS and the Court can glean from the Complaint regarding presentment of a false

---

[6] *See, e.g.*, *U.S. ex rel. Chase v. HPC Healthcare, Inc.*, 723 F. App'x 783, 790 (11th Cir. 2018) (complaint dismissed where plaintiff failed to allege "when the falsifications occurred[] or when the fraudulent bills were submitted to Medicare"); *Corsello*, 428 F.3d at 1013 (complaint dismissed that contained only vague allegations of improper practices "throughout the statutory time period").

[7] *See, e.g.*, *U.S. ex rel. Butler v. Magellan Health Servs., Inc.,* 101 F. Supp. 2d 1365, 1368 (M.D. Fla. 2000) ("When pleading fraud, the plaintiff should generally identify *the individuals who made the alleged misrepresentation*, the time of the alleged fraud and the place of the alleged fraud."); *Corsello*, 428 F.3d at 1012 ("To state a claim under the False Claims Act with particularity, the complaint must allege . . . *who* engaged in [the allegedly fraudulent acts].").

[8] *See, e.g.*, *Carrel v. AIDS Healthcare Found.*, 898 F.3d 1267, 1275 (11th Cir. 2018) (affirming dismissal where relators "were unable to pinpoint specific false claims" or "specific instances where [defendant] wrongfully demanded payment from the government"); *Sanchez*, 596 F.3d at 1302 (affirming dismissal where "Sanchez failed to provide any specific details regarding either the dates on or the frequency with which the defendants submitted false claims, the amounts of those claims, or the patients whose treatment served as the basis for the claims."); *Atkins*, 470 F.3d at 1358-60 (dismissing complaint that failed to "show[] that the defendants *actually submitted* reimbursement claims").

[9] *See, e.g.*, *Britton ex rel. U.S. v. Lincare, Inc.*, 634 F. App'x 238, 241 (11th Cir. 2015) ("[A]bsent facts demonstrating the actual submission of false claims, . . . speculation is insufficient to satisfy . . . Rule 9(b)."); *Carlisle v. Daewon Kangup Co.*, 2018 WL 3199148, at *5 (M.D. Ala. Mar. 29, 2018), *adopted*, 2018 WL 2336757 (M.D. Ala. May 23, 2018) ("[T]he plaintiffs-relators' basic assumption is that because the defendants manufactured defective parts and sold [them] to automobile manufactures, the court can infer that some vehicles purchased by the government contain defective parts. The law is clear that the court cannot make that speculative, inferential leap.").

claim is this, and only this: at some indeterminate point in time between 2005 and 2015, some unknown individual at NNS submitted at least one unidentified purchase order or invoice that may have contained at least one certification that may have been false, though what that certification said and who made that certification on behalf of NNS is unknown.   Certainly such pleading cannot satisfy Rule 9(b). *See U.S. ex rel. Seal 1 v. Lockheed Martin Corp*., 429 F. App'x 818, 820 (11th Cir. 2011) (affirming dismissal of complaint that did "not allege the amount of the claims, the number of claims presented nor dates on when such claims were made," nor the "the terms of payment under the [] contract," nor "what, if any, representations were made by Lockheed at the time it sought payment under the contract and how those representations were false or fraudulent").

Moreover, there are no "indicia of reliability" supporting the allegation of an actual false claim for payment. *Clausen*, 290 F.3d at 1311; *accord, e.g.*, *Hill v. Morehouse Med. Assocs.*, 2003 WL 22019936, at *3 (11th Cir. Aug. 15, 2003); *Carrel*, 898 F.3d at 1275; *Corsello,* 428 F.3d at 1013-14.   *Hill* provides an example of what Relator would need to allege to meet that standard. There, the relator "observed [defendant's employees] alter various CPT and diagnosis codes," "provided the names of the employees and physicians who were responsible for making the fraudulent changes," and, "[m]ost important[ly]," "was privy to [defendant]'s files, computer systems, and internal billing practices . . . because she worked in [defendant]'s billing and coding department for seven months."  2003 WL 22019936, at *4.  Here, unlike in *Hill,* Relator's chief sources of information were employees of a *subcontractor* and had no knowledge of the billing practices or claims between NNS and the Navy.  As a corporate outsider, Relator's allegations lack the necessary indicia of reliability to withstand a motion to dismiss.  *See, e.g.*, *Atkins*, 470 F.3d at 1358-60 (dismissing claims brought by corporate outsider doctor); *Liberty Ambulance Serv.*, 2016 WL 81355, at *3-4 (relator did "not demonstrate the same degree of familiarity with the billing

process as would provide the indicia of reliability necessary to meet the Rule 9(b) standard").

