IN THE UNITED STATES DISTRICT
COURT FOR THE MIDDLE DISTRICT
OF FLORIDA JACKSONVILLE
DIVISION

UNITED STATES OF AMERICA
ex rel. 84Partners LLC,

      Plaintiff,

vs.                                                                                   Case No. 14-cv-1256-J-32PDB

NUFLO, INC., SYNERGY FLOW
SYSTEMS, LLC, GENERAL DYNAMICS,
MARINE SYSTEMS DIVISION, ELECTRIC
BOAT CORP., and HUNTINGTON
INGALLS INDUSTRIES, NEWPORT
NEWS SHIPBUILDING DIVISION,

      Defendants.
_____/

**UNITED STATES' STATEMENT OF INTEREST IN RESPONSE TO THE
MOTIONS TO DISMISS OF DEFENDANT GENERAL DYNAMICS
ELECTRIC BOAT CORP. (DOCKET NO. 60) AND DEFENDANT
HUNTINGTON INGALLS INDUSTRIES, NEWPORT NEWS
<u>SHIPBUILDING DIVISION (DOCKET NO. 61)</u>**

Pursuant to 28 U.S.C. § 517, the United States respectfully submits this Statement of Interest in Response to the Motions to Dismiss of Defendant General Dynamics Electric Boat Corp. (Docket No. 60) and Defendant Huntington Ingalls Industries, Newport News Shipbuilding Division (Docket No. 61). In its motion, Defendant Electric Boat (EB) raises a cursory, three sentence challenge to the constitutionality of the *qui tam* provisions of the False Claims Act (FCA). In both motions, Defendants EB and Newport News Shipbuilding (NNS) raise a matter of statutory interpretation regarding the FCA's knowledge element. We begin with EB's constitutional challenge.

1

I.  The FCA's *Qui Tam* Provisions are Consistent with the Constitution

It is well-established that the FCA's *qui tam* provisions do not infringe upon the Executive's authority under the Take Care Clause of Article II of the U.S. Constitution to control litigation on behalf of United States, or to remove individuals exercising such authority; nor violate the Appointments Clause by permitting relator's to pursue *qui tam* litigation without being appointed as "Officers."

    A.  The FCA's *Qui Tam* Provisions are Consistent With the Executive's Obligation under Article II To "Take Care" that the Laws Be Faithfully Executed

The "Take Care" Clause of the U.S. Constitution provides that the Executive must "take Care that the Laws be faithfully executed." U.S. Const., art. II., cl. 5. Defendant EB contends that the FCA's *qui tam* provisions offend separation of principles by infringing on the authority of the Executive Branch under the Take Care Clause to control litigation on behalf of the United States and to remove relators. Def. Br. At 25. EB is incorrect.

"In determining whether [legislation] disrupts the proper balance between the coordinate branches, a proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 443 (1977). Courts have long agreed that a relator's pursuit of *qui tam* litigation does not prevent the Executive from carrying out its constitutional functions. Several courts of appeals have rejected contentions similar to those advanced by EB here, and have held the *qui tam* provisions are consistent with separation of powers principles. *United States ex rel. Stone* v. *Rockwell Int'l Corp.*, 282 F.3d 787, 805 (10th Cir. 2002); *Riley* v. *St. Luke's Episcopal Hosp.*, 252 F.3d 749, 757 (5th Cir. 2001) (*en banc*); *United States ex rel. Taxpayers Against Fraud* v. *Gen Elec.*

*Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994); *Kelly* v. *Boeing Co.*, 9 F.3d 743, 750-55, 758 n.21 (9th Cir. 1993), *cert. denied*, 510 U.S. 1140 (1994); *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1154-56 (2nd Cir. 1993); *see also U.S. ex rel. Butler v. Magellan Health Services, Inc.*, 74 F. Supp. 2d. 1201, 1212 (M.D.Fla. 1999) ("A standard defense is an attack on the constitutionality of the FCA . . . . Each of these arguments has been brought repeatedly by defendants in qui tam cases, and each has been rejected resoundingly by the District and Circuit courts, [each] for different reasons."). In doing so, these courts have cited to (1) the long history of permitting private suits to collect fines and penalties, and (2) the Government's practical control over *qui tam* litigation, which satisfies the Executive's Article II responsibility to take care that the laws are faithfully executed. Defendant EB does not refer to this precedent or offer any basis for distinguishing it.

