**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* 84Partners LLC,  Plaintiff and Relator,  v.  GENERAL DYNAMICS ELECTRIC BOAT and HUNTINGTON INGALLS INDUSTRIES, NEWPORT NEWS SHIPBUILDING DIVISION  Defendants. | 3:14-CV-1256-J-32-PDB  Hon. Timothy J. Corrigan |

**DEFENDANT HUNTINGTON INGALLS INDUSTRIES,
NEWPORT NEWS SHIPBUILDING DIVISION'S REPLY
<u>MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS</u>**

Michael C. Marsh
Donnie M. King
AKERMAN LLP
Three Brickell City Centre
98 Southeast Seventh Street, Suite 1100
Miami, FL 33131
(305) 374-5600
<u>michael.marsh@akerman.com</u>

Michael L. Waldman (admitted *pro hac vice*)
Lee Turner Friedman (admitted *pro hac vice*)
John B. Goerlich (*pro hac vice* motion to be filed)
Carolyn M. Forstein (*pro hac vice* motion to be filed)
ROBBINS, RUSSELL, ENGLERT,
 ORSECK, UNTEREINER & SAUBER LLP
2000 K Street N.W., Fourth Floor
Washington, DC 20006
(202) 775-4500
<u>mwaldman@robbinsrussell.com</u>

*Counsel for Defendant Huntington Ingalls
Industries, Newport News Shipbuilding Division*

**PRELIMINARY STATEMENT**

Relator 84Partners LLC's opposition brief [ECF # 73, "Opp."] suffers from the same flaw as its Complaint: It is full of sweeping, general accusations of fraud, but sorely lacking in specifics. Huntington Ingalls Industries, Newport News Shipbuilding Division ("NNS") argued in its opening brief [ECF # 61, "NNS Br."] that Relator's Complaint must be dismissed for two independent reasons: (1) failure to plead fraud with particularity as required by Rule 9(b); and (2) failure to plead facts to support a plausible inference that NNS "knowingly" submitted a false claim. Rather than confront NNS's arguments about its pleading deficiencies, Relator mostly ignores them, instead falling back on overheated rhetoric accusing NNS and General Dynamics Electric Boat ("EB") of shirking their responsibilities in delivering submarines and aircraft carriers to the Navy. At bottom, and as is evident from the many NNS arguments that are never addressed by the opposition brief, Relator has no answer to the fatal pleading deficiencies identified by NNS.

First, Relator all but admits that it cannot allege particular facts showing the actual submission by NNS of false claims for payment. Instead, it asks the Court to let the Complaint proceed to discovery based on its "indicia of reliability." But this approach to satisfying Rule 9(b) is reserved for corporate insiders with firsthand knowledge who can plead the details of the defendant's fraud. Relator is a corporate outsider, a corporate entity whose only identified members, the Skobics, are former employees of a vendor (Nuflo) who principally know about welding practices at that vendor. Relator's involvement in an alleged fraud perpetuated *by Nuflo* and *against NNS and the Navy* cannot as a matter of law be bootstrapped into a "reliable basis" for Relator's claim that *NNS* knowingly submitted false claims for payment to the United States.

Nor can Relator wish away Rule 9(b)'s mandate that Relator plead with specificity the other details of the alleged fraudulent scheme. Relator's opposition is notably silent as to which

1

particular nonconforming parts (among the "more than 225,000 pipe fitting for use by the Navy" manufactured by Nuflo, Amended Complaint ("AC") ¶ 35) were allegedly delivered to the Government. Relator also never addresses the fact that the Complaint "leaves open the possibility that any fraudulent repairs were remedied," *U.S. ex rel. Grant v. United Airlines, Inc.*, 912 F.3d 190, 198 (4th Cir. 2018)—a possibility Relator itself highlights by offering numerous examples of NNS catching and correcting non-conforming parts. AC ¶¶ 160, 166, 168, 170, 173, 174. Relator's opposition also fails to describe what NNS's wrongful conduct actually was, other than Relator's subjective belief that NNS's quality assurance system did not do "enough."