This case is *Clausen*, through and through.  In *Clausen*, "[n]o amounts of charges were identified," "[n]o actual dates were alleged," "[almost no] policies about billing or even second-hand information about billing practices were described," and "[n]o copy of a single bill or payment was provided."  290 F.3d at 1312.  So too here; despite having access to information gathered during a five-year-long investigation by the Government, Relator still cannot satisfy the basic requirements of Rule 9(b).[10]  Relator has failed to provide the dates, much less the amounts, of false claims or certifications, has described no billing policies besides a vague surmise that it was done by purchase orders or invoices, and has not provided any NNS invoices or certifications to the Government or payments from the Government to NNS.  The threadbare allegations in *Clausen* required dismissal.  *Id.* at 1315.  The same result should follow here.

### B. Relator Fails To Plead With Particularity A Fraudulent Scheme That Led To The Submission Of A False Claim By NNS.

The gravamen of the "fraudulent scheme" that Relator posits is that Nuflo provided nonconforming parts to NNS that NNS accepted and installed on submarines and aircraft carriers.  But the Complaint fails to allege which of the "more than 225,000 pipe fittings" Nuflo manufactured "for use by the Navy" (AC ¶ 35) were the product of the scheme, *i.e.*, were

---

[10] What limited detail the Complaint contains about NNS comes from the Government's investigation, not Relator's personal knowledge.  The initial complaint was entirely devoid of detail as to the actions of NNS (and EB, for that matter).  *See generally* ECF No. 3.  Relator reaped the benefits of the Government's years-long investigation in filing the Amended Complaint, adding numerous allegations—such as the discussion of "red flags" NNS supposedly ignored, AC ¶¶ 160-76—that rely entirely upon documents produced by NNS during the investigation.  This reliance on the discovery obtained from the shipbuilders is clearly improper, and only the original complaint should be considered in assessing compliance with Rule 9(b).  *See Bingham v. HCA, Inc.*, 783 F. App'x 868, 876 (11th Cir. 2019) ("We agree with the district court that, in this case, the goals of applying Rule 9(b) to False Claims Act cases are advanced by striking information in Relator's SAC that was learned through discovery."); *U.S. ex rel. Keeler v. Eisai, Inc.,* 568 F. App'x 783, 804-05 (11th Cir. 2014) ("[A]llowing [relator] to use documents obtained in discovery to overcome pleading hurdles would circumvent the purpose of Rule 9(b)."); *cf.* J.  Boese & D. Baruch, *Civil False Claims & Qui Tam Actions* § 4.04[C] (12/2019 Update) ("Even less justifiable are added claims based on information uncovered by the *government* in its investigation of *qui tam* allegations.  Allowance of such claims in amended complaints is an invitation to relators to file initial complaints on the basis of unsupported rumors and suspicions.").

nonconforming, let alone which were delivered to NNS for installation and invoicing to the Navy. If NNS cannot identify the parts at issue in Relator's claims against it, then NNS cannot defend itself against allegations that it made false claims concerning those parts.

1. According to the Complaint, the fraudulent scheme consists of five broad "categories of failures." AC ¶ 95.  For four of those categories—falsified heat treatments (*id.* ¶¶ 120-21), failure to conduct nondestructive testing (*id.* ¶¶ 122-24), uncertified inspectors and improper inspections (*id.* ¶¶ 125-28), and falsified documentation (*id.* ¶¶ 129-31)—Relator does not identify a single specific nonconforming part resulting from this supposed misconduct.  In fact, the discussion of these supposed failures—for each category, a single page or less—is striking for its lack of specifics: no dates, no parts, no purchase orders, no contracts, and no invoices mentioned anywhere.  Relator's description of these defects is wholly generic, with no specific incidents or events alleged.  These allegations are plainly insufficient under 9(b)'s requirements.[11]

Relator devotes the most attention to the fifth category, unauthorized and undocumented weld repairs (AC ¶¶ 96-118, 206-42), boasting of "about 3,929 weld repairs" allegedly performed by Mr. Skobic between 2006 and 2013.  *Id.* ¶ 207.[12]  But despite acknowledging that "Nuflo received approval for one weld procedure," *id.* ¶ 103, and that other welds could be made with "written authorization," *id.* ¶ 70, Relator does not even attempt to disentangle the authorized weld repairs from the unauthorized ones.  Moreover, the Complaint does not identify which of these nearly 4,000 welds (whether authorized or not) were on parts delivered to NNS.  As Relator itself

---

[11] *See, e.g.*, *U.S. ex rel. Mateski v. Raytheon Co.*, 745 F. Appx. 49 (Mem.) 50 (9th Cir. 2018) ("Relator alleges that Raytheon 'failed to perform complete tests and retests of component parts and of assembled hardware in violation of' two contractual requirements. Which tests? Which component parts? Were no tests done, or were they done incompletely? . . . [W]ithout knowing which tests and approximately when they were performed, Raytheon does not have enough information to defend against the claims.").