In considering similar separation of powers challenges, courts also have held that the Take Care Clause "does not require Congress to prescribe litigation by the Executive as the exclusive means of enforcing federal law." *Riley,* 252 F.3d at 753. "Our current statutory framework includes many laws that authorize individuals to act as 'private attorneys-general' bringing causes of action for the common weal," *Taxpayers Against Fraud*, 41 F.3d at 1042, such as Title VII and the Sherman Act.

As the Supreme Court has recognized, there is a long history of permitting private parties to bring suits for statutory penalties or fines to vindicate the sovereign's interest in enforcing compliance with the law. *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 768, 772-78 & nn. 5-7 (2000); *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 n.4 (1943) ("Statutes providing for actions by a common

informer, who himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our government."). This history shows that the Framers did not regard such private actions as inconsistent with the Executive's obligation to Take Care that the laws are faithfully executed. *Id*. at 807 (Stevens, J., dissenting)[1].

Second, the FCA reserves to the Attorney General significant control over the prosecution of the claims pressed in a *qui tam* complaint, which courts have found sufficient to preserve the Executive's authority under the Take Care Clause. *Riley,* 252 F.3d at 753. For example, once filed, the *qui tam* complaint remains under seal to permit the Government to investigate relator's allegations, 31 U.S.C. § 3730(b)(2)-(4), and allows the Government the option to take over the case and assume "primary responsibility for prosecuting the action," without being "bound by an act of the [relator]". 31 U.S.C. §§ 3730(b)(4), (c)(1). Even if the Government declines to take over the case and relator moves forward with litigation, it retains the right to receive copies of all pleadings and deposition transcripts (§ 3730(c)(3)); to stay any discovery by the relator that "would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts" (§ 3730(c)(3)); to pursue "any alternate remedy available to the Government" against the defendant (§ 3730(c)(5)); and to intervene at any time thereafter "upon a showing of good cause," 31 U.S.C. § 3730(c)(3).

---

[1] The *Vermont Agency* majority found that the Article II issue had not been preserved for review and therefore did not address it on the merits. *Id.* at 778 n.8.

Whether it intervenes or not, the Government may settle a *qui tam* action over relator's objection upon showing the settlement is "fair, adequate and reasonable" (§ 3730(c)(2)(B)), and it may dismiss a *qui tam* over relator's objection (§ 3730(c)(2)(A)) upon notice and a hearing. *United States v. Everglades Coll., Inc.*, 855 F.3d 1279, 1286 (11th Cir. 2017); *Swift v. United States*, 318 F.3d 250, 252 (D.C. Cir. 2003); *United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1145 (9th Cir. 1998).

Throughout, the relator is neither the Government nor its legal representative, nor are his legal and factual representations those of the United States. He is a "private part[y] seeking to vindicate his independent interest, which arises from the statute's "partial assignment of the Government's damages claim" to him. *Vermont Agency,* 529 U.S. at 773; *see also* 31 U.S.C. § 3730(d) (entitling a relator to a share of the award if his action results in a financial recovery).

Defendant EB relies on a single case, *Morrison* v. *Olson*, 487 U.S. 654 (1988), to support its claim that the *qui tam* provisions infringe the Executive's authority under the Take Care Clause. But *Morrison* does not support EB's position and to the contrary makes clear that the type of practical control over the relator's prosecutorial authority that the FCA provides more than satisfies the requirements of the Take Care Clause. In *Morrison*, the Supreme Court considered whether provisions of the Ethics in Government Act violated Article II. That statute authorized the appointment of an independent counsel to investigate and prosecute certain high-ranking Government officials for violations of Federal criminal law. *Id*. at 662. It further provided that costs relating to the establishment and operation of the independent counsel were to be paid with public

funds. *Id*. at 663 n.7. The independent counsel, moreover, was not generally subject to supervision by the President or the Attorney General and could be removed only for good cause, physical disability, mental incapacity, or other condition substantially impairing the performance of his or her duties. *Id*. at 662-63. The Court nonetheless held that this ultimate power to terminate for good cause left the Executive Branch with sufficient control over the independent counsel to satisfy the Take Care Clause of Article II. *Id*. at 662-63. By contrast, the FCA provides the Executive Branch with far more control over a *qui tam* relator.