Second, Relator simply cannot plausibly plead wrongful knowledge on the part of NNS. It cannot identify any NNS employee with actual knowledge of Nuflo's wrongful conduct. It does not even attempt to explain how NNS could have been "reckless" or "deliberately ignorant" when its own Complaint shows numerous instances of NNS identifying problems and rejecting and correcting fittings from Nuflo. And it skips over its own allegation that Nuflo engaged in an elaborate scheme to evade detection by NNS's quality system. Finally, Relator's attempt to overcome NNS's lack of knowledge by imputing certain Nuflo employees' knowledge to NNS through a farfetched agency theory runs directly counter to binding Eleventh Circuit precedent.

The Complaint should be dismissed.

## ARGUMENT

### I.   Relator's Failure To Plead Fraud With Particularity

### A.   Relator Fails To Plead Presentment Of A False Claim

To survive a motion to dismiss, an FCA complaint must plead with particularity that the defendant presented a false claim to the Government. NNS Br. 7-11; *U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002). In its opening brief, NNS showed

2

through a series of questions that the Complaint fails to clear this hurdle, omitting the critical who, what, where, when, and how of any alleged fraudulent submission by NNS. NNS Br. at 9. Rather than point to specific factual allegations that would satisfy the particularity requirements of Rule 9(b), Relator's opposition instead mocks NNS for its "laundry list" of questions asking for the specifics about the alleged false claims—and, tellingly, chooses not to answer them. Opp. 28. Yet NNS did not concoct these questions: The need to set forth the who, what, where, when, and how of the false claims submitted to the United States is established by a vast body of Eleventh Circuit caselaw cited in NNS's brief. NNS Br. 9 (collecting cases); *see also U.S. ex rel. Gallo v. Thor Guard, Inc.*, 2020 WL 1248975, at *5-6 (M.D. Fla. Mar. 16, 2020) (Corrigan, J.) (relators satisfied Rule 9(b) by attaching sample invoices that showed the who, what, when, where, and how of the alleged fraud). *Relator ignores every single one of those cases*.[1] By failing to address these questions, or the myriad cases dismissing FCA complaints for failure to adequately plead a false claim, Relator essentially concedes that it does not (and cannot) plead with particularity the actual submission of false claims by NNS.[2]

---

[1] Relator's opposition brief does not even acknowledge, let alone attempt to distinguish, the following cases cited by NNS in which the Eleventh Circuit and various district courts dismissed FCA actions that, like Relator's Complaint, failed to allege with particularity the presentment of a false claim: *U.S. ex rel. Chase v. HPC Healthcare, Inc.*, 723 F. App'x 783, 790 (11th Cir. 2018); *Carrel v. AIDS Healthcare Found.*, 898 F.3d 1267, 1275 (11th Cir. 2018); *U.S. ex rel. Sanchez v. Lymphatx, Inc*., 596 F.3d 1300, 1302-03 (11th Cir. 2010); *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006); *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005); *Carlisle v. Daewon Kangup Co.*, 2018 WL 3199148, at *5 (M.D. Ala. Mar. 29, 2018), *adopted*, 2018 WL 2336757 (M.D. Ala. May 23, 2018); *U.S. ex rel. Butler v. Magellan Health Servs., Inc.,* 101 F. Supp. 2d 1365, 1368 (M.D. Fla. 2000).

[2] Relator proclaims that it "pled the specific contracts at issue, the specific certifications that are made throughout the life of the contract, and the dates on which the contracts were executed between Defendant NNS and the United States, how the certifications were submitted to the United States, and critically, how the statements were rendered false by NNS's knowing failure to comply with its obligations." Opp. 28. However, as is typical for the opposition brief, *Relator provides no citations—none—to support this broad assertion.* The existence of a contract or what date it was executed tells us nothing about the supposed fraud. And contrary to Relator's claim, *nowhere* in the Complaint (or opposition brief) does Relator ever allege what were the specific certifications submitted by NNS, what these certifications said, when these