[12] Relator offers no explanation for Mr. Skobic's failure, if he truly believed he was engaging in unauthorized welding, to alert either shipyard or the Navy (which had a source inspector on site) until 2014.

concedes, Nuflo had substantial contracts to provide fittings to the Navy and EB.  It also had a thriving commercial business.   Absent information identifying which of the welds were unauthorized, and which welded parts were delivered to NNS, Relator's narrative about improper welding practices at Nuflo does not advance a False Claims Act claim against NNS.

In fact, the 79-page Complaint only references "NNS" in connection with four specific instances of welding by Mr. Skobic.  *Id.* ¶¶ 230, 235, 236, 240-41.  For three of these references, the Complaint again lacks the who, what, when, where and how: it provides no NNS purchase order number, no delivery date to NNS, no NNS individuals who received the parts, etc.  Instead, Relator only mentions the Nuflo or SFS internal job numbers, which do not allow NNS to know what parts are being referenced.  Without more information, NNS cannot even tell *whether* it received the parts at issue from Nuflo or SFS—let alone whether it billed the Navy for those parts—and Relator fails to connect those three parts to any submitted invoice.  Because NNS is unable to identify what parts the Complaint alleges were nonconforming, it is not at all "alert[ed] to the precise misconduct with which [it is] charged." *Durham*, 847 F.2d at 1511.

In only one instance of allegedly unauthorized welding does Relator provide an NNS purchase order and delivery date.  AC ¶¶ 240-41.  Yet Relator *still* fails to allege with particularity that these parts – even if nonconforming – were ever billed to the United States.  Relator has the benefit of information from the Government's five-year investigation and yet cannot even allege that a particular nonconforming part was invoiced to the Navy.  Nor does the Complaint allege any factual basis to conclude that an increase in NNS's oversight of Nuflo would have prevented the acceptance and billing of these particular parts.  One instance of NNS accepting nonconforming parts hardly suffices to state a claim that NNS submitted false claims to the Navy based on that

acceptance, or did so with deliberate ignorance or reckless disregard.[13]   Indeed, it "would be remarkable if, on a project of this magnitude and scale, there were not some issues." *U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 729 (4th Cir. 2010).

    2.    A complaint that "leaves open the possibility that any fraudulent repairs were remedied prior to government payment" does not state a claim for violation of the FCA.  *U.S. ex rel. Grant v. United Airlines, Inc.*, 912 F.3d 190, 198 (4th Cir. 2018).  Since Relator's Complaint is a textbook example of such a pleading, it must be dismissed.  Welding is only one step in the manufacturing process at Nuflo.  In addition to traveling through the remaining steps of that process, a welded part would need to pass inspection and testing at Nuflo (AC ¶ 168); be delivered to NNS (rather than sent to another customer with more pressing scheduling concerns); pass inspection and testing at NNS (*id.* ¶ 173); be selected by NNS for use on a Navy ship; and invoiced to the Navy (*id.* ¶ 246) before any claim was made.  The Complaint notes numerous instances where parts were repaired or rejected during their journey through these processes.  *See, e.g.*, AC ¶¶ 160, 166, 168, 170, 173, 174.  Because Relator is not able to show that NNS installed any specific fittings that Mr. Skobic welded, the Complaint "leaves open the possibility" that the parts Skobic welded "were remedied" through the various processes at Nuflo and NNS (or accepted by the Navy for use despite a known nonconformance[14]) and thus never resulted in a NNS submitting a false claim to the Government.  *Grant*, 912 F.3d at 198.[15]

---

[13] Although not before the Court at this stage, it highlights the importance of Rule 9(b)'s particularity requirement that NNS located one of the fittings at issue in AC ¶¶ 240-241, and forensic testing shows that *the part was never welded*.

[14] The Navy, even after the filing of the Complaint and multi-year investigation of Relator's allegations, continues to approve and use Nuflo parts.

[15] The closest the Complaint comes to a nonconforming Nuflo part reaching the Navy is its mention of "six nonconforming parts . . . on the USS North Dakota (SSN-784), three on the USS John Warner (SSN-785), and one on the USS Minnesota (SSN-783)."  AC ¶ 200.  Relator provides no further information about these parts.  Who purchased these parts and installed them on the ship—the Navy, EB, or NNS?  Which contractual or specification requirements were not met?  When were the parts delivered and billed to the Government?  Were the parts inspected and by whom?  Without more information, this stray allegation cannot sustain a False Claims Act case.

3.      This leads to yet another fatal flaw in the Complaint: Relator cannot link the alleged nonconformances to NNS's submission of false invoices or certifications to the Navy.  Because Relator fails to identify specific NNS-purchased nonconforming parts caused by Nuflo's conduct and leaves open the possibility of repair prior to installation, Relator has not alleged that any NNS invoice submitted to the Navy was false "as a result of" the alleged acts.  *Clausen*, 290 F.3d at 1311.  The Eleventh Circuit requires such pleading, and Relator's failure to so plead mandates dismissal of the Complaint.