As all the courts of appeals to address the question have held, *Morrison* demonstrates that the FCA's *qui tam* provisions are consistent with Article II. Unlike the independent counsel statute at issue in *Morrison,* the FCA vests considerably less prosecutorial power in a *qui tam* relator and more discretion in the Executive Branch. A relator does not have a general warrant to prosecute claims beyond those at issue in his complaint. *Qui tam* suits, moreover, are civil in character and do not entail delegation of the Government's core sovereign function of enforcing the criminal law. *See Riley*, 252 F.3d at 755. And throughout the proceedings, the relator litigates at his own expense with his own private resources, not the prosecutorial resources of the United States. The Attorney General retains substantially greater control over a *qui tam* case, including the authority to take over the litigation at its outset and to compel dismissal of the case. *See Kelly*, 9 F.3d at 755; *Taxpayers Against Fraud*, 41 F.3d at 1041; *United States ex rel. Kreindler*, v. *United Technologies*, 985 F.2d 1148 1155 (2d Cir. 1993).

Defendant EB's suggestion that the *qui tam* statute violates the Take Care Clause is meritless.

B.  *Qui Tam* Relators are not Officers of the United States Subject to the Appointments Clause of Article II

Defendant EB suggests that the responsibility to conduct civil litigation intended to vindicate public rights must be vested in "officers" of the United States who are appointed in accordance with the Appointments Clause, U.S. Const. art. II, § 2, cl. 2, and that the FCA, by purportedly vesting this function in a non-appointed private party, violates this Constitutional requirement.  In the years since the 1986 Amendments of the FCA were enacted, numerous courts have rejected Appointments Clause challenges to the FCA, and Defendant EB offers nothing new here.

The Appointments Clause governs the procedures by which "Officers of the United States" are appointed.  The Appointments Clause provides:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2. "The Constitution for purposes of appointment . . . divides all its officers into two classes." *United States* v. *Germaine*, 99 U.S. 508, 509 (1879). "Principal officers are selected by the President with the advice and consent of the Senate. Inferior officers Congress may allow to be appointed by the President alone, by the heads of departments, or by the Judiciary." *Buckley* v. *Valeo*, 424 U.S. 1, 132 (1976). Lesser functionaries, who are neither principal nor inferior officers, are "government employees," who may be selected without regard to Article II. *Id.* at 126 n.162; *see Freytag* v. *Commissioner*, 501 U.S. 868, 881-82 (1991).

Several courts of appeals have held that relators are not constitutional officers and that the *qui tam* provisions of the False Claims Act therefore do not contravene the Appointments Clause.  *See, e.g., United States ex rel. Stone* v. *Rockwell Int'l Corp.*, 282 F.3d at 805 (Relators "do not serve in any office of the United States" ); *Riley*, 252 F.3d at 757-8; *United States ex rel. Taxpayers Against Fraud v. Gen Elec. Co.*, 41 F.3d at 1041; *Kelly v. Boeing Co.*, 9 F.3d at 759.

As the Fifth Circuit has explained, "Supreme Court precedent has established that the constitutional definition of an 'officer' encompasses, at a minimum, a continuing and formalized relationship of employment with the United States Government." *Riley*, 252 F.3d at 757.  The above precedents hold that *qui tam* relators lack the tenure, salary, scope of duties, and other indicia of Constitutional officers and thus are not subject to the Appointments Clause in the first instance. *See, e.g., Stone*, 282 F.3d at 805.  "There is no legislatively created office of informer or relator under the FCA"; "[r]elators are not entitled to the benefits of officeholders, such as drawing a government salary"; and relators "are not subject to the requirement, noted long ago by the Supreme Court, that the definition of an officer 'embraces the ideas of tenure, duration, emolument, and duties, and the latter were continuing and permanent, not occasional or temporary.'" *Rockwell,* 282 F.3d at 805 (quoting *United States v. Germaine*, 99 U.S. 508, 511-12 (1879)); *see also Auffmordt v. Hedden*, 137 U.S. 310, 326-327 (1890)  (holding that a person who performs public duties for a "particular case" but "has no general functions, nor any employment which has any duration as to time" is not an Officer because his "position is without tenure, duration, continuing emolument, or continuous duties, and he acts only occasionally and temporarily").