3

Instead, Relator insists that it can satisfy Rule 9(b) through the "alternative means" of demonstrating "indicia of reliability" from which to infer presentment of a false claim. Opp. 29-31. Relator argues that this constitutes a "flexible 9(b) standard" for pleading fraud, but the cases that it cites demonstrate the opposite. In *every case Relator cites*, the relator either *did* allege an actual false claim,[3] or provided *detailed firsthand knowledge as a corporate insider* of the defendant's alleged FCA violation. *See U.S. ex rel. Grubbs v. Kanneganti,* 565 F.3d 180, 192 (5th Cir. 2009) (relator was employee of defendant who described his "first-hand experience of the scheme," and alleged "specific dates" of false claims); *U.S. ex rel. Troncoso v. Rego Int'l, LLC*, 2018 WL 2220430, at *2, *3 (S.D. Fla. May 15, 2018) (relator was "an insider with firsthand knowledge of violations" with knowledge of billing practices); *U.S. ex rel. Willis v. Angels of Hope Hospice, Inc.*, 2014 WL 684657, at *1 n.3, *8 (M.D. Ga. Feb. 21, 2014) (insider relator recorded conversations with management describing the false billing); *see also U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 703, 708-10 (11th Cir. 2014) (a relator needs "direct, first-hand knowledge of the defendants' submission of false claims gained through her employment"; "corporate outsider[s]" and relators "without first-hand knowledge of the defendants' billing practices" are "unlikely to have a sufficient basis" for alleging submission of false claims). For example, in Relator's chief case, *U.S. ex rel. Lockhart v. Gen. Dynamics Corp.*, 529 F. Supp. 2d

---

certifications were submitted, how they were false, or any information about the alleged false claims. Those omissions are fatal to Relator's claims, both under Rule 9(b) and the *Iqbal/Twombly* pleading standard.

[3] *See U.S. ex rel. Matheny v. Medco Health Sols., Inc.,* 671 F.3d 1217, 1225-26 (11th Cir. 2012) (Relators alleged "which documents [and] exactly which sentence and its substance [were false], . . . who was responsible . . . when the Certification was submitted . . . and what the Defendants gained as a result," and *also* were corporate insiders with personal knowledge of alleged fraud); *United States v. Crumb*, 2016 WL 4480690, at *20 (S.D. Ala. Aug. 24, 2016) (Government alleged that defendants made false diagnoses on Form CMS-1500s submitted to Medicare, Medicaid and TRICARE, and attached to complaint "nearly 300 pages of . . . spreadsheets with detailed claims data . . . contain[ing] names and medical information for patients as to whom defendants purportedly made false claims for reimbursement").

4

1335 (N.D. Fla. 2007) (Opp. 30-31), the court concluded that the complaint contained a reliable basis for its FCA allegations against the defendant because the relator himself participated in *the defendant's* fraudulent conduct by failing to perform required inspections. *Id.* at 1336.

Here, Relator 84Partners has no firsthand knowledge of any conduct *by NNS*. Its member, Mickey Skobic, was a Nuflo employee who allegedly kept records of the welds he performed there. AC ¶¶ 13, 115. As is evident from the Complaint, Mr. Skobic knows only about the manufacturing of Nuflo fittings and knows nothing about NNS's quality systems or its processes for building submarines and aircraft carriers. In particular, the Complaint contains no information whatsoever about what claims or certifications NNS submits to the United States. Relator contends that Skobic's personal knowledge of *Nuflo's* alleged fraud provides a reliable basis for inferring that *NNS* submitted false claims, but we are aware of no case holding that a corporate outsider's complaint can satisfy Rule 9(b) with only bare conclusory assertions that a defendant must have submitted a false claim and with no specific facts relating to presentment to the United States. This Court should not be the first.

Lacking a corporate insider who can provide specific facts from which presentment can be inferred, Relator is left to insist—without citing to its Complaint—that its allegations leave "no room for an alternative conclusion," other than that NNS "repeatedly certified to the United States . . . that [it] would construct the nuclear submarines using the mandated quality assurance systems." Opp. 33. Relator also asks the Court to assume—again without citing to the Complaint—that NNS could not possibly have delivered ships without billing the Navy for nonconforming parts, or without making that "mandated certification." *Id.* But Eleventh Circuit law could not be clearer: "speculation is insufficient to satisfy . . . Rule 9(b)." *Britton ex rel. U.S. v. Lincare, Inc.*, 634 F. App'x 238, 241 (11th Cir. 2015). "[A] False Claims Act plaintiff may not describe an improper

5

scheme in detail and assume that a claim for payment must have been or likely was submitted based on the scheme." *U.S. ex rel. Pelletier v. Liberty Ambulance Serv., Inc.*, 2016 WL 81355, at *3 (M.D. Fla. Jan. 7, 2016) (Corrigan, J.). That is precisely what Relator seeks to do here.