In *Clausen*, for example, the court affirmed dismissal of the complaint because, though the relator laid out a scheme whereby the defendant sought "to increase its testing and testing revenues," he failed to "provide any factual basis for his conclusory statement . . . that bills were submitted to the Government *as a result of* these schemes."  *Id.* at 1312.  Similarly, in *Corsello*, the court affirmed dismissal where the complaint alleged "[u]nderlying improper practices alone" without tying them to "a specific fraudulent claim [that] was in fact submitted to the government." 428 F.3d at 1014.  And in *Klusmeier v. Bell Constructors, Inc.*, the Eleventh Circuit affirmed dismissal where the complaint "allege[d] details as to how Bell violated its contracts" and alleged that "Bell submitted some invoices" but *did not* allege facts "show[ing] that Bell's monthly invoices actually billed for the non-compliant work."  469 F. App'x 718, 721 (11th Cir. 2012). Thus, even if the allegations of Nuflo's scheme satisfy Rule 9(b)—and they do not—Relator has failed to allege that such scheme resulted in the Navy being billed for non-compliant parts, and such failure mandates dismissal.[16]

---

[16] For example, the Complaint alleges that NNS submitted false claims in connection with its construction of aircraft carriers.  *See, e.g.,* AC ¶¶ 249, 273, 274, 277, 278.  Yet, there is no mention of *any* specific Nuflo parts that were even intended for an aircraft carrier, let alone the date, place, individuals, amounts, etc. of any NNS invoices to the Navy for an aircraft carrier that charge for nonconforming Nuflo parts.

### C.  Relator Fails To Plead With Particularity Any Wrongful Conduct By NNS.

Relator describes an alleged fraud at Nuflo, but does not allege that NNS actually participated in that fraud.  Rather, it contends NNS should be held liable because it should have "demand[ed]" additional information from Nuflo and "required . . . additional corrective measures or oversights."  AC ¶ 168.  Those exceedingly vague contentions fail under Rule 9(b) for three reasons.  First, they lack the required specificity for alleging wrongful conduct on NNS's part.  Second, they are too amorphous to constitute an "objective falsehood" necessary to trigger FCA liability.  And, third, the Complaint fails to allege facts showing that the failure to take these nebulous corrective measures caused any actual false claim submitted to the Navy.

1.    Relator seeks to hold NNS liable under the False Claims Act but does not allege with particularity NNS's failures in its oversight of Nuflo.  What exactly were the failures?  How should NNS have acted differently?  The Complaint is full of criticisms that "Defendants" "did not assert adequate . . . oversight and control" (AC ¶ 134), were "without effective audit and inspection" (*id.* ¶ 139), failed to "exert appropriate quality control" (*id.* ¶ 157), and failed to impose "heightened scrutiny" or take "additional steps or corrective actions."  (*id.* ¶¶ 166, 168, 169, 170).  But not only do these allegations fail to distinguish between the different defendants, contrary to Eleventh Circuit law,[17] they are precisely the kind of "general conclusory allegations" that Rule 9(b) prohibits.  *Cooper,* 19 F.3d at 568.  If NNS is to defend against fraud allegations, then vague, hindsight-driven demands that it did not do "enough," without any specificity, do not suffice.  *See also U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 145 F. Supp. 3d 1220, 1267 (N.D. Ga. 2015) (finding "failure to connect the dots" to identify fraud may have been negligent but was

---

[17] Relator alleges wrongdoing by "Defendants," with the Complaint using that term *155 times*.  But a complaint that "lumps together all defendants, failing to allege the conduct of each defendant" is subject to dismissal for violating Rule 9(b).  *U.S. ex rel. Isabell v. Kindred Healthcare*, 2019 WL 4345782, at *3 (M.D. Fla. Sept. 12, 2019); *see also, e.g.*, *U.S. v. Choudhry*, 2016 WL 7228760, at *3 (M.D. Fla. Oct. 11, 2016).

not an FCA violation), *rev'd on other grounds*, 841 F.3d 927 (11th Cir. 2016).

2.      In addition, it is well-established that a "claim cannot be 'false' . . . and thus cannot trigger FCA liability" without "an objective falsehood."  *U.S. v. AseraCare, Inc.*, 938 F.3d 1278, 1296-97 (11th Cir. 2019); *see also, e.g.*, *U.S. ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 959 (10th Cir. 2008) (same); *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376-77 (4th Cir. 2008) (same).  Yet standards such as "adequate oversight," "effective audit and inspection," "appropriate quality control," and "heightened scrutiny," (*e.g.*, AC ¶¶ 134, 139, 157, 166, 168, 169, 270), all are so amorphous as to defy being provable as true or false.  These allegations are no different than the question of whether the defendant performed "sufficient" maintenance, which "is precisely the sort of claim that courts have determined not to be a false statement under the FCA."  *Wilson*, 525 F.3d at 377.  Allegations involving "general and relatively vague . . . provisions" of contracts fall short of stating a claim under the FCA, *id.*; Relator's "general and relatively vague" *paraphrases* of supposed (but never identified) contractual requirements most assuredly fall even further short.