The relator's role is far more limited than that of a Constitutional officer or even an employee.  The FCA's *qui tam* provisions make a limited partial assignment of the Government's monetary claim *Vermont Agency*, 529 U.S. at 773, to a relator for a single case and do not generally vest the relator with plenary authority to wield the Government's prosecutorial power.  *Kelly*, 9 F.3d at 759 ("a qui tam relator who litigates only a single case does not have 'primary responsibility' within the meaning of *Buckley* for enforcing the FCA.").  Moreover, *qui tam* cases are civil in character and do not authorize the relator to bring criminal cases based on the fraud committed against the Government. Rather, Congress enacted separate criminal provisions pertaining to fraud on the United States, and the core, sovereign function of prosecuting these criminal offenses remains vested exclusively in the Attorney General and subordinate Federal officers.  *See* 18 U.S.C. § 287; *see also Rainwater* v. *United States*, 356 U.S. 590, 592 n.8 (1958) (noting separation of criminal fraud prosecutions from civil FCA).  And even as to civil claims, a relator remains subject to all the restrictions the FCA imposes on its ability to pursue the litigation, including the Government's right to take over the case itself (31 U.S.C. §§ 3730(b)(4)(A) & (c)), settle the matter or relator's objection (§ 3730(c)(2)(B)) or seek its dismissal over relator's objection (31 U.S.C. § 3730(c)(2)(A)).

*Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018), is the only new case Defendant EB cites in support of its Appointments Clause argument, but it does nothing to alter the existing landscape that *qui tam* relators are not Officers of the United States under the Appointments Clause.  *Lucia* held that administrative law judges for the SEC, who the Court held exercised nearly all the tools of federal trial judges, are constitutional officers

and subject therefore to the Appointments Clause. As to relators, well established case law has reached the opposite conclusion.

II. <u>An Agent's FCA Knowledge May Be Imputed to the Principal</u>

Relator alleges that EB and NNS designated various Nuflo or SFS employees as their agents (known as Supplier Delegated Inspectors (SDIs)) to perform certain inspections on their behalf as part of their Qualified Supplier Delegated Inspection Program, (SDIP) and that the SDIs obtained knowledge of the alleged falsities, *e.g.*, pipefitting non-conformances, within the scope of their agency. See, e.g., Relator's Amended Complaint, § 150. Defendants contend that the actual knowledge of their alleged agents should not be imputed to them, and seek dismissal.[2]

We begin with well-established principles of agency law. As corporations are fictional persons, knowledge attributable to a corporation as a matter of law derives from the natural persons, *e.g.*, directors, officers, managers, employees, agents, capable of obtaining such knowledge. Thus, all corporate knowledge is imputed knowledge. As one commentator stated:

> A corporation cannot see or know anything except by the eyes or intelligence of its officers; and a corporate body, as a legal entity, cannot itself have knowledge. **If it can be said to have knowledge at all, it must be the imputed knowledge of some corporate agent**. Knowledge of the proper corporate agent must be regarded, in legal effect, as the knowledge of the corporation.

3 *Fletcher Cyc. Corp.* § 787 (**bold** added).

---

[2] The FCA defines "knowingly" to include "actual knowledge of the information," "deliberate ignorance of the truth or falsity of the information," or "reckless disregard of the truth or falsity of the information." *Id.* at § 3729(b)(l)(A). "[N]o proof of specific intent to defraud is required." *Id.* at § 3729(b)(1)(B).

The Restatement (Second) of Agency § 1 (1958) (June 2018 Update) provides that "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act **on his behalf and subject to his control**, and consent by the other so to act." (**Bold** added).  Comment 1(a) to the Restatement states:

> The relation of agency is created as the result of conduct by two parties manifesting that one of them is willing for the other to act for him subject to his control, and that the other consents so to act. The principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on the principal's behalf and subject to his control. Either of the parties to the relation may be a natural person, groups of natural persons acting for this purpose as a unit such as a partnership, joint undertakers, or a legal person, such as a corporation.

Here, relator alleges that EB and NNS, in delegating inspection responsibilities to the SDIs, to act (1) on behalf of EB and NNS, and (2) subject to EB's and NNS' control through written instructions, principal/agency relationships were created between the Defendants and their respective SDIs.  Relator's Amended Complaint, § 150.  These allegations are more than sufficient to establish a plausible principal-agent relationship for purposes of a motion to dismiss.