Such speculation is especially inappropriate in this case. NNS submitted billions of dollars of invoices to the Navy over the 2005-2015 time period on a variety of different submarines and aircraft carriers. As a Nuflo employee, Relator has no idea whether NNS placed any nonconforming parts on a Government ship, let alone which parts, when were they placed on the ship, and which invoices and certifications were associated with any particular nonconforming part. Moreover, the Complaint "leaves open the possibility that any fraudulent repairs were remedied prior to government payment." *Grant*, 912 F.3d at 198. Without the direct detail that a corporate insider can provide, the Complaint lacks the "indicia of reliability" necessary to plead with particularity a False Claims Act violation. *Clausen*, 290 F.3d at 1313 n.24.

### B. Relator Fails To Plead A Fraudulent Scheme Resulting In A False Claim

Relator also is silent in response to NNS's arguments concerning the Complaint's failure to plead the underlying fraudulent scheme with particularity. For example, NNS argued that the Complaint fails to identify with specificity the nonconforming Nuflo parts that NNS supposedly accepted and placed on its ships. NNS Br. 11. NNS pointed out that the Complaint provides only the vaguest of generalities concerning four of the five "categories of failures" alleged in the Complaint—it identifies no specific parts, purchase orders, contracts, or invoices, or even dates that improper work allegedly was performed. *Id.* at 12. Relator does not respond, never even attempting to point to or supply the missing particulars. As for unauthorized welds, the only category actually discussed in the Complaint, NNS highlighted that the Complaint fails to disentangle Mr. Skobic's unauthorized welds from his authorized ones, and fails to identify which

6

(if any) unauthorized welds were actually made to parts delivered to, accepted by, and installed by NNS, and billed to the Navy. *Id.* at 12-13.[4] Relator again offers no response regarding the supposed unauthorized welds, implicitly conceding that it is unable to point to allegations that identify any specific nonconforming parts that were delivered by Nuflo to NNS and subsequently installed on Navy ships.

As NNS previously noted, the entire 79-page Complaint provides only *four* specific instances of welding that Mr. Skobic allegedly performed on NNS parts, and, for *three of the four*, NNS cannot even discern from the facts alleged that it received those parts (let alone whether the welds were unauthorized or whether the Navy was billed for the parts)—failing utterly to put NNS on notice of the claims against it. NNS Br. 13.[5] Relator again does not dispute this, but instead responds only with a 'gotchya,' claiming that its Complaint satisfies Rule 9(b) because NNS was able to identify *a single part* that Relator alleges was nonconforming. Opp. 2. Of course, even if Relator's allegations as to this single part were sufficient, they could not form the basis of a massive FCA suit. But Relator's allegations are lacking even as to this part: The Complaint does not allege that this part was installed by NNS on a ship, that it was still nonconforming when it

---

[4] To be sure, Relator tries once more to lump the Defendants together by arguing that Nuflo parts made their way onto three submarines "delivered by Defendants" to the Navy, without grappling with caselaw that holds that a relator cannot satisfy Rule 9(b) by "lump[ing] together all defendants, failing to allege the conduct of each defendant." *U.S. ex rel. Isabell v. Kindred Healthcare*, 2019 WL 4345782, at *3 (M.D. Fla. Sept. 12, 2019). Because of the impermissible group pleading, there is no way for NNS to know if Relator is alleging NNS had a role in how the nonconforming parts supposedly ended up on the three submarines. And Relator does not allege installation of a defective part on an aircraft carrier, and so any claims concerning NNS's construction of those ships should be deemed forfeited as well.

[5] For these three instances, Relator provides no NNS purchase order number, no delivery date, no acceptance date, and no NNS employee who received the parts; the Complaint only mentions the Nuflo or SFS internal job numbers, which do not allow NNS to know which parts are being referenced.

7

was installed, or that NNS ever billed the Navy for the part. Relator says it "stands by all of its factual allegations" about this part, *id*. at 2 n.2, but those allegations are woefully insufficient.