3.      Not surprisingly, then, Relator fails to link these supposed deficiencies in supplier oversight to any alleged false claims or certifications that NNS submitted to the Government.  *See Corsello*, 428 F.3d at 1014.  To allege an FCA claim based on NNS's failure to take certain steps—i.e. more inspections or audits of Nuflo—it must be that such steps "*would have revealed* that false submissions were being made." *U.S. v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997).  Relator makes no plausible allegation that inspections or audits would have detected the fraud in which Nuflo supposedly engaged.  How would more audits of weld repair processes have revealed that Nuflo was secretly repairing parts without documentation, especially where Nuflo "regularly and intentionally falsified records?"  AC ¶ 92.  How would more inspections of Nuflo parts have

17

uncovered unauthorized welds that cannot be detected by visual and dimensional inspections, in particular given the relatively tiny percentage of nonconforming parts?  Indeed, the Navy, which performed dozens of audits of Nuflo and had its own onsite source inspector onsite at Nuflo during this period, never discovered the supposed fraud.  The Complaint leaves entirely unexplained how audits and inspections by NNS would have detected Nuflo's fraud, and thus fails to link the alleged lack of such oversight to the submission of any false claim.

Relator's treatment of the Supplied Delegated Inspection ("SDI") program—the portion of NNS's supplier oversight program on which Relator focuses the most vitriol, *see* AC ¶¶ 140-53—highlights its inability to connect any supposed flaws in the NNS oversight program to specific false claims or certifications submitted by NNS to the Government.  Relator vaguely alleges that NNS "delegated its inspection responsibilities" to Nuflo and SFS, *id.* ¶ 270, but on close examination the Complaint barely explains what the SDI program is, and does not explain *what* "hardware" and "documentation" inspections (*id.* ¶ 142) suppliers perform under the program or how those inspections would have detected the alleged nonconformance (e.g., weld repairs or falsified heat treatment numbers) had NNS employees performed them instead.[18]  Relator's disdain for the SDI program cannot save the Complaint from dismissal when the Complaint does not allege any specific non-conforming part that was subject to the SDI program and ultimately invoiced to the Government.

The Complaint's lack of detail here likely is not accidental, as detail would expose Relator's SDI argument as a mirage.  Relator conveniently omits that many Nuflo parts purchased

---

[18] Relator demonstrates a deep misunderstanding of the SDI program, pursuant to which the shipyards approve supplier personnel to perform certain limited inspections on final parts.  SDI inspectors do not inspect processes.  Given that they inspect parts, it is mystifying why Relator considers it relevant that SFS personnel worked at a warehouse without "machining capability."  AC ¶ 143.  Relator also never explains why it would be nefarious that SFS is a distributor, given that distributors commonly supply parts to the Navy, EB, NNS and other industrial enterprises.

by NNS were not subject to the SDI program at all; thus, changes to the SDI program could not have revealed the fraud to NNS or prevented the nonconformances.  NNS purchased thousands of fittings directly from Nuflo (not through SFS) after Nuflo was suspended from the SDI program in 2007, all of which would have been subject to NNS's regular inspection program. *Id.* ¶¶ 143, 162.  Relator also makes much of the importance of Level 1 parts but omits that neither Nuflo nor SFS performed any SDI inspections on Level 1 parts ordered by NNS prior to 2011.  This highlights the importance of knowing *which particular parts* Relator alleges were nonconforming – if the nonconforming parts were purchased directly from Nuflo post-2007, or were Level I parts purchased prior to 2011, then Relator's attacks on the SDI program would be irrelevant, as the nonconformances could not be linked to any deficiency in that program.  But, of course, the Complaint lacks any such specificity, and fails to describe with particularity (as required by Rule 9(b)) which Nuflo parts were subject to the SDI program and which were not.

## II.  THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO PLEAD FACTS TO SUPPORT A PLAUSIBLE INFERENCE OF A "KNOWING" VIOLATION

The FCA is a fraud statute, punishing a wrongdoer with treble damages as well as penalties of (currently) between $11,665 and $23,331 per violation.  AC ¶ 21; *Urquilla-Diaz*, 780 F.3d at 1058.  Consequently, to prevail on an FCA claim, "the relator must show that the defendant acted 'knowingly.'"  *See id.*; 31 U.S.C. § 3729(a)(1)(A)-(B).  The FCA defines "knowing" to mean having "actual knowledge of the information," acting "in deliberate ignorance of the truth or falsity of the information," or acting "in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1)(A)(i–iii).  This scienter requirement is "rigorous."  *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016).  Although Rule 9(b) allows knowledge to be pled generally, it still requires Relators to plead "sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind."