It is well-established that a principal may be deemed to have legally received certain knowledge or notice that has, in fact, been received only by the agent.  *Restatement (Second) of Agency* § 268, 272, 278 (1958); William A. Gregory, *The Law of Agency and Partnership* §§ 57, 59 (3d ed. 2001); *Anderson v. Walthal*, 468 So. 2d 291, 294 (Fla. Dist. Ct. App. 1985) ("it is equally settled that knowledge of, or notice to, an agent is imputed to the principal when it is received by the agent while acting within the course and scope of employment..."); *Ouachita Equip. Rental Co. v. Trainer*, 408 So. 2d 930, 935 (La. Ct. App. 1981) ("The knowledge of the agent is imputed to the principal

11

even if the agent neglects to specifically convey that information to the principal."). Accordingly, if an agency relationship exists between the SDIs and the shipbuilders, the knowledge that defendants' agents acquired about the non-conformance of the pipe fittings at issue in this case may be imputed to and treated as the knowledge of the defendants themselves.

In the case of corporate defendants, FCA knowledge is necessarily imputed from natural persons to the corporation following established principles of agency law.  While it is frequently the case that the natural persons are employees of the corporate defendants, an agent is an agent whether they are an employee or not.

Both EB and NNS contend that *U.S. v. Ridglea State Bank*, 357 F.2d 495 (5th Cir. 1966) and *Grand Union Co. v. United States*, 696 F.2d 888, 891 (11th Cir. 1983), which followed *Ridglea*, set the standard for imputing an agent's knowledge to the principal: that the SDIs' knowledge was obtained within the scope of the agency and for the benefit of the principal.  Assuming that is correct, the defendants raise a factual question that cannot be resolved at the motion to dismiss stage.[3]  But the logic undergirding the decision in *Ridglea* is in doubt.  The FCA then in effect did not define the degree of *scienter* needed and the *Ridglea* court interpreted it to require specific intent and applied a criminal standard of agency: "if a specific criminal intent is necessary to constitute a crime, an employer may be penalized for an employee's criminal act only if the agent acted within the scope of employment, and not if the agent acted for some purpose other

---

[3] Although Defendants draw one inference from Relator's allegations, another may be drawn, in plaintiff's favor, that the SDIs who allegedly failed to address the pipefitting non-conformances did so to benefit both the suppliers, who would be required to repair or replace the fittings at additional cost, and the Defendant shipbuilders, whose manufacturing schedules might be delayed or disrupted pending correction of the non-conformances.  Spiral Direct, Inc. v. Basic Sports Apparel, Inc., 151 F.Supp.3d 1268, 1274 (M.D. Fla. 2015) ("At the motion to dismiss stage, a court must evaluate all plausible inferences derived from the facts of the complaint in favor of the plaintiff.").

than that of serving his employer." *Id.* at 498. The Fifth Circuit further reasoned that the availability of double damages and penalties was so punitive that the usual rules of imputed liability in a civil case did not apply. *See, id.* at 499-500.

Since *Ridglea* was decided, however, two developments call its holding into question.  First, in 1982, the Supreme Court decided *American Society of Mechanical Engineers v. Hydrolevel Corp.,* 456 U.S. 556 (1982), and held that an employee's actions could be imputed to a corporate employer for purposes of an antitrust statute imposing treble damages, even where the employee was not acting for the benefit of the corporate employer. *See id.* at 574-76. In that case, the Supreme Court reasoned that because antitrust treble damages are designed not only to punish, but to compensate victims and deter other violations, "it is in accord with both the purpose of the [ ] law[ ] and principles of agency law" to impute liability. *Id*. at 576-77. The Court held that "a principal is liable for an agent's fraud though the agent acted solely to benefit himself, if the agent acts with apparent authority." *Id.* at 566. In fact, the Court in *Hydrolevel* identified *Ridglea* as precedent supporting the unsuccessful argument made by the defendant in *Hydrolevel*, and noted that in contrast to cases such as *Ridglea*, "[a] majority of courts . . . have held corporations liable for punitive damages imposed because of the acts of their agents, in the absence of approval or ratification." *Id.* at 575 and n.14.