Relatedly, Relator also *ignores entirely* NNS's argument that the Complaint must be dismissed because a "complaint that 'leaves open the possibility that any fraudulent repairs were remedied prior to government payment' does not state a claim for violation of the FCA." NNS Br. 14 (quoting *Grant*, 912 F.3d at 198). Relator does not (and cannot) escape that its own Complaint details repeated occasions where NNS *caught* nonconforming parts and made sure the problem was remedied, *see* NNS Br. 14, 21, yet Relator makes no attempt to explain why the possibility that any improperly welded parts supplied by Nuflo were similarly caught and remedied is not fatal to the Complaint. *Id.* at 14 (describing the various steps in the manufacturing, inspection and installation processes where welded parts could have been repaired, rejected, or even delivered to customers other than NNS).

Finally, NNS argued that the Complaint fails to show that any claim or certification to the Navy was false as a result of NNS's alleged actions. NNS Br. 15. Relator responds by insisting on several occasions that "false claims actually did result from Defendants' conduct." Opp. 33; *see also id.* at 27, 31. But Relator cites *no* specific factual allegation in its Complaint to support this assertion, despite having the benefit of access to all of the information from the Government's five-year investigation. Even assuming the truth of Mr. Skobic's allegations of unauthorized welding at Nuflo, Relator has not alleged that any false invoice or certification was submitted by NNS to the Navy "as a result of" the welding. *Clausen*, 290 F.3d at 1311.[6] That compels dismissal of Relator's FCA claims.

---

[6] Relator claims that Mr. Skobic engaged in almost 4,000 weld repairs between 2006 and 2013. AC ¶ 207. But it acknowledges that "Nuflo received approval for one weld procedure," *id.* ¶ 103, and that other welds

8

### C. Relator Fails To Plead Wrongful Conduct By NNS

Relator's pattern of sidestepping NNS's arguments continues with its failure to meaningfully engage with NNS's argument that the Complaint fails to plead with particularity any wrongful conduct by NNS. NNS Br. 16-19. NNS highlighted that the Complaint never specifically articulates what NNS should have done differently, relying instead on vague and amorphous criticisms that Defendants did not do "enough" to detect Nuflo's fraud. *Id.* at 16. How does Relator respond? By arguing—without citing the Complaint, a governing regulation, a specific contractual requirement, or any other applicable authority—that Defendants were "paid a premium to do *all that was necessary* to make sure the Navy received conforming vessels." Opp. 16 (emphasis added). That is exactly the kind of amorphous 'should have done more' theory of liability that cannot sustain an FCA claim. NNS Br. 17.

Relator claims that the "the shipbuilders did not have to guess at ways to measure conformity with respect to defectively-welded parts," citing MIL-Q-9858A and ISO 9001. Opp. 17 (citing AC ¶ 63). Paragraph 63 of the Complaint alleges that MIL-Q-9858A required NNS to "establish and maintain an effective and positive system for controlling nonconforming material." AC ¶ 63. Any claim by Relator that NNS did not maintain an "effective and positive system" "rests not on an objective falsehood, as required by the FCA, but rather on Relators' subjective interpretation of [NNS's] contractual duties." *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376-77 (4th Cir. 2008) (affirming dismissal of an FCA case because the

---

could be made with "written authorization," *id.* ¶ 70. Moreover, Nuflo had substantial contracts to provide fittings to the Navy and EB, with Nuflo having 591 direct contracts with the Government. *Id.* ¶ 35. Relator also does not dispute that Nuflo had a thriving commercial business. Relator makes no attempt to specify what subset of these 4,000 weld repairs were (1) unauthorized repairs and (2) on parts delivered to NNS.

9

question whether maintenance was "sufficient" was not objectively falsifiable); *see U.S. v. Southland Mgmt. Corp.*, 326 F.3d 669, 675 (5th Cir. 2003) ("'[d]ecent, safe, and sanitary' … is not precise or measurable," and therefore cannot serve as basis for FCA liability).[7]

Relator's opposition insists that NNS "did not make even basic inquiries" or take "minimal steps" to prevent nonconformances, citing paragraphs 170 and 174 of the Amended Complaint. Opp. 18. But the cited paragraphs prove the opposite, with each alleging that NNS identified nonconforming parts and required Nuflo to fix them. These paragraphs then go on to complain that "NNS did not take any additional steps or corrective actions," without reference to any contractual or other requirements. AC ¶ 170, 174. As a matter of law, Relator cannot sustain an FCA action based on its own opinion that NNS's remedial steps did not suffice. *Wilson*, 525 F.3d at 376-77.