*Herengracht Grp. LLC v. WM. Wrigley Jr. Co.*, 2011 WL 13174744, at *4 (S.D. Fla. Aug. 15, 2011). "[B]are assertion[s]" and "legal conclusion[s]" will not suffice. *Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101, 1107 (11th Cir. 2015). Courts do not hesitate to dismiss FCA complaints that fail to plead facts supporting an inference that the defendant acted knowingly.[19]

### A.  Relator Does Not Even Attempt To Plead That NNS Had "Actual Knowledge."

Relator does not even attempt to allege that NNS submitted a false claim with "actual knowledge"—the quintessential FCA violation.  Even after a multi-year investigation, no individual NNS employee is ever mentioned in the Complaint, much less identified as a person with actual knowledge of Nuflo's fraudulent scheme or the submission of a false claim to the Navy. There are no emails, conversations, meetings, memoranda, letters or other documents indicating any involvement or knowledge by NNS personnel in Nuflo's improper conduct.  Nowhere present in the Complaint are any facts from which one could infer that an NNS employee was aware of Nuflo's misdeeds or sent an invoice or certification to the Navy believing it was false.

### B.  Relator Does Not Plead Facts To Support A Plausible Inference That NNS Acted With "Deliberate Ignorance" Or "Reckless Disregard."

Relator alleges instead that NNS acted with "deliberate ignorance" or "indifference" or "reckless disregard" to Nuflo's conduct by failing to exercise appropriate oversight of these suppliers.  *E.g.*, AC ¶¶ 132, 153, 271, 273, 275.  Reckless disregard is "an extension of gross negligence"—an "extreme version of ordinary negligence" or "gross negligence-plus." *Krizek*, 111 F.3d at 942; *U.S. ex rel Aakhus v. Dyncorp Inc.*, 136 F.3d 676, 682 (10th Cir. 1998) ("aggravated form of gross negligence" or "gross negligence-plus").  Congress intended the "reckless disregard" provision of the FCA to "capture[] the 'ostrich' type situation where an

---

[19] *See, e.g.*, *U.S. ex rel. Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 454 (5th Cir. 2005); *U.S. ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 438 (6th Cir. 2016).

individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted." *Urquilla-Diaz*, 780 F.3d at 1058.  But "Congress did not intend to turn the False Claims Act, a law designed to punish and deter fraud, into a vehicle either punishing honest mistakes or incorrect claims submitted through mere negligence." *Id.*  Nor did it intend to "impos[e] a burdensome obligation on government contractors rather than a limited duty to inquire." *Id.*  And, as the Eleventh Circuit has held, deliberate ignorance "demands *even more* culpability than that needed to constitute reckless disregard." *Id*. at 1058 n.15.

Relator's allegations do not meet the extraordinarily high standard for either "reckless disregard" or "deliberate ignorance."  Rather, the Complaint itself shows that NNS more than fulfilled its "limited duty to inquire." *Id.*  According to Relator's own allegations, NNS repeatedly *identified, investigated, and addressed—not ignored*—quality issues at Nuflo and SFS (none of which could be deemed "warning signs"):

- NGSS issued a nonconformance report and a request to return and replace material to Nuflo.  AC ¶ 160.

- NNS suspended Nuflo from the SDI program due to quality issues.  *Id.* ¶ 162.

- NNS issued a quality notification to SFS, and as a result Nuflo agreed to purchase new equipment as a preventative action.  *Id.* ¶ 166.

- NNS requested information from Nuflo following a delivery delay, leading to Nuflo advising NNS that it was rejecting and reworking the parts.  *Id.* ¶ 168.

- NNS issued a Corrective and Preventative Action Request to SFS, and only accepted the parts after receiving an acceptable response from SFS.  NNS then conducted a two-day SDIP audit at Nuflo.  *Id.* ¶ 169.

- NNS notified SFS that certain parts appeared to be mismarked and then coordinated efforts with SFS to replace the mismarked parts.  *Id.* ¶ 170.

- NNS refused to accept an SFS shipment of Nuflo parts at receipt inspection and issued a Quality Notification concerning the parts.  *Id.* ¶ 173.

- NNS issued a Quality Notification regarding SFS's mismarking of certain parts, and the parts were remarked and resubmitted.  *Id.* ¶ 174.

- NNS determined that a Nuflo part did not meet wall thickness requirements. NNS then determined independently that the elbow could be used for its intended application. *Id.* ¶ 176.[20]

Each of these so-called "red flags" actually describes a strong functioning quality management system: in each instance NNS itself identified quality issues and took corrective action.