The second development occurred in 1986, when Congress amended the FCA to define a "knowing" violation to mean actual knowledge, deliberate ignorance or reckless disregard of the truth, and clarify that "no proof of specific intent to defraud" is required. *See* Pub. L. 99-562, § 2, Oct. 27, 1986, 100 Stat. 3153.  Because of this amendment to the FCA's knowledge definition, the *Ridglea* standard was rejected in *U.S. ex rel. McCready*

13

*v. Columbia/HCA Healthcare Corp.*, 251 F.Supp.2d 114, 118 n.2 (D.D.C. Mar. 7, 2003) ("This amendment decreased the level of scienter required for violation of the FCA and obviated the concerns about attributing the heightened level of intent of an employee to an employer that had prompted the *Ridglea* decision."). *McCready* held instead that "a corporation is liable under the FCA for the fraudulent acts of its agents even if the corporation received no benefit from its fraud." *Id.* at 118. Similarly, in *U.S. v. O'Connell*, 890 F.2d 563 (1st Cir. 1989), the First Circuit applied *Hydrolevel* to the post-1986 FCA, and held that a corporation could be held liable without proving that the employee's actions benefitted the corporation. *See id.* at 567-69. *O'Connell* found *Ridglea* unpersuasive in light of *Hydrolevel*. *See id.* at 568-69.

Although the Fifth Circuit has not rejected the ongoing application of the *Ridglea* standard in light of *Hydrolevel* or the FCA's 1986 amendments, the Fifth Circuit and some district courts within it have questioned its continuing validity. *See, e.g., U.S. ex rel. Bias v. Tangipahoa Parish School Bd.,* 816 F.3d 315, 327 n. 8 (5th Cir. 2016)*; United States ex rel. Vavra v. Kellogg Brown & Root, Inc.,* 727 F.3d 343, 349-352 (5th Cir.2013); CoU.S. v. Conway Tec Corporation*, 1996 WL 41842, *2, n.2 (S.D. TX Jan. 23, 1996); *U.S. ex rel. Roberts v. Aging Care Home Health, Inc.*, 2007 WL 4522465, *3, n.2 (W.D. LA Dec. 18, 2007).

Even if *Ridglea* and *Grand Union* supply the standard for imputing FCA liability, Relator's Amended Complaint alleges that the SDIs had knowledge within the scope of their agency to provide inspection services at their location; it does not allege that the SDIs engaged in the type of self-interested behavior for which the court faulted the agent

14

in *Ridglea, i.e.*, acting "to line his own pockets*." Ridglea State Bank*, at 498.  The relator's allegations must be accepted as true for purpose of this motion to dismiss.

EB and NNS warn that the imputation of an agent's knowledge to a principal under the FCA might expand the scope of the statute to an unacceptable extent.  EB argues that ". . . neither the Eleventh Circuit nor any other court has adopted Relator's unbounded theory and attributed to a contractor the knowledge of its subcontractors." Similarly, NNS argues that "[t]o hold an entity liable for fraud based on what another entity knew would read the scienter requirement out of the FCA, essentially turning it into a strict liability statute."  Defendants' warnings are inapplicable here.  Relator is alleging the imputation of the knowledge of Defendants' *agents*, not merely Defendants' subcontractors or suppliers; indeed their status as subcontractors or suppliers is entirely irrelevant or incidental to the imputation argument.  The SDIs defendants appointed as their agents, under their respective SDIPs, *see* Relator's Amended Complaint Paragraph 152, became defendants' "eyes and ears" for inspections at the suppliers' facilities and the defendants cannot escape this result simply because those eyes and ears also happened to be employees of the defendants' subcontractors or suppliers.

Dated:  May 15, 2020					Respectfully submitted,

						JOSEPH H. HUNT
						Assistant Attorney General

						MARIA CHAPA LOPEZ
						United States Attorney

						*/s Charles T. Harden III*
						CHARLES T. HARDEN III
						Assistant United States Attorney
						Florida Bar No: 97934
						400 North Tampa Street, Suite 3200
						Tampa, FL 33602

Telephone: (813) 274-6096
Fax: 813-274-6198
Email: charles.harden@usdoj.gov

ANDY J. MAO
MICHAL TINGLE
ALAN S. GALE
ARNOLD M. AUERHAN
Attorneys, Civil Division
Commercial Litigation Branch
U.S. Department of Justice
Post Office Box 261
Washington, D.C. 20044
(202) 307-0278
Attorneys for the United States

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that this day I filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

*/s Charles T. Harden III*
CHARLES T. HARDEN III
Assistant United States Attorney