Relator also now claims that the "[m]ost egregious[]" example of NNS's wrongful conduct was when it "independently decided" that a "nonconforming elbow fitting from Nuflo" "could be used for its intended application." Opp. 18 (citing AC ¶ 176). Tellingly, Relator did not think this "egregious" act warranted extra attention or factual support when drafting the Complaint, where it simply is listed as one of many purported warning signs. Construing the Complaint broadly, it alleges only—without any support whatsoever—that NNS (through its quality management process) identified a fitting that did not meet the requirements set forth in the Purchase Order placed with Nuflo and that NNS independently determined that the elbow could be used for its

---

[7] The other 'standards' Relator proposes in its Complaint—*e.g.*, "adequate oversight," "effective audit and inspection," "appropriate quality control," and "heightened scrutiny," (AC ¶¶ 134, 139, 157, 166, 168, 169, 270)—are likewise too imprecise and subjective to constitute the "objective falsehood" necessary to trigger FCA liability. *See U.S. v. AseraCare, Inc.*, 938 F.3d 1278, 1296-97 (11th Cir. 2019); *U.S. ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 959 (10th Cir. 2008).

10

intended purpose. The Complaint does not allege (nor could it) that NNS lacked the authority under its contract with the Navy to make this engineering determination. Nor does the Complaint allege that NNS engineers erred in concluding that the fitting could be used in its intended application in accordance with the contract.[8] But now in its opposition brief—for reasons that are never explained, much less supported by specific facts in the Complaint—Relator (for the first time) insists that NNS should not have accepted and used this fitting. Such bald conclusory allegations do not satisfy Rule 8 after *Twombly* and *Iqbal*, let alone meet the heightened pleading standard of Rule 9(b).

Relator also continues to attack NNS's Supplier Delegated Inspection ("SDI") program. But, as NNS pointed out in its opening brief, the Complaint does not identify *any* non-conforming part that escaped detection and was installed on a ship because it was inspected through the SDI program. NNS Br. 18. Relator's opposition again offers no response, making no attempt to link the SDI program to the alleged fraud committed by Nuflo or any specific nonconforming part billed to the Navy. But that fatal lack of detail does not stop Relator from filling its opposition brief with rhetoric about the "fox in charge of the nuclear henhouse," Opp. 4, or "NNS abdicat[ing] their strict quality control responsibilities," *id.* at 25. Relator can complain all day long about the features of NNS's supplier quality program that it would change or ameliorate, but without alleging

---

[8] Relator ignores that the fitting at issue *met* the contractual requirements for installation on the ship. A part may comply with the contractual design requirements for ship construction (as this one did) even if it does not meet requirements placed on the vendor supplying the part, as the procurement specifications often leave an additional design margin. Under procedures approved by the Navy, NNS is authorized to determine whether a part complies with the ship's technical design requirements, even if it does not meet the procurement specifications. This is a common shipbuilding practice, and consistent with that practice, NNS fully documented the determination of its engineers to install the Nuflo part. These records were a part of the Government's investigation of this matter (before it elected not to intervene), and in that regard were likely made available to Relator and its counsel.

11

that those features actually caused the submission of a false claims, such criticisms are irrelevant to whether the Complaint properly pleads an FCA violation.[9]

## II. Relator's Failure To Plead NNS's "Knowing" Submission Of A False Claim

### A. Relator Fails To Plead NNS Acted With Actual Knowledge, Deliberate Ignorance Or Reckless Disregard

As NNS pointed out in its opening brief, the Complaint—which mentions no NNS employees by name and identifies no one at NNS with actual knowledge of Nuflo's supposed scheme to defraud NNS, EB, and the Navy—does not allege facts that would support a finding of "actual knowledge." NNS Br. 20. Yet, Relator now insists in its opposition brief that NNS *did* have "actual knowledge" that it submitted false claims, relying once more on a single allegation—now apparently the hallmark of its case against NNS—that NNS independently determined that it could install a single nonconforming Nuflo part on a Navy ship. Opp. 21 (citing AC ¶ 176). But as noted earlier, there is no allegation in the Complaint that NNS was prohibited (let alone *knew* it was prohibited) from making independent engineering decisions concerning the disposition of this Nuflo part; in fact, NNS was expressly authorized by the contract to make engineering determinations of this type. Nor does the Complaint allege that NNS's engineering determination to accept the part for its intended application—which was documented and available for review by the Navy or design yard—was incorrect. While attacking NNS for "intentional deceit of a known defect" in approving this part, Relator provides no facts that would indicate that there was anything wrong with NNS's engineering determination to accept this Nuflo part as is.[10] And, in any event,

---

[9] Relator's criticisms of the SDI program also stand in contrast to the Navy (the actual government customer), which has audited and approved the continued use of the program.