Indeed, as evidenced by its elaborate falsifications and subterfuge,  Nuflo itself recognized that NNS had an active and diligent quality system which needed to be evaded.  The Complaint details the extensive efforts Nuflo undertook to conceal its quality control failures from NNS, including "intentionally falsif[ying] records [and] cover[ing] up defects, *id.* ¶ 92, delivering parts "with false certifications of conformance," *id.* ¶ 107, "intentionally chang[ing] heat-lot numbers on products," *id.* ¶ 120, and "falsif[ying] the documents" attesting that parts had been properly manufactured, tested, inspected, and approved, *id.* ¶ 129.  NNS's not detecting violations that Nuflo was actively hiding does not indicate that NNS's oversight was inadequate, much less reckless. *See, e.g.*, *U.S. ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 30 (D.C. Cir. 2014) ("We think a contractor . . . is ordinarily entitled to rely on a supplier's certification that the product meets [Government] requirements.").[21]

At bottom, Relator's allegations of recklessness are based on the failure of NNS to detect the alleged fraudulent scheme at Nuflo.  But the mere failure of a compliance program to identify *all* nonconforming parts or *every* instance of a supplier's contractual noncompliance does not constitute reckless disregard.  *See, e.g., U.S. ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 110 (3d Cir. 2007) ("The mere failure of a system to catch an error does not establish recklessness.").  That is true even where the contractor identifies room for improvement in its

---

[20] The vast majority of the other so-called "warning signs" referenced in the Complaint do not relate to NNS.  *See* AC ¶¶ 161, 163, 164, 165, 167, 171, 172, 177, 178.

[21] *See also, e.g., U.S. ex rel. Ervin & Assocs., Inc. v. Hamilton Sec. Grp.*, 298 F. Supp. 2d 91, 101 (D.D.C. 2004) (finding that contractor was not "negligent in the extreme, if negligent at all" when it relied on supplier's test results).

processes. *See U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 130 F. Supp. 3d 866, 879 (S.D.N.Y. 2015) ("[I]dentifying errors in data collection or recognizing the need for better quality control does not constitute 'reckless disregard' within the meaning of the FCA.").[22]

Relator's "red flags" refute any allegation of "reckless disregard" by showing that NNS went beyond its obligation to make "simple inquiries." *Urquilla-Diaz*, 780 F.3d at 1058. Relator cannot plead "reckless disregard" by second-guessing NNS's compliance program or simply disagreeing with NNS's engineering decisions. *Id.* at 1059 (relator cannot manufacture reckless disregard under the FCA through "personal, hypercritical assessments of . . . performance . . . untethered from any binding or persuasive authority"). And even if the issues NNS identified should somehow have put NNS on notice of other issues, a mere "failure to connect the dots" does not establish "recklessness," *Saldivar*, 145 F. Supp. 3d at 1267—especially a handful of purported "dots" over a ten-year period during which Nuflo delivered hundreds of thousands of parts to NNS. None of the facts alleged in the Complaint support an inference that NNS was "grossly negligent-plus" and, accordingly, it fails to plausibly plead scienter under the False Claims Act.[23]

## C. Relator Cannot Establish FCA Scienter By Imputing Knowledge From Other Entities To NNS.

Unable to allege that NNS had direct knowledge of or recklessly disregarded Nuflo's

---

[22] *See also MW Builders, Inc. v. U.S.*, 134 Fed. Cl. 469, 522 (2017) ("The court does not disagree . . .that [defendant's] review was not as thorough as it could have been. But, in other cases where the United States Court of Federal Claims has found FCA liability, there was not even a minimal examination of records."); *Ervin*, 298 F. Supp. 2d at 102 (although "more extensive quality controls could have been in place (as is always the case)," failure "to create a system better attuned to the possibility of error … d[oes] not constitute" an FCA violation.).

[23] In a desperate attempt to manufacture scienter, Relator contends that the criminal conduct at supplier Hunt Valve in the late 1990's is somehow relevant. AC ¶¶ 76-85. This argument is a red herring. Hunt Valve was a valve supplier whose Quality Assurance Manager went to prison for falsifying non-destructive testing (NDT) results. NNS has always known the importance of monitoring suppliers; it did not need the criminal conduct at Hunt Valve to remind it. A problem years before at one of its thousands of suppliers cannot possibly give rise to a reasonable inference that NNS knew of fraud or acted recklessly with Nuflo. *See, e.g.*, *U.S. ex rel. Polukoff v. St. Mark's Hosp.* 2016 WL 1449219, at *4 (M.D. Tenn. Apr. 13, 2016) ("Relator seems to rest his claims against HCA on the hope that the Court will intuit that because of HCA's past compliance issues and current compliance policies, HCA should have known of [the] alleged scheme. Without more, this unsubstantiated speculation simply cannot survive a motion to dismiss").

fraudulent scheme, Relator attempts to impute the conduct and knowledge of other companies—Nuflo, SFS, and EB—to NNS.  It alleges that because the SDI program allowed Nuflo and SFS personnel to perform certain inspections, Nuflo's knowledge should be imputed to NNS.  AC ¶ 150.  Similarly, it contends that because of their teaming arrangement, EB's knowledge is attributable to NNS, and vice versa.  *Id.* ¶ 283.  These farfetched agency theories have no legal basis and cannot save Relator's deficient Complaint.