[10] The Complaint's entire discussion of the disposition of this Nuflo part consists of a single sentence: "NNS independently determined that the elbow could be used for its intended application, so placed it on a submarine even though it was below the required standards." AC ¶ 176.

the acceptance of this single Nuflo fitting surely does not support an inference that NNS knew that Nuflo was engaged in a decade-long fraud, which is what Relator asks this Court to hold.[11]

Turning to the "reckless disregard" standard of FCA liability, Relator maintains that it has pled the 'ostrich with its head in the sand' situation and that this case is analogous to *U.S. ex rel. Ervin & Assocs., Inc. v. Hamilton Sec. Grp. ("Ervin II")*, 370 F. Supp. 2d 18 (D.D.C. 2005). Opp. 23. In *Ervin II*, however, several "key employees" of the defendant knew the company had used an optimization model in connection with a sale of property to HUD that did not meet HUD's specifications, but those employees failed to take any steps to ensure correction of the problem prior to the next property sale. *Id.* at 42. The defendant was even required to generate a post-sale report specifically to identify "lessons learned," but the report failed to mention the need to modify the optimization model, which the court held constituted "gross negligence plus." *Id.* at 43.

Here, the Complaint itself describes attempts by NNS to *identify, investigate, and remedy* nonconforming parts delivered by Nuflo (NNS Br. 21)—a far cry from *Ervin II*. Relator accuses NNS of trying to inappropriately "recast" the Complaint's factual allegations as showing NNS actively catching and correcting nonconforming parts (Opp. 18), but NNS has simply described those alleged facts *without* Relator's opinions as to what NNS should have done differently. "[C]ourts may infer from the factual allegations in the complaint obvious alternative explanation[s], which suggest lawful conduct rather than the unlawful conduct that plaintiff would ask the court to infer." *Kivisto v. Miller, Canfield, Paddock & Stone, PLC,* 413 F. App'x 136, 138

---

[11] Relator also alleges that "NNS had enough knowledge that Nuflo was manufacturing nonconforming parts to suspend Nuflo from the SDIP program - but continued [to] acquire the same products through virtually the same process by simply transferring the purchase orders to Nuflo sibling, SFS, Inc." Opp. 21. Yet, the Complaint never explains why there was anything wrong with NNS having different individuals at a different location employed by a different company with a different ownership and management structure perform SDI inspections. Moreover, NNS purchased thousands of fittings directly from Nuflo (not through SFS) that would have been subject to NNS's regular inspection program. NNS Br. 19.

(11th Cir. 2011) (internal quotation marks omitted).  Here, the factual allegations (which are what the Court takes as true, not Relator's inferences or opinions about them) indisputably describe an operational quality system, with NNS diligently overseeing its supplier Nuflo. NNS. Br. 21.  Even if, as Relator claims, a trier of fact were to ultimately determine that the steps taken by NNS were not sufficient, Relator comes nowhere close to alleging the "gross negligence plus" that gives rise to FCA liability under a theory of "reckless disregard."  *See id.* at 21, 23.[12]

### B. Relator Cannot Establish Scienter Through Its Far-Fetched Agency Theory

Because Relator cannot allege facts from which this Court could reasonable infer that NNS acted with actual knowledge or reckless disregard, it asks this Court to take the unprecedented step of imputing the knowledge of certain employees of NNS's subcontractor to NNS.  AC ¶ 150.  NNS explained that Eleventh Circuit precedent does not support such a theory absent a showing that the subcontractor employees acted with an intent to benefit NNS.  NNS Br. 23-25.  In response, Relator and the Government both ask this Court to ignore that precedent.  Opp. 25-27; U.S. Statement of Interest, ECF# 72 ("Gov't Statement") at 12-15.  Whether Relator and the Government like it or not, *U.S. v. Ridglea State Bank*, 357 F.2d 495, 500 (5th Cir. 1966), and *Grand Union Co. v. U.S.*, 696 F.2d 888, 891 (11th Cir. 1983), remain binding precedent in this Circuit.  Indeed, the Government concedes that neither the Fifth nor Eleventh Circuit has overruled either case.  Gov't Statement at 14.  "[C]ircuit precedent can only be overruled by a Supreme Court decision that is