To hold an entity liable for fraud based on what *another* entity knew would read the scienter requirement out of the FCA, essentially turning it into a strict liability statute.  *See, e.g.*, *U.S. v. Nazon*, 1993 WL 459966, at *2 (N.D. Ill. Nov. 3, 1993) (rejecting argument that defendant could be held liable under the FCA based on the acts and knowledge of others with "no evidence of *his* mental state").  Relator's theory would "impose[] damages that are essentially punitive in nature," *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 784 (2000), on blameless defendants that have no knowledge whatsoever of the falsity of any claim or certification.[24]

Unsurprisingly, Relator's theory lacks any legal support.  For example, Relator offers no support for its bold assertion that the mere existence of a teaming agreement between NNS and EB—the terms of which Relator does not cite or even purport to describe—renders the "knowledge attributable to one contractor [] equally attributable to the other."  AC ¶ 283.  NNS knows of no case relaxing the scienter requirement in that manner.  As Relator acknowledges, NNS is a *subcontractor* to EB, AC ¶ 30, and NNS is aware of no case in which the knowledge of a prime contractor is automatically attributed to its subcontractor.  NNS likewise is aware of no case supporting Relator's attempts to establish NNS's scienter by virtue of certain inspection tasks

---

[24] Relator's attempt to aggregate each individual company's scienter into one undifferentiated whole runs counter to case law that prohibits the lumping-together of defendants.  *See Choudhry*, 2016 WL 7228760, at *3 (FCA complaint "impermissibly lump[ed] together all defendants, failing to allege what conduct each defendant engaged in").

being allocated to Nuflo.  Rather, it is well accepted that "the innocent prime contractor has no FCA liability because it does not knowingly present a false claim."  *See* J. Boese & D. Baruch, *Civil False Claims & Qui Tam Actions* § 2.01[A][2][*a*] (12/2019 Update).

Furthermore, even if the SDI agreement (which Relator does not cite or describe the terms of) somehow transformed Nuflo/SFS personnel into agents of NNS—again, NNS is aware of no case supporting such a proposition, and such an expansion would obliterate the FCA's high scienter requirements—Relator's attempt to invoke agency law in the circumstances here would contradict long-standing Eleventh Circuit precedent.  In the employee context, the Eleventh Circuit has long held that the knowledge or intent of an employee "not acting with a purpose to benefit his employer, will not be imputed to the employer, when the latter is sought to be held liable under a statute requiring knowledge or guilty intent." *U.S. v. Ridglea State Bank*, 357 F.2d 495, 500 (5th Cir. 1966) (FCA case); *see also Grand Union Co. v. U.S.*, 696 F.2d 888, 891 (11th Cir. 1983); *U.S. v. Hill*, 676 F. Supp. 1158, 1178 (N.D. Fla. 1987).  Relator nowhere alleges that the purported wrongful conduct by Nuflo or SFS was to benefit NNS.  To the contrary, the Complaint details a decade-long effort by Nuflo to *defraud* NNS—not benefit it.  As such, the alleged misconduct of Nuflo and SFS should not be imputed to NNS under *Ridglea* and *Grand Union*.

## CONCLUSION

NNS also adopts and incorporates in their entirety the arguments advanced by EB in its Motion to Dismiss (filed March 16, 2020).  For the reasons set forth above as well as in EB's Motion, Relator's Amended Complaint (ECF No. 52) should be dismissed with prejudice.

Dated:  March 16, 2020        Respectfully submitted,

**AKERMAN LLP**

By:    */s/ Michael C. Marsh*
        Michael C. Marsh (Fla. Bar No. 072796)
        Email: michael.marsh@akerman.com
        Donnie M. King (Fla. Bar No. 101386)
        Email:  donnie.king@akerman.com
        98 Southeast Seventh Street
        Suite 1100
        Miami, Florida 33131
        Phone: (305) 374-5600
        Fax:    (305) 374-5095

**OF COUNSEL:**

Michael L. Waldman (*pro hac vice* motion to be filed)
Lee Turner Friedman (*pro hac vice* motion to be filed)
John B. Goerlich (*pro hac vice* motion to be filed)
Carolyn M. Forstein (*pro hac vice* motion to be filed)
ROBBINS, RUSSELL, ENGLERT,
  ORSECK, UNTEREINER & SAUBER LLP
2000 K Street N.W., Fourth Floor
Washington, DC 20006
 (202) 775-4500
mwaldman@robbinsrussell.com

*Counsel for Defendant Huntington Ingalls Industries,*
*Newport News Shipbuilding Division*

26

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 16, 2020, the foregoing document is being served on all counsel of record or *pro se* parties either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: _/s/ Michael C. Marsh_
Michael C. Marsh