---

[12] Relator's reliance on *Crumb* is even farther afield. Opp. 23. There, a physician and his employer were charged with submitting false claims for payment to Medicare. The *Crumb* complaint alleged that the defendant employer violated its own written compliance policy; failed to train and educate billing personnel; refused to institute policies to receive updates from agencies regarding billing guidelines; ignored updates from Alabama Medicaid concerning the proper use of the very billing modifiers at issue; and ignored warnings from private payers about its billing practices. 2016 WL 4480690, at *28. By contrast, the Complaint here does not come close to alleging an actual false claim, much less that NNS was entirely derelict in its compliance policies, training, and implementation.

14

'clearly on point,'" *U.S. v. White*, 837 F.3d 1225, 1230 (11th Cir. 2016), and no such direct, clear rejection of *Ridglea* or *Grand Union* has occurred here.[13]

That leaves Relator and the Government with the wan suggestion that the Court should infer that the Nuflo personnel *defrauded* NNS in order to *benefit* it. *See* Gov't Statement at 12 n.3; Opp. at 29. The Amended Complaint makes no such allegation. To the contrary, the allegations in the Complaint describe Nuflo's extensive efforts to *hide* its fraud from NNS for the better part of a decade, refuting any inference that the fraud was taken with NNS's benefit in mind. This Court should therefore reject the Government and Relator's belated attempts to construct an outside-the-complaint argument that Nuflo's knowledge should be imputed to NNS.

## **CONCLUSION**

For the reasons set forth above and in NNS's opening brief, Relator's Amended Complaint (ECF No. 52) should be dismissed with prejudice.

Date: June 26, 2020
                                                    /s/ Michael C. Marsh
                                                    Michael C. Marsh
                                                    Donnie M. King
                                                    AKERMAN LLP
                                                    Three Brickell City Centre
                                                    98 Southeast Seventh Street, Suite 1100
                                                    Miami, FL 33131
                                                    (305) 374-5600
                                                    michael.marsh@akerman.com

                                                    /s/ Michael L. Waldman

---

[13] Relator asserts that "[m]ost courts" have taken a different approach but cites only *one* nonbinding case, *U.S. ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114 (D.D.C. 2003) (Opp. 27 n.18). And it ignores a case from this Circuit—*U.S. v. Hill*, 676 F. Supp. 1158 (N.D. Fla. 1987) (NNS Br. 25)—holding that *Ridglea* applies in cases involving statutes, like the FCA, with a "knowingly" scienter requirement. A single differing district court opinion from another jurisdiction hardly provides a basis for this Court to ignore binding precedent. Moreover, *Hill* is not the only case in this Circuit applying *Ridglea* and *Grand Union*. *See, e.g.*, *U.S. ex re. Silva v. VICI Mktg., LLC*, 361 F. Supp. 3d 1245, 1255-56 (S.D. Fla. 2019); *U.S. ex rel. Graves v. Plaza Med. Ctrs. Corp.*, 2015 WL 11199840, at *3 (S.D. Fla. July 6, 2015).

Michael L. Waldman (admitted *pro hac vice*)
Lee Turner Friedman (admitted *pro hac vice*)
John B. Goerlich (*pro hac vice* motion to be filed)
Carolyn M. Forstein (*pro hac vice* motion to be filed)
ROBBINS, RUSSELL, ENGLERT,
  ORSECK, UNTEREINER & SAUBER LLP
2000 K Street N.W., Fourth Floor
Washington, DC 20006
(202) 775-4500
mwaldman@robbinsrussell.com

*Counsel for Defendant Huntington Ingalls
Industries, Newport News Shipbuilding Division*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 26, 2020, the foregoing document is being served on all counsel of record or pro se parties either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                                                  By: _/s/  Michael L. Waldman_____
                                                  Michael L. Waldman